AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 5/14/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____ ASI ____ DEPUTY |

for the

Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 05/15/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____ IV ____ DEPUTY |

United States of America

v.

ARA ARTUNI,
DAVIT HAZRYAN,
VAHAGN STEPANYAN, AND
CHRISTIAN SEDANO,

       Defendant(s)

Case No.   2:25-mj-02952-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 7, 2023 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1959(a)(5) | Attempted Murder in Aid of Racketeering Activity |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

                */s/ Jerome S. Salvador*
                  *Complainant's signature*

         Jerome S. Salvador, HSI Special Agent
                *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 15, 2025

City and state:   Los Angeles, California

                  *Judge's signature*

      Honorable Patricia Donahue, U.S. Magistrate Judge
                *Printed name and title*

AUSAS: Lyndsi Allsop/Kenneth Carbajal

**TABLE OF CONTENTS**

I.    BACKGROUND OF AFFIANT................................1

II.   CRIMINAL COMPLAINTS AND ARREST WARRANTS..............3

III.  PERSONS AND PREMISES TO BE SEARCHED..................4

IV.   ITEMS TO BE SEIZED..................................8

V.    ARMENIAN ORGANIZED CRIME IN LOS ANGELES COUNTY.......18

VI.   SUMMARY OF THE INVESTIGATION AND PROBABLE CAUSE......22

VII.  THE AMIRYAN ORGANIZED CRIME GROUP...................23

VIII.     MEMBERS AND ASSOCIATES OF THE AMIRYAN ORGANIZED
          CRIME GROUP.....................................23

IX.   THE ARTUNI CRIMINAL ENTERPRISE......................27

      A.    The Artuni Enterprise.........................27

      B.    Purpose of the Artuni Enterprise..............28

      C.    The Means and Methods of the Artuni Enterprise..29

X.    MEMBERS AND ASSOCIATES OF THE ARTUNI ENTERPRISE......30

XI.   SUMMARY CHART OF RELEVANT INCIDENTS OF VIOLENCE
      COMMITTED BY THE AMIRYAN ORGANIZED CRIME GROUP AND THE
      ARTUNI ENTERPRISE...................................35

XII.  SUMMARY OF OTHER RACKETEERING ACTS COMMITTED BY THE
      ARTUNI ENTERPRISE...................................38

XIII.     STATEMENT OF PROBABLE CAUSE.....................38

      A.    July 21, 2020: Murder of A.S. and Attempted
            Murder of D.M. in Burbank.....................38

            1.    Probable Cause Summary..................38

            2.    Description of the Murder and Attempted
                  Murder..................................39

            3.    The Artuni Enterprise's Connection to A.S.'
                  Murder and D.M.'s Attempted Murder......42

      B.    October 25, 2022: Individuals Attempt to Murder
            STEPANIAN At His Former Residence in Granada
            Hills, California.............................54

1.    Probable Cause Summary.....................54

2.    Description of the Attempted Murder.......54

3.    The Artuni Enterprise's Connection to the
      Attempted Murder..........................55

C.    April 3, 2023: AMIRYAN Is Shot at While in the
      Garage of His Former Residence...................56

1.    Probable Cause Summary.....................56

2.    Description of the Attempted Murder.......56

3.    The Artuni Enterprise's Connection to the
      Attempted Murder..........................58

D.    June 6, 2023 to June 7, 2023: Members and
      Associates of the Amiryan Organized Crime Group
      Kidnap, Assault, and Torture A.K................58

1.    Probable Cause Summary.....................58

2.    Description of the Kidnapping, Assault, and
      Torture...................................59

3.    The Amiryan Organized Crime Group's
      Connection to A.K.'s Kidnapping, Assault,
      and Torture...............................70

4.    The Amiryan Organized Crime Group's
      Possession and Use of Unregistered Firearms
      .........................................86

5.    The Artuni Enterprise's Connection with A.K.
      .........................................86

E.    June 12, 2023: G.M. Is Shot as He Is Driving Home
      .............................................88

1.    Probable Cause Summary.....................88

2.    Description of the Attempted Murder.......88

3.    The Artuni Enterprise's Connection with the
      Attempted Murder..........................91

F.    July 7, 2023: AMIRYAN Is Shot While on the
      Balcony of His Former Residence.................96

1.    Probable Cause Summary.....................96

2.    Description of the Attempted Murders.......97

3.    The Artuni Enterprise's Connection with the
      Attempted Murder..........................99

G.    August 18, 2023: Individuals Shoot at V.
      HARUTYUNYAN's Former Residence.................107

      1.    Probable Cause Summary....................107

      2.    Description of the Shooting...............108

      3.    The Artuni Enterprise's Connection to the
            Shooting..................................109

H.    August 25, 2023: V. HARUTYUNYAN Is Shot While in
      the Backyard of His Residence.................111

      1.    Probable Cause Summary....................111

      2.    Description of the Attempted Murders......112

      3.    The Artuni Enterprise's Connection to the
            Attempted Murder..........................113

I.    November 9, 2023: H.H. Is Shot While Sitting in
      His Car at a Starbucks........................118

      1.    Probable Cause Summary....................118

      2.    Description of the Attempted Murder.......119

      3.    The Artuni Enterprise's Connection to the
            Attempted Murder..........................120

J.    December 12, 2023: Law Enforcement Seizes the
      Artuni Enterprise's Firearms, Ammunition, and
      Body Armor from a Storage Facility............124

K.    December 12, 2023: Law Enforcement Seized
      Firearms from the Residences of ARTUNI, HAZRYAN,
      A. A. KAZARYAN, and MANUKYAN..................128

      1.    Firearms, Ammunition, Body Armor, and a
            Large Sum of Cash Found at ARTUNI's
            Residence.................................128

      2.    Loaded Firearm Found at HAZRYAN's Residence
            .........................................128

      3.    Firearms, Ammunition, and Firearm Accessory
            Found at A. A. KAZARYAN's Residence.......129

      4.    Firearms and Ammunition Found at Felon and
            Addict MANUKYAN's Residence...............129

3

L.    April 2024: ARTUNI Flees from the United States and to Armenia, and then Dubai................131

M.    March 14, 2025 and March 28, 2025: AMIRYAN's Significant other (R.M.) and GZRARYAN are Both Shot in Seemingly Related Acts of Violence.....133

    1.    March 14, 2025: R.M. Is Shot While Parking Her Car at Her Apartment Building in Studio City.....................................133

    2.    March 28, 2025: GZRARYAN Is Shot While Sitting in a Car in Front of His Home.....135

N.    April 11, 2025: AGOPIAN, a Felon, Brandishes a Firearm at a Plainclothes Officer..............137

O.    Other Racketeering Activities Conducted by Members and Associates of the Artuni Enterprise ...........................................141

    1.    Relating to Wire and Financial Institution Fraud...................................141

    2.    Relating to the Theft of Interstate Shipment ........................................150

P.    Health Care Fraud............................180

Q.    2018 to 2023: "Tribute" Payments to ARTUNI.....183

R.    Felony Criminal Histories....................185

    1.    The Amiryan Organized Crime Group.........186

    2.    The Artuni Enterprise....................188

S.    Alienage.....................................193

    1.    The Amiryan Organized Crime Group.........193

    2.    The Artuni Enterpise....................194

T.    Interstate Nexus of Firearms and Ammunition....194

U.    Identification of the SUBJECT PREMISES and SUBJECT VEHICLES.............................195

    1.    AMIRYAN: SUBJECT PREMISES 1 and SUBJECT VEHICLE 1................................195

    2.    GZRARYAN: SUBJECT PREMISES 2 and SUBJECT VEHICLE 2................................196

4

3.    STEPANIAN: SUBJECT PREMISES 3 and SUBJECT
      VEHICLES 3, 4 and 5........................197

4.    EGUILUZ: SUBJECT PREMISES 4 and SUBJECT
      VEHICLE 6.................................198

5.    ARTUNI: SUBJECT PREMISES 5...............199

6.    AGOPIAN: SUBJECT PREMISES 6 and SUBJECT
      VEHICLE 7.................................200

7.    HAZRYAN: SUBJECT PREMISES 7 and SUBJECT
      VEHICLES 8, 9, and 10....................201

8.    STEPANYAN: SUBJECT PREMISES 8 and SUBJECT
      VEHICLE 11...............................202

9.    A. A. KAZARYAN: SUBJECT PREMISES 9........203

10.   BEZIK: SUBJECT PREMISES 10 and SUBJECT
      VEHICLE 12...............................204

11.   MANUKYAN: SUBJECT PREMISES 11 and SUBJECT
      VEHICLE 13...............................205

12.   SEDANO: SUBJECT PREMISES 12 and SUBJECT
      VEHICLE 14...............................206

XIV.  TRAINING AND EXPERIENCE REGARDING THEFT OF INTERSTATE
      OR FOREIGN SHIPMENTS..............................207

XV.   TRAINING AND EXPERIENCE REGARDING HEALTH CARE FRAUD.209

XVI.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES.......212

XVII.    TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES
         213

XVIII.   TRAINING AND EXPERIENCE ON HOMICIDE, KIDNAPPING,
         AND OTHER VIOLENT OFFENSES.........................215

XIX.  TRAINING AND EXPERIENCE REGARDING BANK FRAUD, WIRE
      FRUAD, IDENTITY THEFT, AND ACCESS DEVICE FRAUD......217

XX.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES.........219

XXI.  TIME OF EXECUTION OF WARRANTS.......................223

XXII.    CONCLUSION..................................223

## AFFIDAVIT

I, Jerome S. Salvador, being duly sworn, declare and state as follows:

## I.  BACKGROUND OF AFFIANT

1.    I am a Special Agent with the Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), in Los Angeles County, California, and I have been so employed since May 2022.  I am currently assigned to HSI Ventura, where I am responsible for investigating fraud schemes, marriage fraud and document benefit fraud, narcotics smuggling, money laundering, illegal gambling, firearms violations, immigration crimes, child exploitation, human trafficking, transnational organized crime, and various other violations of immigration and customs law.

2.    Prior to 2022, I was employed as a Federal Law Enforcement Officer, with the DHS, Enforcement and Removal Operations (ERO).  I began my employment as a Special Agent in May 2022.  Since becoming a Special Agent in May 2022, I received formal training at the Criminal Investigator Training Program and HSI Special Agent Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.  This training included classes concerning organized crime, drug crimes, money laundering, financial crimes, firearms crimes, and human trafficking.

3.    Through my training, experience, and consultation with other experienced agents and law enforcement officers, I have

knowledge of the operation methods used in narcotics smuggling, firearms trafficking, marriage fraud schemes, human trafficking, and financial crimes, specifically, illegal gambling, and money laundering. I am also familiar with how criminal organizations use digital devices and financial institutions to facilitate and conceal their crimes.

4. During my time at HSI, I have investigated crimes involving narcotics smuggling, firearms violations, illegal gambling, money laundering, and marriage fraud. I have participated in many aspects of criminal investigations, such as, but not limited to, reviewing evidence, the issuance of subpoenas, analyzing cellphone data and Global Positioning System (GPS) tracking records, conducting physical and electronic surveillance, and executing search and arrest warrants.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints, arrest warrants, and search warrants, and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. All amounts are approximate, and all dates and times are on or about those stated. Unless otherwise stated, all witness interviews were recorded.

## II. <u>CRIMINAL COMPLAINTS AND ARREST WARRANTS</u>

6.    This affidavit is made in support of six criminal complaints and six arrest warrants against the following individuals:

a.    Robert AMIRYAN, also known as ("aka") "Rubo Fish," aka "Rubo," aka "Rub," aka "Fish," and "Santoro," ("AMIRYAN"), Vahan HARUTYUNYAN, aka "V," ("V. HARUTYUNYAN"), Sevak GZRARYAN, aka "Seco," ("GZRARYAN"), Mikael STEPANIAN, aka "Mko," aka "Maik," ("STEPANIAN"), Artur HARUTYUNYAN, aka "Arthur," aka "Bull," ("A. HARUTYUNYAN"), Ivan BOJORQUEZ, aka "Stal," ("BOJORQUEZ"), and Renzo Francisco EGUILUZ, aka "Temper," aka "Temps," ("EGUILUZ") for a violation of 18 U.S.C. § 1201(a)(1): Kidnapping;

b.    Ara ARTUNI, aka "Ara Harutyunyan," aka "Aro," aka "Araboyi," aka "Arabo," aka "Santos," ("ARTUNI"), Davit HAZRYAN, aka "Davo," aka "Dav," aka "D," ("HAZRYAN"), Vahagn STEPANYAN, aka "Vee," aka "Vova Titov," aka "Juha Alver," aka "Vahan Stephanian," ("STEPANYAN"), and Christian SEDANO ("SEDANO") for a violation of 18 U.S.C. § 1959(a)(5): Attempted Murder in Aid of Racketeering Activity (on or about July 7, 2023);

c.    Alex AGOPIAN, aka "Alik," ("AGOPIAN") for a violation of 18 U.S.C. § 922(g): Felon in Possession of a Firearm (Kimber 1911, model Custom TLE II, .45 caliber, semi-automatic pistol bearing serial number K707215); Manuk MANUKYAN ("MANUKYAN") for a violation of 18 U.S.C. § 922(g): Felon in Possession of a Firearm (Ruger, model 10/22, .22 caliber rifle, bearing serial number 129-54711); and Levon ARAKELYAN

3

("ARAKELYAN") for a violation of 18 U.S.C. § 922(g): Felon in
Possession of a Firearm (Glock, model 29 Gen4, 10mm Auto
caliber, pistol bearing serial number BRRT964); and

        d.   Arvin Albert KAZARYAN, aka "Artur," aka "Art,"
("A. A. KAZARYAN") and Areg BEZIK, aka "Elvis Narek," formerly
known as ("fka") "Narek Bezikian," ("BEZIK") for a violation of
18 U.S.C. §§ 659, 371: Conspiracy to Commit Theft of Interstate
Shipments (NBA HOLDINGS, LLC).

### III. <u>PERSONS AND PREMISES TO BE SEARCHED</u>

    7.   This affidavit is made in support of applications for
warrants to search the following:

        a.   The person of AMIRYAN, as described more fully in
Attachment A-1;

        b.   6446 Deep Dell Place, Los Angeles, California
90068 ("SUBJECT PREMISES 1"), as described more fully in
Attachment A-2;

        c.   A 2017, black, Lexus SUV bearing California
license plate number 9LTT595 and Vehicle Identification Number
("VIN") JTJHY7AX4H4239861 ("SUBJECT VEHICLE 1"), as described
more fully in Attachment A-3;

        d.   The person of GZRARYAN, as described more fully
in Attachment A-4;

        e.   1103 North Maple Street, Burbank, California
91505 ("SUBJECT PREMISES 2"), as described more fully in
Attachment A-5;

f.    A 2014, gray, Honda Accord bearing California
license plate number 7WLR494 and VIN 1HGCR2F52EA104736 ("SUBJECT
VEHICLE 2"), as described more fully in Attachment A-6;

g.    The person of STEPANIAN, as described more fully
in Attachment A-7;

h.    4035 Ellenita Avenue, Tarzana, California 91356
("SUBJECT PREMISES 3"), as described more fully in Attachment A-
8;

i.    A 2024, black, GMC Hummer EV bearing California
license plate number 9NPY868 and VIN 1GKB0NDE1RU108181 ("SUBJECT
VEHICLE 3"), as described more fully in Attachment A-9;

j.    A 2025, blue, BMW iX bearing California license
plate number 9NXG011 and VIN WB523CF06SCS10124 ("SUBJECT VEHICLE
4"), as described more fully in Attachment A-10;

k.    A 2025, black, BMW sedan bearing California
license plate number 9SQY613 and VIN WBY23HD06SFU17405 ("SUBJECT
VEHICLE 5"), as described more fully in Attachment A-11;

l.    The person of EGUILUZ, as described more fully in
Attachment A-12;

m.    14709 Budlong Avenue, Apartment 305, Gardena,
California 90247 ("SUBJECT PREMISES 4"), as described more fully
in Attachment A-13;

n.    A 2020, silver, BMW 530i bearing California
license plate number 8PLM033 and VIN WBAJR3C0XLWW69835 ("SUBJECT
VEHICLE 6"), as described more fully in A-14;

o.    The person of ARTUNI, as described more fully in
Attachment A-15;

5

p.    19747 Winged Foot Way, Northridge, California 91326 ("SUBJECT PREMISES 5"), as described more fully in Attachment A-16;

q.    The person of AGOPIAN, as described more fully in Attachment A-17;

r.    10880 Amidon Place Tujunga, California 91042 ("SUBJECT PREMISES 6"), as described more fully in Attachment A-18;

s.    A 2024, black, Land Rover bearing California license plate number 9NVB635 and VIN SALKZBF93RA229854 ("SUBJECT VEHICLE 7"), as described more fully in Attachment A-19;

t.    The person of HAZRYAN, as described more fully in Attachment A-20;

u.    20648 Pesaro Way, Porter Ranch, California 91326 ("SUBJECT PREMISES 7"), as described more fully in Attachment A-21;

v.    A 2025, black, Toyota Tundra bearing California license plate number 04340D4 and VIN 5TFMA5DB6SX264289 ("SUBJECT VEHICLE 8"), as described more fully in Attachment A-22;

w.    A 2024, black, Land Rover Velar bearing California license plate number 9LFD749 and VIN SALYL2EX5RA389634 ("SUBJECT VEHICLE 9"), as described more fully in Attachment A-23;

x.    A 2021, black, Chevrolet Suburban bearing California license plate number DF14G31 and VIN 1GNSKCKD3MR461190 ("SUBJECT VEHICLE 10"), as described more fully in Attachment A-24;

6

y.    The person of STEPANYAN, as described more fully
in Attachment A-25;

z.    8007 Cabernet Court, Sun Valley, California 91352
("SUBJECT PREMISES 8"), as described more fully in Attachment A-
26;

aa.    A 2023, white, Mercedes S580 bearing California
license plate number 9GOF815 and VIN W1K6G7GB7PA222390 ("SUBJECT
VEHICLE 11"), as described more fully in Attachment A-27;

bb.    The person of A. A. KAZARYAN, as described more
fully in Attachment A-28;

cc.    10053 Tujunga Canyon, Tujunga, California 91042
("SUBJECT PREMISES 9"), as described more fully in Attachment A-
29;

dd.    The person of BEZIK, as described more fully in
Attachment A-30;

ee.    19867 Turtle Springs Way, Porter Ranch,
California 91326 ("SUBJECT PREMISES 10"), as described more
fully in Attachment A-31;

ff.    A 2024, silver, Chevrolet Suburban bearing
California license plate number 9ROW138 and VIN
1GNSKDKD6RR355846 ("SUBJECT VEHICLE 12"), as described more
fully in Attachment A-32;

gg.    The person of MANUKYAN, as described more fully
in Attachment A-33;

hh.    6653 Cedros Avenue, Van Nuys, California 91605
("SUBJECT PREMISES 11"), as described more fully in Attachment
A-34;

ii.  A 2011, red, Toyota Camry bearing California
license plate number 6RBU664 and VIN 4T1BF3EK8BU678389 ("SUBJECT
VEHICLE 13"), as described more fully in Attachment A-35;

jj.  The person of SEDANO, as described more fully in
Attachment A-36;

kk.  8641 Glenoaks Boulevard, Apartment 132, Sun
Valley, California 91352 ("SUBJECT PREMISES 12"), as described
more fully in Attachment A-37;

ll.  A 2007, gray, Toyota Camry bearing California
license plate number 5ZWX352 and VIN 4T1BE46K6tU694170 ("SUBJECT
VEHICLE 14"), as described more fully in Attachment A-38.
Attachments A-1 through A-38 are incorporated herein by
reference.

### IV. <u>ITEMS TO BE SEIZED</u>

8.  The items to be seized from AMIRYAN, SUBJECT PREMISES
1, and SUBJECT VEHICLE 1 are evidence, fruits, or
instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and
abetting), 371 (conspiracy), 875 (interstate communications),
922(g) (prohibited person in possession of firearms and
ammunition), 924(c) (possession of a firearm in furtherance of
crimes of violence), 1201 (kidnapping); 26 U.S.C. §§ 5861(d)
(possession of unregistered firearms), 5861(i) (possession of
firearms without serial numbers) ("the AMIRYAN Group Subject
Offenses"), as described more fully in Attachment B-1.  An
additional item to be seized from SUBJECT PREMISES 1 is the
person of AMIRYAN, as described more fully in Attachment B-2.
An additional item to be seized from AMIRYAN is a sample of

deoxyribonucleic acid ("DNA"), which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of AMIRYAN's Subject Offenses.  Attachments B-1, B-2, and B-3 are incorporated herein by reference.

9.   The items to be seized from GZRARYAN, SUBJECT PREMISES 2, and SUBJECT VEHICLE 2 are evidence, fruits, or instrumentalities of violations of the AMIRYAN Group Subject Offenses, as described more fully in Attachment B-1.  An additional item to be seized from SUBJECT PREMISES 2 is the person of GZRARYAN, as described more fully in Attachment B-4. An additional item to be seized from GZRARYAN is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of the AMIRYAN Group Subject Offenses.  Attachment B-4 is incorporated herein by reference.

10.  The items to be seized from STEPANIAN, SUBJECT PREMISES 3, SUBJECT VEHICLE 3, SUBJECT VEHICLE 4, and SUBJECT VEHICLE 5 are evidence, fruits, or instrumentalities of violations of the AMIRYAN Group Subject Offenses, as described more fully in Attachment B-1.  An additional item to be seized from SUBJECT PREMISES 3 is the person of STEPANIAN, as described more fully in Attachment B-5.  An additional item to be seized from STEPANIAN is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of the

AMIRYAN Group Subject Offenses.  Attachment B-5 is incorporated herein by reference.

11.  The items to be seized from EGUILUZ, SUBJECT PREMISES 4, and SUBJECT VEHICLE 6 are evidence, fruits, or instrumentalities of violations of the AMIRYAN Group Subject Offenses, as described more fully in Attachment B-1.  An additional item to be seized from SUBJECT PREMISES 4 is the person of EGUILUZ, as described more fully in Attachment B-6. An additional item to be seized from EGUILUZ is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of EGUILUZ's Subject Offenses. Attachment B-6 is incorporated herein by reference.

12.  The items to be seized from ARTUNI and SUBJECT PREMISES 5 are evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), 875 (interstate communications), 922(g) (prohibited person in possession of firearms and ammunition), 922(o) (possession of a machinegun), 924(c) (possession of a firearm in furtherance of crimes of violence), 1543 (forgery or false use of passport), 1958 (use of interstate commerce facilities in the commission of murder-for-hire), 1959 (violent crimes in aid of racketeering activity), 1962 (RICO conspiracy) wherein the underlying racketeering includes acts involving murder, chargeable under California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and acts under the following provisions of 18 §§ U.S.C. 659 (relating to theft from interstate shipment),

932 (relating to straw purchasing), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1543 (relating to forgery or false use of a passport), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of unregistered firearms), 5861(i) (possession of firearms without serial numbers) ("ARTUNI's Subject Offenses"), as described more fully in Attachment B-7. An additional item to be seized from SUBJECT PREMISES 5 is the person of ARTUNI, as described more fully in Attachment B-8. An additional item to be seized from ARTUNI is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of ARTUNI's Subject Offenses. Attachments B-7 and B-8 are incorporated herein by reference.

13. The items to be seized from AGOPIAN, SUBJECT PREMISES 6, and SUBJECT VEHICLE 7 are evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), 875 (interstate communications), 922(g) (prohibited person in possession of firearms and ammunition), 922(o) (possession of a machinegun), 924(c) (possession of a firearm in furtherance of crimes of violence), 1958 (use of interstate commerce facilities in the commission of murder-for-hire), 1959 (violent crimes in aid of racketeering activity), 1962 (RICO conspiracy) wherein the underlying racketeering includes acts involving murder, chargeable under California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and

11

acts under the following provisions of 18 §§ U.S.C. 659 (relating to theft from interstate shipment), 932 (relating to straw purchasing), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of unregistered firearms), 5861(i) (possession of firearms without serial numbers) ("AGOPIAN's Subject Offenses"), as described more fully in Attachment B-9. An additional item to be seized from SUBJECT PREMISES 6 is the person of AGOPIAN, as described more fully in Attachment B-10. An additional item to be seized from AGOPIAN is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of AGOPIAN's Subject Offenses. Attachments B-9 and B-10 are incorporated herein by reference.

14. The items to be seized from HAZRYAN, SUBJECT PREMISES 7, SUBJECT VEHICLE 8, SUBJECT PREMISES 9, and SUBJECT PREMISES 10 are evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), 875 (interstate communications), 922(g) (prohibited person in possession of firearms and ammunition), 922(o) (possession of a machinegun), 924(c) (possession of a firearm in furtherance of crimes of violence), 1028 (fraud and related activity in connection with identification documents, authentication features, and information), 1028A (aggravated identity theft), 1029 (access device fraud), 1343 (wire fraud), 1344 (bank

fraud), 1347 (health care fraud), 1543 (forgery or false use of passport), 1958 (use of interstate commerce facilities in the commission of murder-for-hire), 1959 (violent crimes in aid of racketeering activity), 1962 (RICO conspiracy) wherein the underlying racketeering includes acts involving murder, chargeable under California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and acts under the following provisions of 18 §§ U.S.C. 659 (relating to theft from interstate shipment), 932 (relating to straw purchasing), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1543 (relating to forgery or false use of a passport), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of unregistered firearms), 5861(i) (possession of firearms without serial numbers) ("HAZRYAN's Subject Offenses"), as described more fully in Attachment B-11.  An additional item to be seized from SUBJECT PREMISES 7 is the person of HAZRYAN, as described more fully in Attachment B-12.  An additional item to be seized from HAZRYAN is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of HAZRYAN's Subject Offenses.  Attachments B-11 and B-12 are incorporated herein by reference.

15.  The items to be seized from STEPANYAN, SUBJECT PREMISES 8, and SUBJECT VEHICLE 11 are evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), 875 (interstate communications),

922(g) (prohibited person in possession of firearms and
ammunition), 922(o) (possession of a machinegun), 924(c)
(possession of a firearm in furtherance of crimes of violence),
1958 (use of interstate commerce facilities in the commission of
murder-for-hire), 1959 (violent crimes in aid of racketeering
activity), 1962 (RICO conspiracy) wherein the underlying
racketeering includes acts involving murder, chargeable under
California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and
acts under the following provisions of 18 §§ U.S.C. 932
(relating to straw purchasing), 1343 (relating to wire fraud),
1344 (relating to financial institution fraud), 1958 (relating
to use of interstate commerce facilities in the commission of
murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of
unregistered firearms), 5861(i) (possession of firearms without
serial numbers) ("STEPANYAN's Subject Offenses"), as described
more fully in Attachment B-13.  An additional item to be seized
from SUBJECT PREMISES 8 is the person of STEPANYAN, as described
more fully in Attachment B-14.  An additional item to be seized
from STEPANYAN is a sample of DNA, which is to be obtained via
cotton/buccal or cheek swab from the mouth, as further described
in Attachment B-3, for evidence relating to violations of
STEPANYAN's Subject Offenses.  Attachments B-13 and B-14 are
incorporated herein by reference.

16.  The items to be seized from A. A. KAZARYAN and SUBJECT
PREMISES 9 are evidence, fruits, or instrumentalities of
violations of 18 U.S.C. §§ 2 (aiding and abetting), 371
(conspiracy), 659 (theft of interstate shipments), 875

14

(interstate communications), 922(g) (prohibited person in possession of firearms and ammunition), 924(c) (possession of a firearm in furtherance of crimes of violence), 1347 (health care fraud), 1349 (attempt and conspiracy), 1958 (use of interstate commerce facilities in the commission of murder-for-hire), 1959 (violent crimes in aid of racketeering activity), 1962 (RICO conspiracy) wherein the underlying racketeering includes acts involving murder, chargeable under California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and acts under the following provisions of 18 §§ U.S.C. 659 (relating to theft from interstate shipment), 932 (relating to straw purchasing), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of unregistered firearms), 5861(i) (possession of firearms without serial numbers) ("A. A. KAZARYAN's Subject Offenses"), as described more fully in Attachment B-15.  An additional item to be seized from SUBJECT PREMISES 9 is the person of A. A. KAZARYAN, as described more fully in Attachment B-16.  An additional item to be seized from A. A. KAZARYAN is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of A. A. KAZARYAN's Subject Offenses.  Attachments B-15 and B-16 are incorporated herein by reference.

    17.  The items to be seized from BEZIK, SUBJECT PREMISES 10, and SUBJECT VEHICLE 12 are evidence, fruits, or

instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and
abetting), 371 (conspiracy), 659 (theft of interstate
shipments), 875 (interstate communications), 1347 (health care
fraud), 1349 (attempt and conspiracy), 1962 (RICO conspiracy)
wherein the underlying racketeering includes acts under the
following provisions of 18 §§ U.S.C. 659 (relating to theft from
interstate shipment), 1343 (relating to wire fraud), 1344
(relating to financial institution fraud) ("BEZIK's Subject
Offenses"), as described more fully in Attachment B-17.  An
additional item to be seized from SUBJECT PREMISES 10 is the
person of BEZIK, as described more fully in Attachment B-18.  An
additional item to be seized from BEZIK is a sample of DNA,
which is to be obtained via cotton/buccal or cheek swab from the
mouth, as further described in Attachment B-3, for evidence
relating to violations of BEZIK's Subject Offenses.  Attachments
B-17 and B-18 are incorporated herein by reference.

18.  The items to be seized from MANUKYAN, SUBJECT PREMISES
11, and SUBJECT VEHICLE 13 are evidence, fruits, or
instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and
abetting), 371 (conspiracy), 875 (interstate communications),
922(g) (prohibited person in possession of firearms and
ammunition), 1543 (forgery or false use of passport), 1958 (use
of interstate commerce facilities in the commission of murder-
for-hire), 1959 (violent crimes in aid of racketeering
activity), 1962 (RICO conspiracy) wherein the underlying
racketeering includes acts involving murder, chargeable under
California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and

16

acts under the following provisions of 18 §§ U.S.C. 932
(relating to straw purchasing), 1343 (relating to wire fraud),
1344 (relating to financial institution fraud), 1543 (relating
to forgery or false use of a passport), 1958 (relating to use of
interstate commerce facilities in the commission of murder-for-
hire); 26 U.S.C. §§ 5861(d) (possession of unregistered
firearms), 5861(i) (possession of firearms without serial
numbers) ("MANUKYAN's Subject Offenses"), as described more
fully in Attachment B-19.  The item to be seized from SUBJECT
PREMISES 11 is the person of MANUKYAN, as described more fully
in Attachment B-20.  An additional item to be seized from
MANUKYAN is a sample of DNA, which is to be obtained via
cotton/buccal or cheek swab from the mouth, as further described
in Attachment B-3, for evidence relating to violations of
MANUKYAN's Subject Offenses.  Attachments B-19 and B-20 are
incorporated herein by reference.

        19.  The items to be seized from SEDANO, SUBJECT PREMISES
12, and SUBJECT VEHICLE 14 are evidence, fruits, or
instrumentalities of violations of 18 U.S.C. §§ 2 (aiding and
abetting), 371 (conspiracy), 875 (interstate communications),
922(g) (prohibited person in possession of firearms and
ammunition), 922(o) (possession of a machinegun), 924(c)
(possession of a firearm in furtherance of crimes of violence),
1958 (use of interstate commerce facilities in the commission of
murder-for-hire), 1959 (violent crimes in aid of racketeering
activity), 1962 (RICO conspiracy) wherein the underlying
racketeering includes acts involving murder, chargeable under

17

California Penal Code §§ 21a, 31, 182, 187, 188, 189, 664, and acts under the following provisions of 18 §§ U.S.C. 932 (relating to straw purchasing), 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1543 (relating to forgery or false use of a passport), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire); 26 U.S.C. §§ 5861(d) (possession of unregistered firearms), 5861(i) (possession of firearms without serial numbers) ("SEDANO's Subject Offenses"), as described more fully in Attachment B-21.  An additional item to be seized from SUBJECT PREMISES 12 is the person of SEDANO, as described more fully in Attachment B-22.  An additional item to be seized from SEDANO is a sample of DNA, which is to be obtained via cotton/buccal or cheek swab from the mouth, as further described in Attachment B-3, for evidence relating to violations of SEDANO's Subject Offenses.  Attachments B-21 and B-22 are incorporated herein by reference.

20.  Digital devices seized are to be searched pursuant to the terms of Attachment C, which is incorporated herein by reference.

## V.  <u>ARMENIAN ORGANIZED CRIME IN LOS ANGELES COUNTY</u>

At all times relevant to the conduct described in this affidavit:

21.  Armenian Organized Crime, also referred to as the Armenian Mafia originated in the former Union of Soviet Socialist Republics (the "USSR") and following the Cold War, existed under the control of the Russian Mafia (Russian: русская

мафия, Romanized: *Russkaya Mafiya*), also known as ("aka") *Bratva* (Russian: Братва, English: brotherhood or band of brothers).

22.  Armenian Organized Crime was comprised of senior leaders, members, and associates who resided in modern-day Russia and Armenia, France, Spain, Iran, as well as other countries, including the United States.  In the United States, most Armenian Organized Crime leaders, members, and associates resided in Los Angeles County, which contained one of the largest Armenian populations outside of Russia and Armenia.

23.  Armenian Organized Crime followed a "flat" or "flattened" organizational structure, in contrast to a traditional, strict, linear one wherein each member carried a specific title or rank and there was a clear, designated chain of command.  In Los Angeles County, this organizational restructuring led to the creation of de-centralized, hybrid crime crews that included Armenian Organized Crime members as well as non-member and/or non-Armenian criminals.

24.  When residing outside of the former USSR and its surrounding territories, Armenian Organized Crime groups camouflaged themselves amongst expatriate and immigrant Armenian communities and used these emigrant communities as bases to establish Armenian criminal organizations internationally.  A hallmark of Armenian Organized Crime was the strategic use of violence to send a message, increase an individual's position within the Armenian criminal community, and/or leverage a business interest.  To avoid law enforcement detection, Armenian Organized Crime often assigned these acts of violence to non-

19

Armenian criminal associates, such as members of black and
*Sureño*[1] street gangs.

25.    Power and leadership in Armenian Organized Crime was
based, among other things, on a combination of respect,
seniority, that is, physical age, authority within the Russian
Mafia, and relatedly, authority and influence within the
Armenian criminal community.  Traditionally, Armenian Organized
Crime members and associates reported to a specific, high-level,
male crime boss who was born either in Armenia or a former
Soviet country.  In Armenian Organized Crime, this crime boss
was known as a "*orenk'ov gogh*" (Armenian: օրենքով գող, English:
"thief in law") or "*gogh*" for short.  Colloquially, *goghs* were
also referred to as "*kerop*" (or "*qerop*"), which is Armenian
slang for both "made man" or "wise guy."  A *gogh* could not be

---

[1]Based on my training and experience, I am aware that *Sureños*
or "Southsiders" are known as the enforcers or foot-soldiers for
the Mexican Mafia (aka "*La Eme*," which in English translates to
"the M").  *Sureños* are members of Hispanic criminal street gangs
based in Southern California.  Based on my training and experience,
I also know that the Mexican Mafia is an organized prison gang
that was formed in the 1950s by Hispanic street gang members who
were then incarcerated in Southern California.  The founding
members formed the organization to protect Hispanics from other
gangs within California's jails and prisons.  By using violence,
the Mexican Mafia eventually gained significant power and control
over illegal activities in the California prison system.  Although
historically at odds, at present, the Armenian Power street gang
(also known as "AP" or "AP-13") collaborates with the Mexican Mafia
and received the number 13 to its name as a sign of solidarity.
The AP-*Eme* relationship has expanded to a more global partnership
between the Mexican Mafia and Armenian Organized Crime.  The
Mexican Mafia and Armenian criminal organization alliance has been
fostered principally through the mutual incarceration of its
members.  As such, Armenian Organized Crime groups and the street
gangs that the Mexican Mafia oversees, which included AP, commonly
worked together to engage in criminal activities in the greater
Los Angeles area.

crowned, that is, named or appointed, without the blessing and/or approval of the Russian Mafia.

26.    Under each *gogh*, there were multiple elders who each controlled their own organized crime group.  The elders were the direct connection to the *gogh*, and they were responsible for meting out tasks or giving orders to the members and associates of their respective group.  In essence, the elders were responsible for controlling the day-to-day and street-level criminal activity in their group.  Under each elder, there were assorted members and/or non-member associates with authority and influence within the Armenian Criminal community.

27.    Armenian Organized Crime also included individuals of influence called "*avtoritet*" (Russian: авторитет, English: person of significant authority) who commonly controlled their own crime groups.  Though revered in the Armenian criminal community, *avotoritet*, unlike *goghs*, were not crowned by the Russian Mafia.  Nevertheless, *avtoritet* had an impeccable reputation and were notorious in, among other places, the Armenian criminal underworld.  As such, in Los Angeles County, *avtoritet* commonly operated independently and led their own organized crime groups thereby wielding an incredible amount of power over Armenian criminal organizations, including Armenian Organized Crime, the Armenian criminal street gang -- Armenian Power,[2] and non-member Armenians who committed crimes.

---

[2] Based on my training and experience, I am aware that Armenian Power was founded in the early 1990s in the greater Los Angeles area due, in large part, to the prevalent gang culture and the
*(footnote cont'd on next page)*

## VI. <u>SUMMARY OF THE INVESTIGATION AND PROBABLE CAUSE</u>

28.   In the summer of 2023, HSI, the Los Angeles Police Department ("LAPD"), and Burbank Police Department ("Burbank PD") launched Operation Supper's Ready, a multi-agency investigation aimed at investigating a series of violent crimes committed by members and associates of two warring Armenian Organized Crime groups: (1) a group led by AMIRYAN, an *avtoritet* and suspected Toonerville 13 gang member[3] (hereafter referred to as the "Amiryan Organized Crime Group"), and (2) a group led by ARTUNI, an *avtoritet*, that is known to engage in a pattern of racketeering activity (hereafter referred to as the "Artuni Enterprise").

29.   As set forth in detail below, through the course of the investigation, law enforcement has gathered information from a variety of sources, including but not limited to: (1) witness interviews; (2) video and audio recordings; (3) search warrants for persons, premises, devices, and digital accounts; (4) financial records from both individuals and companies; (5) call detail records; (6) Global Position System ("GPS"), cell tower, and cell-site location data; (7) the analysis of firearms and ammunition; (8) DNA and latent print analysis; and (8) State of

---

considerable number of Armenian nationals who had immigrated to the region.  Given its sheer size, Armenian Power is often, incorrectly, used as a euphemism for Armenian Organized Crime. Instead, Armenian Power operates collaboratively with Armenian Organized Crime and other non-member criminals, as well as individually.

[3] Based on my conversations with law enforcement officers who specialize in Armenian Organized Crime, I am aware that AMIRYAN's nickname "Fish" is derived from "Tunafish," a nickname given to AMIRYAN because of his alleged membership in the predominantly *Sureño* street gang Toonerville 13.

California records, public filings, and other publicly available
information.  The investigation also employed additional
investigative techniques, including but not limited to,
surveillance.  Collectively, the evidence described below
provides probable cause that the targets identified above
committed their attributed Subject Offenses.

30.  Below, I summarize the information and evidence
obtained thus far from these various investigative tools where
relevant to the requested complaints and warrants.  The
investigation remains ongoing.

## VII.  THE AMIRYAN ORGANIZED CRIME GROUP

31.  At all times relevant to the conduct described in this
affidavit:

32.  The Amiryan Organized Crime Group was an Armenian
Organized Crime group that operated in Los Angeles County and
elsewhere with AMIRYAN at the helm.  As an *avtoritet*, AMIRYAN
commanded respect and occupied a position of power within the
Armenian criminal community in the greater Los Angeles area.
Typical of the flat Armenian Organized Crime structure, AMIRYAN
loosely commanded Armenian members of his organization and he
recruited non-Armenian criminal associates for the purpose of
committing crimes at his behest.

## VIII.    MEMBERS AND ASSOCIATES OF THE AMIRYAN ORGANIZED CRIME GROUP

33.  Robert AMIRYAN, aka "Rubo Fish," aka "Rubo," aka
"Rub," aka "Robo," aka "Fish," aka "Santoro," a lawful United
States resident and citizen of Armenia, was an *avtoritet* within

23

the Armenian organized crime community and led his own organized crime group (the Amiryan Organized Crime Group). As described below, AMIRYAN was the target in multiple shooting incidents. As also described below, AMIRYAN was present at the scene of A.K.'s kidnapping, assault, and torture, indicating his importance in the community, and his willingness to commit violent crimes to benefit and protect his standing and the standing of the Amiryan Organized Crime Group. At all times relevant to the criminal events described in this affidavit, AMIRYAN resided in the Central District of California.

34. Vahan HARUTYUNYAN, aka "V," a lawful United States resident, self-reported citizen of the former USSR, and person of Armenian descent, was a member of the Amiryan Organized Crime Group. As described below, V. HARUTYUNYAN was the target in multiple shooting incidents. As also described below, V. HARUTYUNYAN was present at the scene of A.K.'s kidnapping, assault, and torture, indicating his proximity to AMIRYAN and willingness to commit violent crimes to benefit and protect AMIRYAN's standing and the standing of the Amiryan Organized Crime Group. At all times relevant to the criminal events described in this affidavit, V. HARUTYUNYAN resided in the Central District of California.[4]

---

[4] Based on witness statements, I am aware that V. HARUTYUNYAN re-located to the Southern District of Florida in or around January 2025. In addition, based on my involvement in this investigation and review of law enforcement database records, I am also aware that a vehicle belonging to V. HARUTYUNYAN has recently been in Hollywood, Florida, thus confirming my knowledge of V. HARUTYUNYAN's whereabouts.

35.  Sevak GZRARYAN, aka "Seco," a citizen of Armenia and documented member of the Armenian Power street gang residing illegally in the United States, was a member of the Amiryan Organized Crime Group.  As described below, GZRARYAN was the target in at least one shooting incident.  As also described below, GZRARYAN was present at the scene of A.K.'s kidnapping, assault, and torture, indicating his proximity to AMIRYAN and willingness to commit violent crimes to benefit and protect AMIRYAN's standing and the standing of the Amiryan Organized Crime Group.  At all times relevant to the criminal events described in this affidavit, GZRARYAN resided in the Central District of California.

36.  Mikael STEPANIAN, aka "Mko," aka "Maik," aka "Mik," a citizen of Armenia residing illegally in the United States, was a member of the Amiryan Organized Crime Group.  As described below, STEPANIAN was the target in at least one shooting incident.  As also described below, STEPANIAN was present at the scene of A.K.'s kidnapping, assault, and torture, indicating his proximity to AMIRYAN and willingness to commit violent crimes to benefit and protect AMIRYAN's standing and the standing of the Amiryan Organized Crime Group.  At all times relevant to the criminal events described in this affidavit, STEPANIAN resided in the Central District of California.

37.  Artur HARUTYUNYAN, aka "Arthur," aka "Bull," a citizen of Armenia residing illegally in the United States, was a member of the Amiryan Organized Crime Group.  As also described below, A. HARUTYUNYAN was present at the scene of A.K.'s kidnapping,

assault, and torture, indicating his proximity to AMIRYAN and willingness to commit violent crimes to benefit and protect AMIRYAN's standing and the standing of the Amiryan Organized Crime Group. At all times relevant to the criminal events described in this affidavit, A. HARUTYUNYAN resided in the Central District of California.[5]

38. Ivan BOJORQUEZ, aka "Stal," a natural-born United States citizen, was an associate of the Amiryan Organized Crime Group. As described below, AMIRYAN called upon BOJORQUEZ and EGUILUZ to do "favors" for him, which included participating in A.K.'s kidnapping, assault, and torture. At all times relevant to the criminal events described in this affidavit, BOJORQUEZ resided in the Central District of California.[6]

39. Francisco Renzo EGUILUZ, aka "Temper," aka "Temps," a natural-born citizen United States citizen, was a documented member of a historically black criminal street gang (the Fourth Avenue Bloods ("FAB") aka "Fuck a Bitch") and associate of the Amiryan Organized Crime Group. As described below, AMIRYAN called upon EGUILUZ and BOJORQUEZ to do "favors" for him, which included participating in A.K.'s kidnapping, assault, and torture. At all times relevant to the criminal events described

---

[5] As described below, following A.K.'s kidnapping, assault, and torture, A. HARUTYUNYAN fled to Mexico.

[6] Based on my conversations with LAPD Detective Stupar, I am aware that BOJORQUEZ is presently detained in California State custody at the Los Angeles County Jail, North County Correctional Facility, on charges for kidnapping and in separate instance, murder.

in this affidavit, EGUILUZ resided in the Central District of California.

## IX. THE ARTUNI CRIMINAL ENTERPRISE

40.   At all times relevant to the conduct described in this affidavit:

**A.   The Artuni Enterprise**

41.   ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, A. A. KAZARYAN, BEZIK, MANUKYAN, ARAKELYAN, SEDANO, and others known and unknown, were members of the Artuni Enterprise, a criminal organization operating in and around Los Angeles County and elsewhere, whose members and associates engage in, among other things, murder, theft from interstate shipments, bank and wire fraud, forgery or false use of a passport, and murder-for-hire. The Artuni Enterprise operated within the Central District of California and elsewhere.

42.   The Artuni Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.   The Artuni Enterprise constituted an ongoing organization, whose criminal activities began no later than in or around 2020, whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

43.   The Artuni Enterprise, through its members and associates, engaged in racketeering activity, as defined in

Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, and 664; offenses relating to theft from interstate shipment, in violation of Title 18, United States Code, Section 659; offenses involving fraud, in violation of Title 18 United States Code Sections 1343, 1344; offenses involving forgery or false use of a passport, in violation of Title 18, United states Code, Section 1543; and offenses involving the use of interstate commerce facilities in the commission of murder-for-hire, in violation of Title 18, United States Code, Section 1958.

44.   The Artuni Enterprise was an Armenian Organized Crime group that operated in Los Angeles County and elsewhere with ARTUNI at the helm.  As an *avtoritet*, ARTUNI commanded respect and occupied a position of power within the Armenian criminal community in the greater Los Angeles area.  Typical of the flat Armenian Organized Crime structure, ARTUNI loosely commanded members of his organization and he recruited non-Armenian criminal associates for the purpose of committing crimes at his behest.

   **B.   Purpose of the Artuni Enterprise**

45.   The purposes of the Artuni Enterprise included, but were not limited to, the following:

      a.   Enriching members and associates of the Artuni Enterprise through, among other things, the theft of interstate shipments and the commission of fraud in Los Angeles County and elsewhere;

b.    Establishing control over Armenian communities within Los Angeles County;

c.    Preserving, protecting, and expanding the power of the Artuni Enterprise using intimidation, violence, and threats of violence; and

d.    Violently retaliating against rival Armenian Organized Crime groups or perceived outsiders who challenged the Artuni Enterprise's authority or attempted to encroach upon the Artuni Enterprise's sphere of influence.

**C.    The Means and Methods of the Artuni Enterprise**

46.    The means and methods by which the members and associates of the Artuni Enterprise conducted and participated in the conduct of the affairs of the Artuni Enterprise included the following:

a.    Members and associates of the Artuni Enterprise committed, attempted to commit, conspired to commit, and threatened to commit acts of violence, including murder, to preserve, protect, and expand the Artuni Enterprise's operations.

b.    Members and associates of the Artuni Enterprise promoted a climate of fear through acts of violence and threats to commit acts of violence.

c.    Members and associates of the Artuni Enterprise stole from interstate shipments and committed fraud to generate revenue for the enterprise.

### X.  <u>MEMBERS AND ASSOCIATES OF THE ARTUNI ENTERPRISE</u>

47.  Ara ARTUNI, aka "Ara Harutyunyan," aka "Aro," aka
"Araboyi," aka "Arabo," aka "Santos," a lawful United States
resident who self-reported Iranian citizenship but suspectedly
was an Armenian citizen, was an *avtoritet* within the Armenian
organized crime community and led his own organized crime group
(the Artuni Enterprise).  As described below, ARTUNI authorized
murders targeting individuals of importance within the Armenian
criminal community, including his apparent rival AMIRYAN.
ARTUNI was at or near at least one of the murder attempts.  As
also described below, as evidence of his high status, ARTUNI was
chauffeured by members of his enterprise, including HAZRYAN.  As
further evidence of his position, ARTUNI received payment
("taxes" or "tribute") from individuals within the Armenian
criminal community to include members of his own enterprise
(*e.g.*, AGOPIAN, HAZRYAN, A. A. KAZARYAN, and BEZIK).  Often,
ARTUNI transferred or directed these tributes to his family
members.  At all times relevant to the criminal events described
in this affidavit, ARTUNI resided in the Central District of
California.

48.  Alex AGOPIAN, aka "Alik," a naturalized United States
citizen who self-reported being born in Azerbaijan though he was
a person of Armenian descent, was a member of the Artuni
Enterprise.  As described below, AGOPIAN was present at a
storage facility maintained by other members of the enterprise
(STEPANYAN and SEDANO) that served as the enterprise's armory.
AGOPIAN, like ARTUNI, was chauffeured by lower-level members of

30

the enterprise (HAZRYAN), and also like ARTUNI, received a "tribute" from the enterprise's fraudulent schemes, indicating that AGOPIAN maintained a position of prominence within the enterprise. At all times relevant to the criminal events described in this affidavit, AGOPIAN resided in the Central District of California.

49. Davit HAZRYAN, aka "Davo," aka "Dav," aka "D," a naturalized United States citizen who was born in Armenia, was a member of the Artuni Enterprise. As described below, HAZRYAN discussed illicit criminal activities with A. A. KAZARYAN, another member of the enterprise, about joint fraudulent ventures, indicating that there was an ongoing criminal relationship between the two. HAZRYAN also paid tribute to and chauffeured ARTUNI, indicating an ongoing criminal relationship with him. HAZRYAN was at or near the location of several attempted murders conducted on orders from ARTUNI, indicating his membership in the enterprise and willingness to cause and/or conduct violent crimes on its behalf. At all times relevant to the criminal events described in this affidavit, HAZRYAN resided in the Central District of California.

50. Vahagn STEPANYAN, aka "Vee," "Vova Titov," "Juha Alver," "Vahan Stephanian," a derivative United States citizen who self-reported being born in the USSR but was a person of Armenian descent, was a member of the Artuni Enterprise. STEPANYAN was a documented member of the *Sureño* Elmwood street

gang.[7]  As described below, STEPANYAN (along with SEDANO) maintained the enterprise's armory in a storage unit registered under his name.  STEPANYAN was at or near the location of several attempted murders conducted on orders from ARTUNI. STEPANYAN also served as the enterprise's go-between in furtherance of orchestrating a completed murder, further indicating his membership in the enterprise and willingness to cause and/or conduct violent crimes on its behalf.  At all times relevant to the criminal events described in this affidavit, STEPANYAN resided in the Central District of California.

51.  Arvin Albert KAZARYAN, aka "Artur," aka "Art," a natural-born United States citizen and person of Armenian descent, was a member of the Artuni Enterprise.  As described below, A. A. KAZARYAN discussed fraudulent ventures and cargo theft with HAZRYAN and BEZIK, indicating an ongoing criminal relationship between them.  A. A. KAZARYAN paid tribute to ARTUNI, also indicating an ongoing criminal relationship with him.  In addition, members of the Artuni Enterprise used cars leased or registered to A. A. KAZARYAN or his father, at least one of which was used during a murder attempt.  At all times relevant to the criminal events described in this affidavit, A. A. KAZARYAN resided in the Central District of California.

---

[7] Based on my training and experience and conversations with law enforcement personnel, I am aware that the Elmwood street gang (also known as Elmwood 13 given its allegiance to the Mexican Mafia) is a predominately Hispanic street gang that is known to have Armenian members.  Elmwood is mostly active in Burbank, California, but its members also operate in other areas of Los Angeles County.  Elmwood gang members are known to commit crimes ranging from vandalism, narcotics sales, assault with deadly weapons, shootings, and murders.

52. Areg BEZIK, aka "Elvis Narek," fka "Narek Bezikian," a lawful United States resident who self-reported Iranian citizenship, was a member of the Artuni Enterprise. As described below, BEZIK discussed the enterprise's assorted fraudulent ventures with both HAZRYAN and A. A KAZARYAN, indicating an ongoing criminal relationship between them. At all times relevant to the criminal events described in this affidavit, BEZIK resided in the Central District of California.

53. Manuk MANUKYAN, a refugee who self-reported being born in the USSR but was a person of Armenian descent, was an associate of the Artuni Enterprise. As described below, MANUKYAN purchased a vehicle used during an attempted murder committed on orders from ARTUNI, indicating his association with the enterprise and willingness to cause and/or conduct violent crimes on its behalf. At all times relevant to the criminal events described in this affidavit, MANUKYAN resided in the Central District of California.

54. Levon ARAKELYAN, an illegal alien who self-reported being born in the USSR but was a person of Armenian descent, was an associate of the Artuni Enterprise. ARAKELYAN was a self-proclaimed *Sureño*[8] and had a tattoo that read: "Armenian Pride".[9]

---

[8] As previously stated, more recently, Hispanic street gangs controlled by the Mexican Mafia and Armenian organized crime groups have negotiated a peace agreement through their senior leadership, which has led to the normalization of them associating and committing crimes together and to the normalization of persons of Armenian descent joining or aligning themselves with *Sureño* gangs.

[9] I have reviewed information provided by the Federal Bureau of Prisons ("BOP"), National Gang Unit, Intelligence and Counter
*(footnote cont'd on next page)*

As described below, ARAKELYAN frequented the storage facility that served as the enterprise's armory, and his DNA was located on two of the weapons seized from there, evidencing a willingness to cause and/or conduct violent crimes on the enterprise's behalf.  At all times relevant to the criminal events described in this affidavit, ARAKELYAN resided in the Central District of California or was imprisoned in the District of Nevada.

55.  Christian SEDANO, a natural-born United States citizen, was a member of the Artuni Enterprise.  SEDANO, like STEPANYAN, was a documented member of the *Sureño* Elmwood street gang.[10]  As described below, SEDANO (along with STEPANYAN) maintained the enterprise's armory in a storage unit registered under STEPANYAN's name.  Conspicuously timed gaps in usage of his cellphone coincide with multiple murder attempts.  SEDANO's involvement in these attempted murders is indicia of his membership in the enterprise and willingness to cause and/or conduct violent crimes on its behalf.  At all times relevant to

---

Terrorism Branch, who validated ARAKELYAN as a *Sureño* due to his self-admission, gang tattoos, and a BOP memorandum documenting ARAKELYAN walking hallways, sitting on the recreation yard, and eating meals at the same tables with other documented *Sureño* members.  I have also reviewed information provided by the Las Vegas Metropolitan Police Department, Central Intelligence Unit.  Based on my review of this information, I am aware that ARAKELYAN is documented as having the words "ARMENIAN PRIDE" tattooed in large lettering in the mid-section of his back paying homage to his Armenian heritage and his association with the Armenian Power criminal street gang.  Also, above his left elbow, ARAKELYAN has a tattoo of two lines, one over the top of each other, with three dots right above it, signifying the numerical number 13.  This is a common *Sureño* symbol.

[10] On or about September 16, 2022, the two were in a car together when they were detained during a traffic stop investigation.

the criminal events described in this affidavit, SEDANO resided in the Central District of California.

## XI. SUMMARY CHART OF RELEVANT INCIDENTS OF VIOLENCE COMMITTED BY THE AMIRYAN ORGANIZED CRIME GROUP AND THE ARTUNI ENTERPRISE

56. I have prepared the following chart summarizing the relevant instances of violent criminal conduct, the dates on which they occurred, the perpetrator(s), and the victim(s):

| Criminal Conduct | | | |
| --- | --- | --- | --- |
| Date | Summary | Perpetrator(s) | Victim |
| July 21, 2020 | Edward LOPEZ ("LOPEZ") shot A.S. and D.M. as they slept in their bed. A.S. was killed, while D.M. sustained two gunshot wounds but survived. | ARTUNI, AGOPIAN, STEPANYAN, Edward Lopez (deceased), et al. | A.S. D.M. |
| October 25, 2022 | Person(s) shot STEPANIAN in the back as he stood in his driveway. STEPANIAN survived. | ARTUNI, et al. | STEPANIAN |
| April 3, 2023 | Person(s) shot at AMIRYAN while he stood in his garage but missed him. | ARTUNI, et al. | AMIRYAN |
| June 6, 2023 to June 7, 2023 | A. HARUTYUNYAN lured A.K. from his home. A.K. was then kidnapped, assaulted, and tortured. A.K. sustained multiple | AMIRYAN, V. HARUTYUNYAN, GZRARYAN, STEPANIAN, A. HARUTYUNYAN, BOJORQUEZ, EGUILUZ, et al. | A.K. |

| Criminal Conduct | | | |
|---|---|---|---|
| Date | Summary | Perpetrator(s) | Victim |
| | injuries but survived. | | |
| June 12, 2023 | A vehicle registered to A.A. KAZARYAN's father was used in a shooting targeting G.M. at an intersection down the street from his home. G.M. was uninjured. | ARTUNI, HAZRYAN, A. A. KAZARYAN, et al. | G.M. |
| July 7, 2023 | Person shoots at AMIRYAN while he sat on a balcony at his home. AMIRYAN's significant other (R.M.) was also on the balcony. AMIRYAN sustained multiple gunshot wounds but survived. | ARTUNI, HAZRYAN, MANUKYAN, STEPANYAN, SEDANO, et al. | AMIRYAN |
| August 18, 2023 | Person shot at V. HARUTYUNYAN's home while he was inside. V. HARUTYUNYAN was uninjured. | ARTUNI, HAZRYAN, STEPANYAN, et al. | V. HARUTYUNYAN |
| August 25, 2023 | Persons shot V. HARUTYUNYAN while he was in the backyard of | ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, et al. | V. HARUTYUNYAN |

| Criminal Conduct | | | |
|---|---|---|---|
| Date | Summary | Perpetrator(s) | Victim |
| | his home with AMIRYAN, GZRARYAN, et al. V. HARUTYUNYAN sustained multiple gunshot wounds but survived. | | |
| November 9, 2023 | Person shot H.H. while he was parked in a Starbucks parking lot. H.H. sustained multiple gunshot wounds but survived. | ARTUNI, HAZRYAN, STEPANYAN, et al. | H.H. |
| March 14, 2025 | Persons shot at a car driven by R.M. (AMIRYAN's significant other) as she parked it at their home. R.M. sustained a gunshot wound but survived. The couple's children, who were also in the car, were uninjured. | ARTUNI, et al. | R.M. |
| March 28, 2025 | Person shot GZRARYAN in the stomach as he parked his vehicle outside of his home. GZRARYAN survived. | ARTUNI, et al. | R.M. |

## XII. <u>SUMMARY OF OTHER RACKETEERING ACTS COMMITTED BY THE ARTUNI ENTERPRISE</u>

57.    I have prepared the following chart summarizing other relevant racketeering conduct committed by the Artuni Enterprise, the approximate dates (or date range) on which they occurred, the perpetrator(s), and the victim(s):

| Criminal Conduct | | | |
|---|---|---|---|
| Date(s) | Summary of Conduct | Perpetrator(s) | Victim |
| Unk. to 2023 | Utilization of sham business (Freedom At Enterprise Inc) to defraud credit card companies by making false claims. | ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, SEDANO, et al. | Assorted credit card companies, banks, PayPal, and Intuit |
| Unk. to 2023 | Theft of goods being transported using Amazon. | ARTUNI, AGOPIAN, A. A. KAZARYAN, BEZIK, et al. | Amazon; assorted vendors |

## XIII.    <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    **July 21, 2020: Murder of A.S. and Attempted Murder of D.M. in Burbank**

#### 1.    <u>Probable Cause Summary</u>

58.    As set forth below, there is probable cause to believe that ARTUNI, STEPANYAN, LOPEZ, and others known and unknown, murdered A.S. and attempted to murder D.M.  The evidence supporting this determination includes, but is not limited to: (1) the use of a non-Armenian, *Sureño* gang member (LOPEZ) as an assassin; (2) cell-site location data placing LOPEZ and STEPANYAN near the victims' home in the days preceding the murder and attempted murder; (3) call history indicating that

38

LOPEZ and STEPANYAN communicated frequently and met in-person leading up to the murder and attempted murder; (4) a photograph on LOPEZ' cellphone depicting A.S.; (5) STEPANYAN's post-arrest jail calls in which the person he was speaking with referenced ARTUNI; and (6) an anonymous letter identifying ARTUNI and others as the persons responsible for ordering the shooting.

2.    Description of the Murder and Attempted Murder

59.    Based on my review of Burbank PD reports and my conversations with Burbank PD Sergeant Mirakyan, I am aware that:

a.    On or about July 21, 2020, at approximately 1:24 a.m., the Burbank PD Communications Center received a call for service for shots heard at a residence on Cambridge Drive in Burbank (the "Cambridge Drive residence").  The caller (D.M.) advised the 9-1-1 dispatcher that A.S. had been shot and she believed that he was dying.  The communications center then received a flurry of additional calls for service regarding a shooting on Cambridge Drive and, at one point, spoke with one of the victims' children who confirmed that both of his parents had been shot.[11]

b.    At approximately 1:25 a.m., Burbank PD Officer Martinez and other investigators arrived at the victims' home and saw LOPEZ lying in the driveway.  LOPEZ was wearing a black face cover, a black neck cover, a black long-sleeved shirt, dark-colored jeans, black shoes, and black gloves.  Next to

_____

[11] Based on my conversations with Sergeant Mirakyan and my review of Burbank PD reports, I am aware that the victims' three minor children were all at home when the shooting occurred.

LOPEZ, who was bleeding, there was a tan-colored semi-automatic pistol with a long-barrel attachment that was a suppressor.[12]

c.    Officer Martinez tended to LOPEZ and took possession of the firearm next to him.  Officer Martinez then removed a loaded magazine from the firearm and cleared the firearm, at which time, he saw a live round in the chamber. Burbank Fire Department ("Burbank FD") first responders arrived at the house and after attempts to tend to his injuries, ultimately, pronounced LOPEZ dead at approximately 1:43 a.m.[13]

d.    As first responders tended to LOPEZ, Officer Martinez noticed that LOPEZ had several tattoos including, "13"[14] and "PAL"[15].

e.    After LOPEZ was pronounced dead, Officer Martinez canvased the outside of the residence and located a blood trail leading from LOPEZ' body to the back of the residence.  Officer

---

[12] Based on my training and experience, I am aware that a "suppressor" or "silencer" is a device that attaches to a firearm and reduces the noise when the firearm is fired. Individuals engaging in unlawfully activity typically utilize suppressors to avoid detection when they shoot someone.

[13] Based on my review of Burbank PD reports, I am aware that on or about July 26, 2020, Deputy Medical Examiner Robyn Parks determined that LOPEZ had been shot twice in the abdomen. Ultimately, Examiner Parks attributed LOPEZ' death to one of the two gunshot wounds.

[14] Based on my training and experience, I am aware that members of *Sureño* gangs will commonly tattoo themselves with the number "13" to demonstrate their allegiance to the Mexican Mafia.

[15] Based on my review of Burbank PD reports, I am aware that on or about July 24, 2020, Burbank PD Detective Seston telephonically interviewed LOPEZ' mother and confirmed that LOPEZ was a member of the Psycho Ass Life (PAL) street gang.

Martinez continued to follow the blood trail, looked up, and saw blood on a glass railing on the second-floor patio.

f.    At approximately 1:34 a.m., Burbank PD Officer Alexy and other investigators arrived at the Cambridge Drive residence.  Officer Alexy went into the master bedroom on the second floor where he saw a shattered glass door leading to a balcony and an area in the door where there was also at least one bullet hole.  He also saw A.S. surrounded by a pool of blood and lying on the floor next to a bed.  In addition, he saw D.M. lying on the bed with a bloody blanket wrapped around her.  Officer Alexy and another officer provided D.M. aid and found a gunshot wound on the right side of her torso and another gunshot wound on her right arm, near her elbow.  Officer Alexy asked D.M. if she knew who did this to her and she replied, "I can't talk."[16]

g.    Burbank FD paramedics evaluated A.S. and pronounced him dead at approximately 1:44 a.m.  On or about July 26, 2020, Deputy Medical Examiner Dutra generated a report regarding the autopsy findings.  Examiner Dutra determined that A.S.' manner of death was a homicide.  He further determined

---

[16] Based on my involvement in this investigation, I believe that D.M. was stating that she could not name the person(s) responsible because she feared them.  This is further supported by the fact that when she was interviewed at her home by Burbank PD Detective Ekimyan in Armenian, she was asked if she knew who was responsible for the shooting, and she replied, "No?" However, then, when asked if she saw the shooter she replied, "Looked like a Mexican."  My understanding of D.M.'s responses is based on translations provided by Detective Ekimyan, who is a fluent Armenian speaker.

that A.S. sustained approximately eight wounds to his shoulder,
chest, and forearm.

      h.    While still conducting an investigation at and
around Cambridge Drive, Officer Alexy conducted several
interviews, including with a neighbor.  The neighbor stated that
several Armenian males would congregate at the home and stay for
days at a time.  The neighbor noted that all of these "guests"
drove nice cars and one time, when she spoke with one of them,
the "guest" told the neighbor that A.S.' father was "the most
important man in Armenia."

      i.    Later, on or about October 8, 2020, Burbank BP
Detective Sanchez interviewed D.M.  D.M. stated that the shooter
(LOPEZ) entered their residence through the sliding glass door
in their bedroom, walked over to A.S., and started shooting.
A.S. was able to grab a gun and shoot at LOPEZ.  Based on my
training, experience, and knowledge of this case, I believe that
A.S. must have defensively shot at LOPEZ before LOPEZ fell or
jumped over the balcony.

      3.    The Artuni Enterprise's Connection to A.S.'
              Murder and D.M.'s Attempted Murder

          a.    *Burbank PD identifies LOPEZ and determines
              that he communicated with a person using the
              alias "Vee" (STEPANYAN) leading up to A.S.'
              murder*

60.  Based on my review of Burbank PD reports and my
conversations with Sergeant Mirakyan, I am aware that:

      a.    On or about July 21, 2020, Burbank PD
investigators, including Burbank PD Sergeant Kay, located a
black Mercedes Benz parked near the victims' residence on Hilton

Drive.  The rear license plate (7BUJ248) was missing a month and registration sticker.  The front license plate bore a different number: 6DTN335.  In addition, there was a piece of tape affixed to the windshield, covering the Vehicle Identification Number ("VIN").  Burbank PD Detective Starkov conducted a records check on both license plate numbers.  The rear plate (7BUJ248) returned information for a 2008 Mercedes registered to J.T.[17] of Beverly Hills, California.  And, the front plate (6DTN335) returned information for H.G. of Los Angeles, California.  The 6DTN335 license plate had been reported stolen.  Burbank PD Detective Terrill conducted a VIN check and confirmed the VIN number matched that of the black Mercedes.  The detectives had the vehicle impounded on the suspicion that this was LOPEZ' vehicle.

        b.    On or about July 22, 2020, Burbank PD Sergeant Virzi obtained a warrant signed by the Honorable Suzette Clover, Superior Court Judge of the State of California, County of Los Angeles County, to search the black Mercedes.  During the subsequent search, investigators located, among other things, a California driver's license belonging to LOPEZ, $204 cash in U.S. currency folded around the driver's license, a backpack containing a white t-shirt and a black face covering, painter's tape, two license plates for the vehicle (5SKN546), and an LG cellphone ("LOPEZ' Cellphone").

_____

        [17] Based on my conversations with Sergeant Mirakyan and review of Burbank PD reports, I am aware that on or about July 23, 2020, Detective Sarkov contacted J.T. who confirmed that a license plate was missing from her car.  J.T. later filed a police report about her missing plate.

c.    On or about July 27, 2020, Burbank PD Detective
Voorhis and Sergeant Kay reviewed LOPEZ' Cellphone and
determined that it belonged to LOPEZ based on the text messages
and the videos and pictures stored on the device.  When
searching the device, investigators found a string of text
messages between LOPEZ and a person named "Vee" whose number was
ended in -7157 ("Vee's Cellphone").

d.    In particular, on or about June 30, 2020,[18] "Vee"
sent LOPEZ the following messages: "its Vee call me when you
can" and "also don't buy any clothes or shows I take you to get
some".[19]  In addition, "Vee" referenced LOPEZ calling a
documented Mexican Mafia associate, who, hereafter, will be
referred to as "MMA-1".

e.    On or about July 2, 2020, sometime before 4:00
p.m., LOPEZ and "Vee" exchanged several messages indicating that
they had an in-person meeting on that date.  Specifically, "Vee"
asked LOPEZ to let him know when he got on the 134 freeway.  The
cell tower that LOPEZ' Cellphone connected to when sending this
message covers a Burger King, which is located at 523 N. Central
Avenue, Glendale, California (the "Burger King").  Then, on or

---

[18] Based on my conversations with Sergeant Mirakyan and
review of Burbank PD reports, I am aware that LOPEZ was released
from prison on or about June 30, 2020.  LOPEZ had been serving a
two-year sentence for a narcotics offense.

[19] Based on my review of Burbank PD reports and
conversations with Sergeant Mirakyan, I am aware that LOPEZ was
wearing apparently new clothing at the time of his death.

about that same date, around 6:19 p.m., LOPEZ took a picture of
a cellphone.  The cellphone depicted an image of A.S.[20]

       f.    On or about July 9, 2020, at approximately 3:16
p.m., "Vee" and LOPEZ exchanged messages indicating that they
planned to have an in-person meeting.  Specifically, "Vee" sent
LOPEZ the following message: "text me when you're 5 minutes away
and when you get there just wait Ill come to u."  At the time of
this message exchange, Vee's Cellphone connected to a cell tower
that covers the Burger King.

       g.    On or about July 10, 2020, at approximately 12:55
p.m., "Vee" called MMA-1, and this phone call lasted
approximately 13 minutes.  At the time of this call, Vee's
Cellphone connected to a cell tower covering A.S. and D.M.'s
home on Cambridge Drive.

       h.    On or about July 13, 2020, at approximately 12:33
p.m., LOPEZ messaged "Vee": "Can we meet up."  At approximately,
2:08 p.m., "Vee" responded, "Yea, when."  At approximately 8:13
p.m., "Vee" called MMA-1 and they spoke for approximately three
minutes.  At the time of this call, Vee's Cellphone connected to
a cell tower approximately one mile away from A.S. and D.M.'s
residence, suggesting that he was heading towards or coming from
their home.

       i.    On or about July 16, 2020, "Vee" and LOPEZ
exchanged approximately 20 messages and five phone calls.  In
these messages, "Vee" and LOPEZ reference meeting at the Burger

---

[20] Based on my training and experience, I believe that "Vee"
was providing LOPEZ with a photograph of A.S. so that LOPEZ
could kill A.S.

King.  In one message, LOPEZ wrote: "I'm at the BK[21] parking lot.
Across the street from your spot".[22]  In addition, between
approximately 4:08 p.m. and 6:08 p.m., Vee and LOPEZ' Cellphones
utilized the same cell towers, including the tower covering the
Burger King.

       j.   On or about July 18, 2020, "Vee" and LOPEZ
exchanged a number of messages indicating that they were meeting
in-person on that date.  LOPEZ' Cellphone utilized the cell
tower covering the Burger King from approximately 5:20 p.m. to
7:00 p.m.  Cell tower data then indicates that LOPEZ left the
Burger King and traveled to or near A.S. and D.M.'s home, where
he remained between approximately 7:36 p.m. and 7:51 p.m.  Then,
at approximately 8:32 p.m., LOPEZ sent the following message to
"Vee": "pimpin im on the way to the pad.  Something told me not
tonight."  "Vee" responded: "Ok my boy u have a good night."
Based on my training and experience, I believe that after
meeting with "Vee" at the Burger King, LOPEZ traveled to the
Cambridge Drive residence to kill A.S. but, ultimately, decided
against it.  LOPEZ then informed "Vee" of his decision,
indicating that "Vee" or one of his associates had enlisted
LOPEZ to commit this murder.

---

[21] Based on "Vee" and LOPEZ explicit references to "Burger
King" in messages sent minutes after, I believe "BK" means
"Burger King."

[22] Based on my review of Burbank PD reports and
conversations with Sergeant Mirakyan, I am aware that there is
an apartment complex called "Altana" (633 N. Central Avenue,
Glendale, California) located across the street from the Burger
King.  I believe that when speaking about a "spot," LOPEZ is
referencing "Vee" living at the Altana apartment complex.

k.    On or about July 20, 2020, one day before A.S.'
murder, at approximately 12:01 p.m., "Vee" called LOPEZ, and
they spoke for approximately three minutes.  Then, at
approximately 4:43 p.m., "Vee" called LOPEZ, and they spoke for
approximately 50 seconds.  Then, on or about July 21, 2020, at
approximately 2:03 a.m., "Vee" sent the following message to
LOPEZ: "You asleep my boy."  Based on my training and
experience, I believe that "Vee" sent this message to LOPEZ not
yet knowing that he had died.

l.    On or about July 28, 2020, Sergeant Kay obtained
warrants, signed by the Honorable Suzette Clover, for GPS
location data and call detail records for Vee's Cellphone and
historical call detail records for LOPEZ' Cellphone.  Sergeant
Kay determined, after reviewing AT&T cellular records, that
there was no live GPS location data available for Vee's
Cellphone because it had been turned off.  Sergeant Kay later
determined that "Vee" had not used the phone since July 23,
2020, two days after A.S. was murdered.[23]

b.    *Burbank PD determines that "Vee" is
STEPANYAN*

61.  Based on my review of Burbank PD reports and my
conversations with Sergeant Mirakyan, I am aware that:

a.    In August 2020, Burbank PD investigators
determined that "Vee" was STEPANYAN.  Specifically, Sergeant Kay
received records from the cellphone provider associated with

---

[23] Based on my training and experience, I believe that "Vee"
discarded the phone after learning of LOPEZ' death and A.S.'
murder to conceal his involvement.

Vee's Cellphone and determined that it was a pre-paid[24] phone registered to "Vova Titov." Sergeant Kay determined that "Vova Titov" had associated addresses in Las Vegas, Nevada and Norwalk, California. In addition, Sergeant Kay determined that "Vova Titov" had an associated address at the Altana apartment complex located across the street from the Burger King where "Vee" and LOPEZ appeared to have met multiple times. Sergeant Kay then used law enforcement databases to search for individuals associated with the apartment complex and came across the name "Vahan Stephanian," among other names. Sergeant Mirakyan remembered STEPANYAN from a previous arrest and recognized "Vahan Stephanian" as a variation of STEPANYAN's true name. Sergeant Mirakyan also noted that STEPANYAN had a large tattoo across his neck that read: "VALLERO".

b. Sergeant Kay reviewed STEPANYAN's criminal history and determined that he had an associated address of 329 W. Lomita Street, Glendale, California. Based on GPS location data from his phone, this address is within 200 feet of where LOPEZ took a photograph of a cellphone displaying A.S.' picture on or about July 2, 2020, 19 days before his murder. In addition, Sergeant Mirakyan determined that A.B. was paying utilities for Unit #454 at the Altana apartment complex. Sergeant Mirakyan also determined, through reviewing jail records, that A.B. had visited STEPANYAN in 2012 and again, in

---

[24] Based on my training and experience, I am aware that individuals engaged in criminal activity often utilize pre-paid phones and register them under fictious names and addresses, or names and addresses belonging to other people, to avoid law enforcement detection.

2013, when he was imprisoned.  Using law enforcement databases, Sergeant Mirakyan also determined that STEPANYAN and A.B. previously shared a P.O. Box address in Glendale.  Based on this information, Sergeant Mirakyan determined that STEPANYAN and A.B. were likely in a romantic relationship and living together.

       c.   On or about July 31, 2020, Burbank PD officers surveilled the Altana apartment complex and saw a BMW registered to STEPANYAN parked in the parking structure.  Then, on or about August 4, 2020, Sergeant Kay conducted surveillance and saw STEPANYAN walk out onto an apartment balcony on what appeared to be the sixth floor with his shirt off.

       d.   On or about July 31, 2020, Sergeant Kay obtained a warrant signed by the Honorable Suzette Clover, for the e-mail account associated with "Vova Titov" (juhaalver60215@yahoo.com). On or about August 12, 2020, Yahoo provided subscriber information for the account, which included the name "Juha Alver" and a phone number ending in -3880.  Using law enforcement databases, Sergeant Kay determined that that phone number was associated with "Vahan Stephanian."  And further, that "Juha Alver" was associated with Unit #454 at the Altana apartment complex.

       e.   On or about August 14, 2020, the cellphone provider for Vee's Cellphone, sent the credit card number used to pay the account balance to Sergeant Kay.  Sergeant Kay then obtained a search warrant for the account holder information from the Honorable Suzette Clover, and on or about August 26, 2020, JPMorgan Chase Bank provided account holder information,

which included the name "Aso Balavanov."  Sergeant Kay used law
enforcement databases to locate "Aso Balavanov," and ultimately
concluded that this was a fictious name.  However, through these
same databases, Sergeant Kay determined that "Aso Balvanov" was
associated with Unit #454 at the Altana apartment complex.

f.   As part of the production from JPMorgan Chase
Bank, Sergeant Kay also received automated teller machine (ATM)
footage for transaction related to the account associated with
"Aso Balvanov."  On or about July 6, 2020, a man with a large
neck tattoo conducted business on the account.  The man was
wearing a hat, black jacket, and white face mask; however, his
neck was exposed, showcasing the letters "VA".  Sergeant Kay
compared this ATM photograph to STEPANYAN's booking photograph
and determined that this individual was STEPANYAN.

c.   *An anonymous letter names ARTUNI and others*
*as being responsible for A.S.' murder*

62.  Based on my review of Burbank PD reports and my
conversations with Sergeant Mirakyan, I am aware that:

a.   On or about May 25, 2021,[25] an anonymous letter[26]
was delivered to Burbank PD.  The letter identified ARTUNI and
two other persons as being responsible for organizing the murder

---

[25] Based on my conversations with Sergeant Mirakyan and
review of Burbank PD reports, I am aware that Sergeant Kay
generated the report regarding this letter on or about February
1, 2024.  Though the letter was addressed to her, and was post
marked as being received on May 25, 2021, Burbank PD Detective
Sanchez could not recall receiving the letter previously.

[26] Based on my conversations with Sergeant Mirakyan, I am
aware that the sender information was fictious and thus, the
true author of this letter is presently unknown.

of A.S. and attempted murder of D.M.  As it related to ARTUNI, the letter read, in sum and substance, as follows:

> *Homicide [A.S.]*[27]
>
> *July 21, 2020*
>
> *[A.S.' residence on Cambridge Drive]*[28]
>
> *Individuals responsible for [A.S.'] murder are:*
>
> *Aro (Armenian passport photo attached DOB 01.22.1984) – presenting himself as a fake Persian refugee.  is an Armenian from Armenia, unlawfully entered United States, presenting false identity name.  Father's name Vrej.*[29]
>
> *[. . .]*
>
> *Anonymous*

b.    Attached to the letter was a passport photograph depicting a photograph of ARTUNI but bearing the name "Ara Harutyunyan".

> d.    *An individual STEPANYAN speaks with during a jail call references ARTUNI*

63.  Based on my review of Burbank PD reports and my conversations with Sergeant Mirakyan, I am aware that:

a.    In furtherance of its investigation, Burbank PD obtained STEPANYAN's jail calls relating to his October 2020 arrest for identity theft.  Sergeant Mirakyan, a fluent Armenian speaker and department certified Armenian translator, reviewed

---

[27] The letter contained A.S.' true first and last name.

[28] The letter contained A.S.' true address, which is where he was murdered.

[29] Based on my involvement in this investigation, I am aware that ARTUNI's father's first name is, in fact, Vrej.

the jail calls.  The following summaries are based on his translations.  During one call, on or about October 29, 2020, STEPANYAN stated to a bail agent: "It appears to me that the cops are likely at my house and they may have found something there" and "I don't believe I will be getting released".  In another call, STEPANYAN told an individual who identified himself as "Haik:" "The faggots[30] got me and I don't have a phone, so I don't have anyone's numbers."  "Haik" then responded: "What do you want me to do?  You want me to call Aro?"  Based on my involvement in this investigation, I believe that "Aro" is ARTUNI.  "Haik's" suggestion that he contact ARTUNI confirms his connection with STEPANYAN.

b.    In another call, on or about October 29, 2020, STEPANYAN spoke with A.B.  STEPANYAN asked her if the cops took a black shirt, and she told him that they did.  STEPANYAN then responded, "Then I am not getting out of here."  Notably, LOPEZ was wearing a black shirt at the time he died.  Cellphone correspondence between LOPEZ and STEPANYAN indicate that STEPANYAN purchased clothes for him.  Thus, STEPANYAN's concern about law enforcement locating a specific item of clothing, may have been because that item of clothing would tie him to LOPEZ.  In addition, STEPANYAN's proclamations that he would indefinitely be detained are indicia of a guilty conscience.

e.    *ARTUNI's conversations with AGOPIAN point to*

---

[30] Based on my training and experience, I believe that by "faggots," STEPANYAN was referring to law enforcement.

*his involvement in A.S.' murder*

64.   Based on my review of LAPD reports and my
conversations with Detective Stupar, I am aware that:

a.   On or about December 12, 2023, in connection with
this investigation, law enforcement executed search warrants,
signed by the Honorable Jacqueline L. Chooljian, a U.S.
Magistrate Judge in the Central District of California, at
multiple locations associated with the Artuni Enterprise.  The
search of ARTUNI's home was executed pursuant to one such
federal warrant.  (Case No. 2:23-mj-6285.)  When executing the
warrant at the residence, law enforcement located, among other
items, a digital device (iPhone 14 Pro Serial Number LH7D79WWW9
and IMEI Number 357712766644875, "ARTUNI's iPhone 14 Pro") that
was seized and later reviewed.  Detective Mkrtchyan and U.S.
Customs and Border Patrol ("CBP") Officers Hakobyan and
Tsarukyan reviewed the following messages of relevance:[31]

i.   On or about July 20, 2020, AGOPIAN texted
ARTUNI, but ARTUNI did not respond.

ii.   On or about July 22, 2020, AGOPIAN contacted
ARTUNI using a different number and told ARTUNI to text like
everything was normal.  ARTUNI texted back "OK".  Based on my
training and experience, I believe that AGOPIAN "dropped"[32] his

---

[31] Detective Mkrtchyan and the CBP officers are fluent
Armenian speakers.  Detective Mkrtchyan is a department
certified Armenian translator.  My recounting of these
statements is, therefore, based upon their translations.

[32] Based on my training and experience, I am aware that
individuals engaged in criminal activity will commonly dispose
of their cellphones.  This practice is called "dropping" a
*(footnote cont'd on next page)*

phone number after A.S. was murdered on or about July 21, 2020,
to obfuscate his and ARTUNI's potential involvement.  I also
believe that he instructed ARTUNI to act like everything was
normal for the same reason.

**B.    October 25, 2022: Individuals Attempt to Murder
        STEPANIAN At His Former Residence in Granada Hills,
        California[33]**

        1.    Probable Cause Summary

65.    As set forth below, there is probable cause to believe
that ARTUNI, and others known and unknown, attempted to murder
STEPANIAN.  The evidence supporting this determination includes,
but is not limited to: (1) the recurring pattern of violence
targeting the Amiryan Organized Crime Group and (2) the presence
of aerial drone footage of STEPANIAN's residence on one of
ARTUNI's digital devices.

        2.    Description of the Attempted Murder

66.    Based on my conversations with Detective Stupar, my
review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

        a.    On or about October 25, 2022, LAPD Officers
Salcedo and Orantes received a radio call of "Shooting just
occurred" at approximately 4:09 p.m.  Officer Salcedo found
STEPANIAN in the driveway of his residence.  At the time,
STEPANIAN informed Officer Salcedo that he needed medical

---

phone, and it is commonly done so that criminals can avoid law
enforcement detection.

        [33] For reasons explained below in Subsection XIII(V)(9), I
believe that STEPANIAN has since located to SUBJECT PREMISES 3.

assistance.  Sometime thereafter, STEPANIAN was transported to a local hospital.

b.    While at the hospital, LAPD Officers De La Victoria and Harland interviewed STEPANIAN.  STEPANIAN stated that he was standing in his driveway on his cellphone when a vehicle drove up and stopped several feet away from his residence.  The rear passenger door opened, and an individual exited.  The individual shot him in the upper right back, at which time he fell to the ground.  Then, the individual began racking the gun while approaching him and attempted to shoot him a second time.  STEPANIAN ran to a neighbor's house, and the individual got back in the car and fled.  STEPANIAN described the individual as a male wearing a black face mask, dark hoodie, multi-color plaid shirt, black jeans, and black gloves.  In addition, the individual was carrying a handgun with a suppressor.

c.    Officers De La Victoria and Harland interviewed, among other individuals, STEPANIAN's neighbors and reviewed surveillance footage captured on at-home cameras.  The neighbors' statements and camera footage both corroborated STEPANIAN's description of the shooting.

3.    The Artuni Enterprise's Connection to the Attempted Murder

67.  Based on my conversations with Detective Stupar, my review of LAPD reports, and my own involvement in the investigation, I am aware that on ARTUNI's iPhone 14 Pro, investigators located footage of ARTUNI operating a drone in his

backyard and aerial drone footage dated July 29, 2023, of
STEPANIAN's residence.  Although this footage post-dates the
murder attempt, I believe it still attributes ARTUNI to the
failed October 2022 murder, given the recurring targeting of
members of the Amiryan Organized Crime Group at or near their
homes.

### C. April 3, 2023: AMIRYAN Is Shot at While in the Garage of His Former Residence

#### 1. Probable Cause Summary

68.  As set forth below, there is probable cause to believe
that ARTUNI, and others known and unknown, attempted to murder
AMIRYAN.  The evidence supporting this determination includes,
but is not limited to: (1) the recurring pattern of violence
targeting the Amiryan Organized Crime Group and (2) the presence
of AMIRYAN's personal information and then-address on one of
ARTUNI's digital devices.

#### 2. Description of the Attempted Murder

69.  Based on my conversations with Detective Stupar and
Sergeant Mirakyan, my review of LAPD and Burbank PD reports, and
my own knowledge of the investigation, I am aware of the
following:

a.  On or about July 8, 2023, at approximately 10:45
a.m., Burbank PD Detective Pira and Federal Bureau of
Investigation ("FBI") Special Agent Kojayan[34] arrived at a local
hospital to interview AMIRYAN, who had been shot the day prior.

---

[34] Based on my involvement in this investigation I know that
neither the FBI nor Special Agent Kojayan are a part of the
investigative team in this matter.

AMIRYAN suffered injuries to his shoulder and elbow.  The July 7, 2023 shooting is further discussed below.

b.    During the interview, AMIRYAN declined to discuss the July 7, 2023 shooting and, instead, initiated a conversation regarding an alleged shooting that occurred on or about April 3, 2023.  Specifically, according to AMIRYAN, on or about April 3, 2023, at approximately 11:30 p.m., he parked his vehicle in the subterranean garage of his former residence,[35] which was in an apartment complex on East San Jose Avenue in Burbank (the "East San Jose residence").  He began to walk to the alleyway directly behind his residence when, suddenly, a man wearing a ski-mask and dark clothing approached him, fired two shots at him with an AR-15, and fled.  Following the attempt on his life, AMIRYAN went to his apartment.  According to AMIRYAN, he was not hit; however, one round struck the concrete staircase that led to his apartment and the other round struck a metal gate on top of the staircase.  AMIRAYN covered the bullet hole on the gate with black tape and did not notify the police about the shooting. AMIRYAN did not provide an explanation as to why he did not notify police.

c.    On or about July 10, 2023, Burbank PD Detective Voorhis went to AMIRYAN's then-residence and found a bullet strike in the metal gate that was covered by black tape. Detective Voorhis took pictures of the bullet strike.

_____

[35] As explained below, AMIRYAN has since relocated to SUBJECT PREMISES 1.

3.    The Artuni Enterprise's Connection to the
Attempted Murder

70.   Based on my conversations with LAPD Major Crimes
Detective Stupar, my review of LAPD Major Crimes reports, and my
own involvement in the investigation, I am aware that on
ARTUNI's iPhone 14 Pro, investigators located screenshots of a
background check of AMIRYAN and a screenshot of a map with the
address of the East San Jose residence depicted in the
background check screenshot.

D.   **June 6, 2023 to June 7, 2023: Members and Associates
of the Amiryan Organized Crime Group Kidnap, Assault,
and Torture A.K.**

1.    Probable Cause Summary

71.   As set forth below, there is probable cause to believe
that AMIRYAN, V. HARUTYUNYAN, GZRARYAN, STEPANIAN, A.
HARUTYUNYAN, BOJORQUEZ, EGUILUZ, and others known and unknown,
kidnapped, assaulted, and tortured A.K.  The evidence supporting
this determination includes, but is not limited to: (1) the use
of non-Armenian criminals (BOJORQUEZ, EGUILUZ, and others known
and unknown) as the kidnappers and assailants; (2) Ring[36] camera
footage, which is corroborated by cell-site location and GPS
data, placing members of the Amiryan Organized Crime Group
(AMIRYAN, V. HARUTYUNYAN, GZRARYAN, and A. HARUTYUNYAN) at the
residence where A.K. was held captive; (3) call history

_____

[36] Based on my training and experience, I am aware that a
Ring camera is a type of smart home security camera that
provides homeowners with real-time video footage of their
property.  Ring cameras come in various models, including
doorbell cameras, floodlight cameras, and standalone outdoor and
indoor cameras.  They feature motion detection, two-way audio,
and night vision, and can be controlled and viewed via a
smartphone application.

indicating that A. HARUTYUNYAN called A.K. five times
consecutively before he was kidnapped; (4) DNA and latent print
evidence placing AMIRYAN, V. HARUTYUNYAN, GZRARYAN, A.
HARUTYUNYAN, STEPANIAN and EGUILUZ at the residence where A.K.
was held captive; (5) a recorded conversation between ARTUNI and
A.K. in which A.K. named AMIRYAN as the person responsible for
his kidnapping; (6) the presence of vehicles used by A.
HARUTYUNYAN, V. HARUTYUNYAN, BOJORQUEZ, and STEPANIAN at or near
the residence where A.K. was held captive; (7) videos depicting
A.K.'s assault and torture on a cellphone seized from GZRARYAN;
and (8) A. HARUTYUNYAN's flight to Mexico after A.K. escaped
from captivity.

        2.    <u>Description of the Kidnapping, Assault, and
Torture</u>

        *a.    A.K.'s family contacts law enforcement and
reports him missing*

72. Based on my conversations with LAPD Detectives Stupar
and Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

        a.    On or about June 7, 2023, at approximately 10:45
a.m., LAPD North Hollywood Division Officers Walters and
Hoermann responded to a radio call regarding a suspected
kidnapping.  The call came from A.K.'s residence, which was
located on Beeman Avenue in North Hollywood, California (the
"Beeman Avenue residence").

b.    The two officers met with A.K.'s sister and
nephew[37] at the Beeman Avenue residence to discuss the reported
kidnapping.  During their conversation, which was in English,
A.K.'s sister stated that earlier that day, around 6:00 a.m.,
she received a phone call from a family friend who lives in
Armenia via WhatsApp.[38]  Per A.K.'s sister, the family friend
stated that A.K. had been kidnapped and tortured.  The family
friend also claimed to have received this information from an
unknown person using a blocked number.[39]

c.    The two responding officers also spoke to A.K.'s
nephew at the Beeman Avenue residence to discuss the reported
kidnapping.  This conversation was in English.  A.K.'s nephew

---

[37] Based on my conversations with Detectives Stupar and Sam,
my review of LAPD reports, and my own knowledge of the
investigation, I am aware that A.K.'s neighbor initially
reported the crime on behalf of A.K.'s sister and nephew due to
their difficulty communicating fluently in English.

[38] Based on my training and experience, I know that WhatsApp
is an end-to-end encryption messaging platform commonly used by
American-based users to communicate with others internationally.
Based on my training and experience, given that the
communications are encrypted, WhatsApp is also commonly used by
criminals to prevent law enforcement from intercepting their
messages.

[39] Based on my training and experience, I believe that since
notice of the kidnapping originated from Armenia, it is likely
that the kidnappers acted on orders from (or with the blessing
of) someone from Armenia.  As previously stated, Armenian
Organized Crime operates like many transnational criminal
organizations, where many senior leaders, members, and
associates reside in a foreign country.  Armenian Organized
Crime originated in the former Soviet Union, which included
modern-day Armenia.  Thus, today, many Armenian Organized Crime
leaders, members, and associates are Armenian citizens and
nationals, some of whom have residences in or permanently reside
in Armenia.  It is my belief that the kidnappers in this case
were likely providing updates to Armenian Organized Crime
leadership, members, or associates in Armenia, because A.K.'s
family was first notified of his kidnapping by someone in
Armenia.

stated that A.K. left the Beeman Avenue residence on or about
June 6, 2023, at approximately 11:55 p.m., to meet with a friend
named "Arthur."  According to A.K.'s nephew, A.K. did not leave
in his own vehicle.  A.K.'s nephew claimed to know that his
uncle did not leave in his vehicle because he saw him walk away
from the residence on their home security camera.  A.K.'s nephew
did not provide "Arthur's" last name and further stated that he
had no contact information for "Arthur."  (As further detailed
below, law enforcement later identified "Arthur" as A.
HARUTYUNYAN, a member of the Amiryan Organized Crime Group.)

       d.    Later, while conducting their kidnapping
investigation, officers were informed by A.K.'s sister (via a
phone call) that A.K. had contacted his mother in Armenia at
approximately 1:15 p.m. that same day.  According to A.K.'s
sister, A.K. told their mother that he had not been kidnapped,
and that he was safe.  According to his sister, A.K. also said
that he had lost his cellphone and would be returning home later
in the day.  A.K.'s mother relayed the aforesaid information to
her daughter, who then advised law enforcement.  A.K.'s sister
declined to provide law enforcement with her mother's telephone
number to validate these claims because according to her, her
mother is elderly, and she did not want her worrying about A.K.
In addition, A.K.'s sister refused further police involvement.

       b.    *A.K. escapes from the residence where he was*

*being held and returns home*

73.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.  On or about June 7, 2023, at approximately 10:05 p.m., LAPD Foothill Division Officers Elias and Rivera responded to a second radio call for a missing person/kidnapping investigation regarding A.K.  The caller related that A.K. had been tracked via the "Find My" application to the area of 9852 Milburn Drive, Los Angeles, California ("9852 Milburn").[40]  At the time they received this call, the officers were aware of an earlier incident in North Hollywood where other officers had completed a missing person report on A.K.

b.  Upon their arrival at 9852 Milburn, officers noticed that there appeared to be no activity inside of the residence.  There were no vehicles in the driveway or on the street in front of the location, and the lights were off.

c.  The officers saw a 2002, gold GMC Yukon bearing California license plate number 4VVZ782 and VIN 1GKEC13V62R182459 (the "Yukon") parked directly in front of 9842 Milburn Drive, Los Angeles, California ("9842 Milburn").[41]

---

[40] Based on my training and experience, I know that a tracked cellphone typically only gives an approximate location, not the actual location.  Based on my conversations with LAPD Detectives Stupar and Sam, I know that the responding officers had this same understanding.

[41] Based on my conversations with LAPD Detective Sam, who reviewed the LexisNexis Risk Solutions ("LexisNexis") database, I am aware that 9842 Milburn is owned by D.G. (an Armenian citizen and national).  Based on records checks utilizing closed
*(footnote cont'd on next page)*

Officers ran the Yukon's plates and determined that it was
registered to a person bearing the initials V.M.C. at an address
in Bakersfield, California.[42]  Because the registered owner of
the vehicle did not reside in the neighborhood, or even in the
County of Los Angeles, and further, because 9842 Milburn was
within the approximate location of where A.K.'s cellphone was
pinging via the "Find My" application, the officers focused
their attention on that residence.

   d. LAPD Officer Rivera saw an individual through the
front window inside of 9842 Milburn, and he knocked on the front
door.  Two other men peeked through a stained-glass window on
the front door for a quick moment, and then they immediately
backed away.  Officers then saw some of the interior lights
being turned off.  Based on information that A.K. had possibly
been kidnapped and tortured, the fact that A.K.'s cellular phone
was pinging in the surrounding area, and the presence of three
unidentified men in the house who were seemingly unwilling to
engage with law enforcement and furthermore, were taking
concealment-like steps, such as turning the lights in the house
off, officers determined that continuing to try to make contact
with the occupants, without further assistance, was not safe.
Officers backed away from the residence and requested additional

---

sourced law enforcement databases containing immigration
information, I am also aware that D.G. is undocumented and has
been ordered removed from the United States.  His current
whereabouts are unknown.

 [42] Based on my conversations with Detective Sam, who spoke
with V.M.C. on November 5, 2023, V.M.C. claims that he sold the
Yukon around May 2023 or June 2023, and that he does not
remember who he sold it to.

units for further investigation.  Once additional officers
arrived, a perimeter was established to secure the residence.

    e.   The officers, now with the assistance from an
LAPD airship and other additional LAPD units, ordered all
individuals inside of 9842 Milburn to exit.  Eventually,
AMIRYAN, V. HARUTYUNYAN, and GZRARYAN exited the residence and
were detained without incident.  During a cursory search of the
three men, officers found digital devices on AMIRYAN, V.
HARUTYUNYAN, and GZRARYAN's person.  These devices were later
searched pursuant to a federal search warrant signed by the
Honorable Jacqueline L. Chooljian.  (Case No. 2:23-mj-6296.)[43]

    f.   After the three men exited 9842 Milburn, officers
conducted a protective sweep of the residence to confirm that
there were no additional persons inside.  While clearing the
residence, officers saw blood splatter throughout the house,
body armor, bullet holes in two walls that were filled with
fresh blood splatter, and a 2005, white Dodge Caravan minivan
bearing California license plate number 9BXP460 and VIN
2D4GP24R25R170326 (the "Minivan") in the garage that contained a
substantial amount of blood that was seemingly in the process of
being cleaned.[44]  In addition, officers, without entering the

_____

[43] Based on my conversations with Detective Stupar, and my
review of LAPD reports, I am aware that separately, LAPD
obtained a warrant signed by the Honorable Thomas Falls,
Superior Court Judge of the State of California, County of Los
Angeles, to search these devices.

[44] Based on my conversations with Detective Stupar, and my
review of LAPD reports, I am aware that investigators obtained
Ring camera footage from neighboring houses pursuant to a state
search warrant signed by the Honorable Daniel Feldstern, Superior
*(footnote cont'd on next page)*

Yukon, saw through the windows that a semi-automatic pistol was
resting on the driver's seat in plain view.

      g.   Officers exited 9842 Milburn and requested
assistance from LAPD detectives for a search warrant and further
investigation.  An officer on the perimeter was flagged down by
an individual who stated that he had video surveillance of a
possible suspect[45] in the area.  The individual advised the
officer that he heard the LAPD airship in the area and said his
Tesla[46] captured a possible suspect.  Officer Rivera reviewed the
Tesla video recording and captured it on his body worn camera.
The video depicted A.K. fleeing from 9842 Milburn.

      h.   While officers continued to hold the perimeter of
9842 Milburn, LAPD Detective Larkin completed and swore out a
search warrant for 9842 Milburn, as well as the Yukon, and the
Minivan.  The search warrant was signed by the Honorable Lisa
Chung, Superior Court Judge of the State of California, County
of Los Angeles.

      i.   LAPD Detective Smith conducted a walkthrough and
search of 9842 Milburn pursuant to the warrant.  Detective Smith
discovered, among other items, the following: four Kevlar

---

Court Judge of the State of California, County of Los Angeles.
Based on the footage, the Minivan entered the garage at
approximately 12:32 a.m. on or about June 7, 2023.

   [45] The individual assumed that the person captured was a
suspect rather than a victim.

   [46] Based on my training and experience, I know that
generally, Tesla cars have a security system called "Sentry
Mode."  When "Sentry Mode" is enabled by the user, the car's
cameras capture a 360-degree view surrounding the car and record
activity outside of the car even when it is parked, locked, and
unattended.  These recordings are generally saved on a Universal
Serial Bus (USB) drive stored in a port inside of the car.

bullet-proof vests (a type of body armor) inside a garbage bag
in one of the hall closets, black nitrile gloves, blood splatter
throughout the house, an orange two-way radio, blood-stained
men's clothing and shoes, microfiber towels, through-and-through
bullet holes in the master bathroom, and, as previously stated,
the Minivan, which contained a substantial amount of
bloodstaining throughout its interior and looked as if it was in
the process of being cleaned.

      j.   In the backyard, there was an in-ground pool
filled with dirty water, which caused low visibility.  For this
reason, officers at 9842 Milburn requested assistance from
LAPD'S Underwater Dive Unit, who arrived at the residence and
searched the pool for possible victims and other evidence.  LAPD
Detective McKinney, a member of the Underwater Dive Unit,
recovered a loaded Smith & Wesson, model 442-1 Airweight, .38
special caliber, revolver, bearing serial number CYM6399; a
loaded Smith & Wesson, model 642-1 Airweight, .38 special
caliber, revolver, bearing serial number DNR9780; and a car key
belonging to a Kia[47] at the bottom of the pool.

      k.   Additionally, Detective Smith found a black
nitrile glove on the ground on the other side of a wrought iron
fence bordering the backyard of 9842 Milburn.  This glove
matched the gloves found inside 9842 Milburn and the garage.
Also, on an adjacent property on Hollywood Way in Sun Valley,

---

[47] Based my involvement in this investigation and review of
LAPD reports, I am aware that A.K. drove a Kia and upon
returning home, reported that his car keys were missing.
Accordingly, I believe these keys were thrown in the pool to
conceal that A.K. had been at the residence.

California (the "Hollywood Way property"),[48] Detective Smith saw
what appeared to be fresh footprints in the soft dirt, which led
down a hillside.  Detective Smith followed the trail of
footprints, which led him to a black duffle bag and a black,
fabric grocery bag at the edge of the Hollywood Way property
underneath an overgrown tree or bush.  The bags appeared to have
recently been partially covered in dirt and leaves.[49]  Detective
Smith recovered the bags and inside of them found, among other
items, nitrile gloves; balaclava masks; two loaded, unknown
make, unknown model, unknown caliber, AR-15-type semi-automatic
rifles bearing no legitimate manufacturer's mark or serial
number (commonly referred to as "ghost guns"); one Para
Ordnance, model 1911 Expert Commander, .45 auto caliber, semi-
automatic pistol, bearing serial number K029104 with a silencer
attached; one Sig Sauer, model MCX, 5.56 NATO x 7.62 NATO
caliber, semi-automatic rifle, bearing serial number 63F039344;
one Walter, model P22, .22 caliber, semi-automatic pistol, with
an obliterated serial number and a silencer attached; assorted
ammunition and extended ammunition magazines; and a GPS tracking
device.

        l.   On a hillside, on another part of the Hollywood
Way property, Detective Smith found an orange two-way radio

---

[48] Based on my conversations with Detectives Stupar and Sam,
I know that LAPD received consent from the owners to search
their property.

[49] Based on my training and experience, I believe that these
items and others were discarded as members and associates of the
Amiryan Organized Crime Group fled from 9842 Milburn.  I believe
they discarded these items so that they could not be tied back
to them.

matching the one found inside 9842 Milburn.  Nearby the above-mentioned bags, at the base of a chain-link fence on the Hollywood Way property, Detective Smith found a large black garbage bag containing blood-stained men's clothing, microfiber towels matching those found inside 9842 Milburn, and a blood-stained shower curtain.

      m.   Detective Smith continued canvassing the area around 9842 Milburn and the adjacent properties and found a loaded Smith & Wesson, model 638-3 Airweight, .38 caliber revolver, bearing serial number DAM3868 inside a black holster near the sidewalk of the Hollywood Way property, just around the corner from 9842 Milburn.

      n.   LAPD detectives requested additional assistance to process 9842 Milburn and the surrounding area.  LAPD Criminalists Canlas and Wallace collected multiple items of evidence.  LAPD's Technical Investigation Division Photographers Coogle and Hood took photographs of the crime scene and all evidence collected.  LAPD's Technical Investigation Division Latent Print Specialists De Monte, Morales, and Valles recovered latent prints from various locations and items at 9842 Milburn and the surrounding area.  LAPD'S Forensic Science Division Gun Unit Criminalist Saucedo recovered a .22 caliber projectile from inside the wall of the master bathroom where bullet holes were found.

      *c.   A.K. is treated at a local hospital for his*

*injuries*

74.   Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports and hospital records, and my own knowledge of the investigation, I am aware of the following:

a.   While officers continued their investigation at 9842 Milburn, A.K.'s nephew, who was there with his father, advised them in-person that A.K. had returned to his home (the Beeman Avenue residence).  LAPD Officers Camacho and Olivares went to the Beeman Avenue residence and interviewed A.K.  When they met with A.K., the officers saw bruising to A.K.'s eyes, face, and head.  The officers also noted that A.K. was having trouble speaking and was complaining of pain to his head. Officers requested an ambulance, and Rescue Ambulance 889 responded to the Beeman Avenue residence and transported A.K. to the hospital.

b.   According to hospital records, A.K. presented with significant swelling to the face and scalp.  Evaluation and testing determined A.K. suffered from Leukocytosis, a nasal bone fracture, an orbital bone fracture, a left frontal subarachnoid hemorrhage, and transaminitis.  A Computed Tomography (CT) scan of A.K.'s brain identified a small subarachnoid hemorrhage in the frontal lobe, along with comminuted fractures of the nasal bone and anterior nasal spine, nondisplaced fractures of the right medial and inferior orbital walls, and bilateral facial soft tissue swelling with extensive interstitial air.

c.   While at the hospital, the officers interviewed A.K.  This interview was in English.  During the interview, A.K.

stated that he had not been kidnapped, he knew the people living
at the residence (presumably 9842 Milburn), and he had not been
harmed or handcuffed.  He further stated that the people living
at the residence were "not guilty."

        3.   The Amiryan Organized Crime Group's Connection to
A.K.'s Kidnapping, Assault, and Torture

          *a.   Latent print evidence places members and
associates of the Amiryan Organized Crime
Group at 9842 Milburn*

75.  Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

a.  As previously stated, law enforcement processed
9842 Milburn and the surrounding area.  During forensic
processing of the crime scene, approximately 365 items of
evidence were recovered.  One of the items included a 22 fluid
ounce Arizona Mucho Mango aluminum can, which officers found on
the living room floor.  Multiple fingerprints were obtained from
the body of the aluminum can.  Latent Print Specialist Salazar
conducted latent print testing and determined that the prints
obtained from the can matched prints from EGUILUZ.

b.  During forensic processing of 9842 Milburn and
the surrounding area, other items were recovered, including a
12-fluid ounce Coca-Cola can and a digital device (a white Apple
iPhone SE bearing serial number FFMCQ8GJPLJN), which were both
found on top of a circular glass table located outside in the
backyard near a sliding door in the kitchen.  Multiple
fingerprints were obtained from the body of the Coca-Cola can

and one fingerprint was obtained from the back of the iPhone. Latent Print Specialist Salazar, conducted latent print testing and determined the prints obtained from the can and the iPhone matched prints from GZRARYAN.

c.    During forensic processing of 9842 Milburn and the surrounding area, a second and third 12-fluid ounce Coca-Cola can were found on top of a circular glass table located outside in the backyard near a sliding door in the kitchen. Multiple fingerprints were obtained from the body of the Coca-Cola cans. Latent Print Specialist Salazar conducted latent print testing and determined the prints obtained from the Coca-Cola cans matched prints from A. HARUTYUNYAN.

d.    During forensic processing of 9842 Milburn and the surrounding area, a 12-fluid ounce Squirt can was found in the backyard inside of a plastic bag under a circular glass table located outside in the backyard near a sliding door in the kitchen; a 750-milliliter glass bottle of Johnnie Walker Green Label was also found on top of the circular glass table. Prints were obtained from the Squirt can and the side of the Johnnie Walker Green Label bottle. Latent Print Specialist Salazar conducted latent print testing and determined that the prints obtained from the can and the bottle matched prints from AMIRYAN.

e.    During forensic processing of 9842 Milburn and the surrounding area, a red plastic "Solo" cup was found on top of a circular glass table located outside in the backyard near a sliding door in the kitchen; and an open pack of Camel Blue Hard

Pack cigarettes, and a 16.9 fluid ounce Crystal Geyser plastic water bottle label were found on top of the kitchen counter. Fingerprints were obtained from the cup, cigarette pack, and water bottle.  Latent Print Specialist Salazar conducted latent print testing and determined that the prints obtained from the cup, cigarette pack, and water bottle matched prints from V. HARUTYUNYAN.

   f. During forensic processing of 9842 Milburn and the surrounding area, a fourth 12-fluid ounce Coca-Cola can and 750-milliliter glass bottle of Macallan 18 were found on top of a circular glass table located outside in the backyard near a sliding door in the kitchen.  The Macallan packaging was found in the backyard on top of a brown wicker stool.  Fingerprints were obtained from the Coca-Cola can, the front of the 750-milliliter glass bottle of Macallan 18, and on the back of the Macallan packaging.  Latent Print Specialist Salazar conducted latent print testing and determined that the prints obtained from the can, bottle, and packaging matched prints from STEPANIAN.

   *b.* *DNA evidence confirms A.K. and STEPANIAN's presence at or near 9842 Milburn*

  76. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

   a. LAPD's Forensic Science Division analyzed the DNA mixture profile for reddish-brown blood stains in various parts of 9842 Milburn, on clothes found in 9842 Milburn, and in the

Minivan parked in the garage of 9842 Milburn, and determined that the DNA profile was consistent with A.K.'s.

b.    LAPD's Forensic Science Division also analyzed the loaded Smith & Wesson revolver that was discarded near the sidewalk of the Hollywood Way property and received a Combined DNA Index System ("CODIS") hit notification for STEPANIAN, whose DNA was consistent with the majority of DNA that was recovered from the firearm.

> c.    *A.K. identifies members of the Amiryan Organized Crime Group but maintains that they were not responsible for his kidnapping, assault, and torture*

77.    Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.    On October 26, 2023, Detectives Sam, Stupar, and Mkrtchyan conducted a follow-up interview with A.K. at an LAPD North Hollywood police station.  The interview was conducted in both English and Armenian.  When translation to Armenian was necessary, Detective Mkrtchyan, who is a fluent Armenian speaker and certified Armenian translator, acted as the translator.

b.    Prior to meeting with A.K., detectives created separate six-pack photo line-ups of individuals they had identified as potential suspects during their investigation, including V. HARUTYUNYAN, AMIRYAN, GZRARYAN, STEPANIAN, and EGUILUZ.  The photo line-ups were printed in color and separately placed in manila folders.  In addition to the above photo line-ups, Detective Sam also printed a color copy of A.

HARUTYUNYAN's California Department of Motor Vehicles ("DMV")
photo.

      c.   Detective Mkrtchyan read and translated the
photographic show-up admonition to A.K., which he stated that he
understood and acknowledged by signing the admonition.  Prior to
showing A.K. each separate line-up, Detective Mkrtchyan
confirmed that he still understood the admonition, to which A.K.
responded in the affirmative, and signed a separate admonition.

      d.   Detective Mkrtchyan showed A.K. the following
photo line-ups that detectives had previously created, using the
blinded photo line-up procedure:[50]

      i.   Detective Mkrtchyan presented A.K. with
GZRARYAN's photo line-up.  A.K. immediately recognized GZRARYAN,
who was in position number four, as "Sevak."  He placed an X
across GZRARYAN's face and circled GZRARYAN's photo.  A.K.
placed his initials in the top right corner of the photo and the
date (10/26/23) on the bottom right corner of the photo.
Additionally, A.K. wrote "N4 SEVAK" on LAPD's Photographic
Identification Report.[51]

      ii.   Detective Mkrtchyan presented A.K. with V.
HARUTYUNYAN's photo line-up.  A.K. immediately recognized V.
HARUTYUNYAN, who was in position number two, as "Vahan."  A.K.

---

[50] Based on my training and experience, I am aware that the
"blinded photo line-up procedure" is a process by which the
person administering the photo line-up does not create or look
at the photographs prior to showing them.

[51] Based on my training and experience, I know that a
"Photographic Identification Report" is a report showing a
photograph of the suspect along with five other persons who bear
a similar resemblance.

circled V. HARUTYUNYAN's photo, placed his initials above it,
and dated the bottom of the photo. Additionally, A.K. wrote "N2
Vahan" on LAPD's Photographic Identification Report.

        iii. Detective Mkrtchyan presented A.K. with
AMIRYAN's photo line-up. A.K. immediately recognized AMIRYAN,
who was in position number one, as "Rubo," "Fish," or "Rubo
Fish." He circled AMIRYAN's photo and placed his initials and
date above the photo. Additionally, A.K. wrote "N1 Rubo" on
LAPD's Photographic Identification Report.

        iv. Detective Mkrtchyan presented A.K. with
STEPANIAN's photo line-up. A.K. immediately recognized
STEPANIAN, who was in position number five, as "Miko" or
"Maik."[52] He circled STEPANIAN's photo and placed his initials
and date above it. Additionally, he wrote "N5 Maik" on LAPD's
Photographic Identification Report.

        v. Detective Mkrtchyan presented A.K. with
EGUILUZ' photo line-up. EGUILUZ was in position number five.
A.K. did not immediately recognize anyone but stated that he
believed that the person placed in position number 3 (who was
not EGUILUZ) looked familiar. Additionally, he wrote "N3 not
shur" (likely meaning, "not sure") on LAPD's Photographic
Identification Report.

        e. During the interview, detectives asked A.K. if
anyone inside 9842 Milburn had harmed him. A.K. responded that
nobody at the house had attempted to harm or threaten him.

---

[52] Based on my knowledge of this investigation, I believe
that "Maik" is a nickname for STEPANIAN.

f.    Interviewing detectives showed A.K. the video recording of him being assaulted inside 9842 Milburn.  As previously stated, investigators located this video on a digital device (a white iPhone bearing serial number DNPN93ADFFDN) that arresting officers found on GZRARYAN's person.  Initially, A.K. denied that the beating occurred at 9842 Milburn, but when told by detectives that they knew the video was taken from inside 9842 Milburn, he did not deny it.  A.K. then expressed concern about creating problems for himself and mentioned his desire to and avoid any trouble for his family, which he stated, was currently living peacefully.  A.K. stated that "God" will handle his assailants.

g.    During the interview, A.K. was shown a single DMV photo of A. HARUTYUNYAN.  A.K. positively identified the person depicted in the photograph as "Artur."

d.    *Ring cameras capture members of the Amiryan Organized Crime Group entering and exiting 9842 Milburn*

78.    Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware that between on or about June 6, 2023, and June 7, 2023, Ring camera footage captured individuals, including AMIRYAN, V. HARUTYUNYAN, GZRARYAN, and A. HARUTYUNYAN, driving to and from 9842 Milburn, bringing assorted items into 9842 Milburn, and entering and exiting the residence.  As previously stated, this Ring camera footage was searched pursuant to a warrant signed by the Honorable Daniel Feldstern.

79.  Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am also aware that corroboratively, cell-site
and GPS location data for a phone registered to EGUILUZ and
phones found on the persons of V. HARUTYUNYAN and GZRARYAN when
they were detained, placed them at or near 9842 Milburn between
June 6, 2023, and June 7, 2023.

> e.    *Law enforcement locates videos depicting
> A.K.'s assault and torture and a photograph
> depicting A.K.'s address on two of
> GZRARYAN's cellphones*

80.  Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware that law enforcement located
approximately 13 videos on a white Apple iPhone 5S bearing IMEI
number 352028060161101 seized from GZRARYAN's person when he was
arrested ("GZRARYAN's iPhone 5S") that depicted A.K. being
assaulted and tortured.  The following is a description of some
of the videos located:[53]

a.    On or about June 7, 2023, at approximately 1:09
a.m., someone recorded a video titled
"cplARByPGKq2blHrwOMgJ7OkQBHZHu2.mov" on GZRARYAN's iPhone 5S
that depicted, among other things, an individual interrogating
A.K. and asking him, in English, who shot "Rubo" and "Rubo

---

[53] This cellphone was searched pursuant to a warrant issued
by the Honorable Jacqueline L. Chooljian.  (Case No. 2:23-mj-
6296.)  In some of the videos, the person(s) interrogating A.K.
spoke in Armenian.  Detective Mkrtchyan reviewed the videos and
translated them from Armenian to English.  My understanding of
what is said in the videos is, therefore, based on his
translation.

Fish," referring to AMIRYAN, before beginning to punch and stomp
A.K.

　　　b.　On or about June 7, 2023, at approximately 1:10
a.m., someone recorded a video titled
"cplARHx37RwNbEg866vRiSHJma2ywuu.mov" on GZRARYAN's iPhone 5S
that depicted, among other things, an individual interrogating
A.K. and asking him, in English, who shot "Rubo" and "Fish,"
referring to defendant AMIRYAN, and what gang the shooters were
from, and A.K. responding that an individual associated with the
Mexican Mafia ("MMA-2"), "Alik" (who law enforcement believes is
a reference to AGOPIAN), and ARTUNI, among others were
responsible..

　　　c.　On or about June 7, 2023, at approximately 1:47
a.m., someone recorded a video titled
"cplAf9mJiOgyR1hA8JApuaidJ4sAh60.mov" on GZRARYAN's iPhone 5S
that depicted, among other things, an individual interrogating
A.K. and asking, in Armenian, who shot "Mko," referring to
STEPANIAN, who shot "Rubo," referring to AMIRYAN, and further
inquiring whose location "they," meaning those responsible for
the shootings, were offering $50,000 for, and A.K. responding
that ARTUNI, among others, was responsible.

　　　d.　On or about June 7, 2023, at approximately 1:49
a.m., someone recorded a video titled
"cplAQRmgpipkzPt_1BJd_UNvBqTfy6K.mov" on GZRARYAN's iPhone 5S
that depicted, among other things, A.K. covered in blood and
holding a bloody yellow towel.

e.    On or about June 7, 2023, at approximately 1:50 a.m., someone recorded a video titled "cplARhYf7q1R3vPLG7AQgN2ot3RcUaR.mov" on GZRARYAN's iPhone 5S that depicted, among other things, an individual interrogating A.K. and asking him, in Armenian, (a) who shot "Rubo Fish" and "Rubo," referring to AMIRYAN; (b) who was responsible for paying $50,000 for a location; (c) and whose location the person(s) responsible for the shooting were seeking, and A.K. responding that ARTUNI, among others, was responsible.

f.    On or about June 7, 2023, at approximately 1:51 a.m., someone recorded a video titled "cplAWVw6_A4ZJ3Lmu80_dgoR60784g4.mov" on GZRARYAN's iPhone 5S that depicted, among other things, an individual interrogating A.K. and asking him, in Armenian, who shot "Rubo Fish" and "Mko," referring to AMIRYAN and STEPANIAN, and who was offering $50,000 for "Fish's" location, referring to AMIRYAN, and A.K. responding that ARTUNI, among others, was responsible.

g.    On or about June 7, 2023, around 1:52 a.m., someone recorded a video titled "cplAf2K2xsD92w_4Juzko8tQoSOszuS.mov" on GZRARYAN's iPhone that depicted, among other things, an individual demanding, in Armenian, that A.K. provide the names of the "foreigners," involved in targeting AMIRYAN and STEPANIAN, and A.K. providing MMA-2's name.

*f.    A. HARUTYUNYAN calls A.K. five times on the*

*night he is kidnapped*

81.  Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware that a number ending in -0007 was
registered to A.K. at the time he was kidnapped.  On or about
June 6, 2023, from approximately 11:29 p.m., to approximately
11:51 p.m., A.K. received five consecutive phone calls from a
telephone number ending in -0003.[54]  Given, among other things,
the fact that A.K.'s nephew stated that A.K. was speaking with
an "Arthur" the night of his disappearance, I believe that A.
HARUTYUNYAN was the individual calling A.K.

> g.   *Telegram messages reveal that AMIRYAN
>      arranged for BOJORQUEZ and EGUILUZ to come
>      to 9842 Milburn*

82.  Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware that Detective Sam reviewed a digital
device seized from the backyard of 9842 Milburn, and later
determined to belong to AMIRYAN, on the day he was detained (a
blue, iPhone 12 mini bearing serial number F71DP39X0GRV)
pursuant to a federal search warrant signed by the Honorable
Alicia G. Rosenburg, a U.S. Magistrate Judge in the Central
District of California.  (Case No. 2:24-mj-1763.)  During his
review, Detective Sam located approximately 103 messages on the
encrypted messaging application Telegram between AMIRYAN (who

---

[54] This number is registered to S.M.  Per a Burbank Police
Department report regarding a stolen vehicle dated June 19,
2022, S.M. is A. HARUTYUNYAN's girlfriend.  This further leads
me to believe that A. HARUTYUNYAN used this number to call A.K.

was using the handle "Santoro") and BOJORQUEZ (who was using the handle "Stal").  In relevant part, Detective Sam located the following messages leading up to A.K.'s kidnapping:

a.   On or about June 5, 2023, at approximately 9:45 p.m., BOJORQUEZ sent the following message to AMIRYAN to see if he required BOJORQUEZ and EGUILUZ' services that evening: "Hey man wanted to see if u had anything going on tonight for us if not is it ok if I head back tonight I got court tomorrow morning I'll head back over right after".  BOJORQUEZ followed this message with a photograph of court documents bearing his true, legal name.

b.   On or about June 6, 2023, at approximately 3:15 p.m., BOJORQUEZ sent the following message to AMIRYAN to let him know that he and EGUILUZ (who BOJORQUEZ referred to as "temper")[55] were separately heading to Los Angeles: "I just hit up temper to see where he's at and we'll start heading out there when he gets out here to la".  Based on my involvement in this investigation, I believe that BOJORQUEZ was advising AMIRYAN that he and EGUILUZ were separately traveling to 9842 Milburn at AMIRYAN's direction.

_____

[55] Based on my involvement in this investigation, I am aware that the Consolidated Criminal History Reporting System ("CCHRS") lists EGUILUZ as a documented Southsider gang member (or *Sureño*) who uses the moniker "Temps," among others. Additionally, based on my conversations with Detective Stupar, I am aware that in 2007, Hawthorne PD Officer Robles and his partner conducted a traffic stop on a vehicle driven by EGUILUZ. Officer Robles immediately recognized EQUILUZ from previous field contacts and knew him to be a gang member from Fuck a Bitch (FAB) with the moniker of "Temps."

c.    On or about June 6, 2023, at approximately 3:20
p.m., AMIRYAN sent the following response to BOJORQUEZ: "Sounds
good brother. I'll see you in a few 👋".

d.    On or about June 6, 2023, at approximately 3:23
p.m., AMIRYAN sent the following message to BOJORQUEZ: "Come by
around 7:30 – 8 bro".  Based on my involvement in this
investigation, I believe that AMIRYAN was instructing BOJORQUEZ
to come to 9842 Milburn between 7:30 p.m. and 8:00 p.m.

e.    On or about June 6, 2023, at approximately 3:24
p.m., BOJORQUEZ responded with the following message, confirming
that he would see AMIRYAN shortly: "👋".

f.    On or about June 6, 2023, at approximately 6:28
p.m., BOJORQUEZ sent AMIRYAN the following message to alert him
that EGUILUZ (who BOJORQUEZ referred to as "Temper") had
arrived: "Temper just got there im still on the road".

g.    On or about June 6, 2023, at approximately 7:22
p.m., BOJORQUEZ sent AMIRYAN the following message to alert him
that he too had arrived: "Here".

h.    On or about June 6, 2023, at approximately 7:27
p.m., AMIRYAN sent BOJORQUEZ the following message: "Both of you
there ? I'm working this fool right now . I'll see you in a
bit".  Based on my involvement in this investigation, I believe
that the "fool" AMIRYAN was referring to was A.K.  Further, I
believe that when he wrote that he was "working this fool", he
meant that he was working on luring A.K. from his residence.  In
addition, I believe that when AMIRYAN asked if "both of [them

were] there", he was asking if both BOJORQUEZ and EGUILUZ had arrived at 9842 Milburn.

      i.  On or about June 6, 2023, at approximately 7:28 p.m., BOJORQUEZ sent AMIRYAN the following message confirming that he and EGUILUZ were both at the location: "Yeah both of us".

> h.    *Vehicles used by members and associates of the Amiryan Organized Crime Group are parked at or near 9842 Milburn*

83.  Based on my own knowledge of the investigation, I am aware that a 2022 blue Lexus ES bearing California license plate number 9BNT929 and VIN 58ADA1C10NU020519, which was registered to A. HARUTYUNYAN at a residence on Annette Street in Los Angeles, was parked on the street by 9842 Milburn, the residence where A.K. was tortured, on or about June 8, 2023, when law enforcement reviewed the scene.

84.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports and photographs taken of vehicles at or near 9842 Milburn by Photographer Coogle on or about June 8, 2023, and my own knowledge of the investigation, I am also aware of the following:

      a.  A 2023 black Mercedes Benz EQS SUV bearing temporary California license plate number CL95F82, issued permanent California license plate number 9FFV320, and registered to K.P.[56] (STEPANIAN's significant other) was parked

---

[56] I am aware that K.P. is STEPANIAN's significant other based on my review of LAPD reports relating to the attempt on STEPANIAN's life on or about October 25, 2022, described above.

across the street from 9842 Milburn when law enforcement reviewed the scene on or about June 8, 2023.

b.    A 2023 black Jeep Wrangler bearing California license plate number 9DGR329 and registered to V. HARUTYUNYAN was parked across the street from 9842 Milburn, directly in front of the above-described Mercedes Benz, when law enforcement reviewed the scene on or about June 8, 2023.

c.    A 2015 white Honda Civic bearing California license plate number 9ATH201 and registered to E.M.H. (who, per LexisNexis is an associate of BOJORQUEZ') was parked near 9842 Milburn when law enforcement reviewed the scene on or about June 8, 2023.

> i.    *A. HARUTYUNYAN flees to Mexico after A.K. escapes from 9842 Milburn*

85.    Based on my review of CBP reports, and my own knowledge of the investigation, I am aware of the following:

a.    On or about June 8, 2023, at approximately 4:30 a.m., CBP Officer Cortez was conducting border crossing checks when she stopped a 2012 black Range Rover bearing California license plate 6UCR298 (the "Range Rover") for an inspection. The driver of the Range Rover (E.M.) presented her with a green card in his name and stated that he was the only person in the vehicle. E.M. claimed to be traveling from Los Angeles enroute to Rosarito, Mexico to visit his cousin. Officer Cortez instructed E.M. to place his vehicle in park and roll down all his windows. E.M. only cracked open the front window at which point Officer Cortez repeated her instructions and roll down all

84

windows.  In response, E.M. put the vehicle in park.  Officer
Cortez then asked E.M. if he understood her instructions and he
stated, "Yes."  At that point, Officer Cortez noticed a person
covered and laying on the back seat of the Range Rover.

      b.   Officer Cortez confronted E.M. and asked him why
he had stated he was the only person in the vehicle.  E.M.
continued to state that he was the only person in the vehicle
and then stated, "I'm good" and "I can go," to which Officer
Cortez replied that she was not done with her inspection.
Officer Cortez then focused her attention on the male in the
back seat and asked for his travel documents.  The male replied
that he had no documents.  E.M. then stated that the male in the
back of the vehicle did not understand English, and all his
documents were in Mexico.  The Range Rover, E.M., and the male
were taken to the Security Office for further inspection.  The
male was fingerprinted and subsequently identified as A.
HARUTYUNYAN.  Per CBP records, A. HARUTYUNYAN had a prior
derogatory history and adverse immigration actions levied
against him.  And, when he was stopped, A. HARUTYUNYAN had a
pending removal hearing.  A. HARUTYUNYAN was advised to have
proper entry documents or court issued paperwork if he wished to
return to the United States.  Then, both E.M. and A. HARUTYUNYAN
were released into Mexico.

      c.   Based on my training and experience, I believe
that A. HARUTYUNYAN fled to Mexico to avoid being arrested for
his role in A.K.'s kidnapping, assault, and torture.

4.    The Amiryan Organized Crime Group's Possession
and Use of Unregistered Firearms

86.  Per an ATF "blue ribbon" reports at the time of A.K.'s
kidnapping, assault, and torture, AMIRYAN, V. HARUTYUNYAN,
GZRARYAN, STEPANIAN, A. HARUTYUNYAN, EGUILUZ, and BOJORQUEZ, had
not registered to own any firearms.

5.    The Artuni Enterprise's Connection with A.K.

87.  Based on my conversations with Detective Stupar, my
review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

a.   As previously stated, during the search of
ARTUNI's home on or about December 12, 2023, investigators
located a digital device (ARTUNI's iPhone 14 Pro).  On the
device, investigators located recorded conversations between
ARTUNI and A.K.[57]  These conversations were in the Armenian
language and translated by Detective Mkrtchyan, Sergeant
Mirakyan, and CBP Officers Hakobyan and Tsarukyan.  In two of
the recordings, ARTUNI and A.K. discuss A.K.'s kidnapping and
the fact that AMIRYAN (who A.K. referred to as "Fish") may have
mistaken A.K. for another one of ARTUNI's associates ("Alik,"
who law enforcement believes was in reference to AGOPIAN).  In
addition, ARTUNI confronts A.K. about naming him as one of the
persons responsible for targeting AMIRYAN and other members of

---

[57] Based on my training and experience, involvement in this
investigation, and conversations with other law enforcement
officers who specialize in Armenian Organized Crime, I believe
these recordings were made so that they could be sent to
organized crime leaders in Russia and Armenia.  This would be
done so that ARTUNI could dispute the allegations made against
him by AMIRYAN and/or his associates.

his group.  A.K. responds that AMIRYAN and others made him say ARTUNI's name so that it could be recorded.  ARTUNI also brings up that the thieves in law were now involved and suggests that he was now facing some issues because AMIRYAN, or someone close to him, reported ARTUNI (seemingly in relation to the attempted murders).

88.  Based on my training, experience, and involvement in this investigation, I believe that these recorded conversations are significant to this investigation.  *First*, they confirm that A.K. is affiliated with ARTUNI and that is why he was targeted by the Amiryan Organized Crime Group.  *Second*, they confirm that ARTUNI and AMIRYAN, and their affiliates, are embedded within Russian and Armenian Organized Crime.  *Third*, they confirm that AMIRYAN is a figure of significance in the criminal underworld because he was able to successfully appeal for ARTUNI to be "regulated."[58]  *Fourth*, the notion of AMIRYAN's power is reinforced by A.K.'s claims that AMIRYAN was doing most of the talking when he was kidnapped.  This means that AMIRYAN was in charge and was likely the person that can be heard on the recordings interrogating A.K. in Armenian.  *Fifth*, they confirm that there was (and as further detailed below, still is) an ongoing power struggle between AMIRYAN and ARTUNI within the Armenian Organized Crime world.

---

[58] Based on my training, experience, and conversations with other law enforcement officers who specialize in Armenian Organized Crime, I am aware that Armenian and Russian Organized Crime leadership "regulate" certain members who have violated the code of conduct, for example, attempting to kill a man of repute like AMIRYAN without proper clearances, by punishing them with monetary penalties and/or physical violence.

**E.    June 12, 2023: G.M. Is Shot as He Is Driving Home**

1.    Probable Cause Summary

89.    As set forth below, there is probable cause to believe that ARTUNI, HAZRYAN, STEPANYAN, A. A. KAZARYAN, and others known and unknown, attempted to murder G.M.[59]  The evidence supporting this determination includes, but is not limited to: (1) the recurring pattern of violence targeting the Amiryan Organized Crime Group and its associates; (2) the use of a vehicle registered to A. A. KAZARYAN's father during the murder attempt; (3) cell tower data showing ARTUNI and HAZRYAN following G.M. leading up to the murder attempt; (4) call data showing a gap in usage in STEPANYAN's phone coinciding with the date and timing of the murder attempt; and (5) the presence of drone footage depicting G.M.'s residence on HAZRYAN's cellphone.

2.    Description of the Attempted Murder

90.    Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

---

[59] Based on my involvement in this investigation and conversations with law enforcement officers who specialize in Armenian Organized Crime, I am aware that G.M. is considered an "elder."  Historically, G.M., who is Armenian, served under the leadership of Armen "Pzo" Kazarian, a documented Armenian Organized Crime leader who maintained control of the entire western United States as a *gogh*.  G.M.'s power and influence drastically diminished in 2015 when his son, who claimed to be a member of Armenian Power, committed an unprovoked and unauthorized murder of a White Fence gang member in North Hollywood.  The unsanctioned murder triggered a chain of events that caused the Mexican Mafia to place a green light (approval to kill) on all Armenian Power gang members and levy a heavy tax (or fine) on G.M. as punishment.  Following this conflict with the Mexican Mafia, G.M. went into hiding and began using an alias.

a.    On or about June 12, 2023, at approximately 3:19
p.m., a caller reported a shooting at the intersection of
Devonshire Street and Melvin Avenue in Los Angeles.  Around 3:30
p.m., LAPD Officers Mejia and Hong responded to a radio call
regarding the shooting.

b.    When the two officers arrived at the
intersection, the reporting party stated that around 3:15 p.m.,
as he was driving westbound on Devonshire Street approaching
Melvin Avenue, he saw two or three cars driving in the same
direction as him.  As the reporting party reached the
intersection, he saw someone inside of a white or cream-colored
Chevrolet SUV or Crossover shoot approximately seven or eight
rounds at another vehicle.  The shooter then sped away.  The
reporting party believed that a shooting occurred because he saw
glass fragments and bullet casings eject from the shooter's
vehicle.  Additional officers responded to the intersection to
provide investigative assistance.  LAPD Officer Park recovered
approximately eight Federal .45 caliber spent shell casings at
the intersection.

c.    While continuing their investigation at the
Devonshire Station, Officers Mejia and Hong received another
radio call regarding the shooting.  At approximately 4:11 p.m.,
a second caller reported the shooting and from this call,
officers were able to locate G.M. at his residence on Hiawatha
Street in Los Angeles.

d.    After locating G.M., LAPD Detective Reyes
consensually obtained dash camera footage from the vehicle that

89

G.M. was driving when he was shot at.  Detective Reyes reviewed G.M.'s dash camera footage and surveillance footage that he consensually obtained from another Melvin Avenue resident. Collectively, the footage shows a 2011 off-white GMC Acadia SUV bearing California license plate number 6NVB285 and VIN 1GKKRNED3BJ287455 (the "GMC SUV") and a 2021, dark blue BMW X6 M50 bearing temporary license plate number CM36D82[60] and VIN 5UXCY8C02M9E21818 (the "blue BMW X5 M50") shadowing G.M.'s car in a trained manner that suggests both drivers were familiar with G.M.'s route home.  At the Melvin Avenue intersection, the rear passenger's window of the GMC SUV lowers, and an arm extends a handgun towards G.M.'s vehicle, as the GMC SUV is turning.  Approximately seven to eight gunshots are audible, and it sounds as though bullets are hitting G.M.'s vehicle.  The blue BMW X5 M50 and GMC SUV both speed away, and G.M. drives his car a few blocks to his residence.

91.  Based on my involvement in this investigation, I am aware that G.M. and AMIRYAN have a close relationship.  When searching one of AMIRYAN's cellphones that were seized at 9842 Milburn (a black iPhone 13 bearing IMEI number 355701905187161), Detective Sam located a photograph of AMIRYAN and G.M. together. In addition, on WhatsApp, Detective Sam located messages and calls between AMIRYAN and an individual using the handle "KBO2." Based on my involvement in this investigation, and conversations with law enforcement officers who specialize in Armenian

---

[60] Based on my review of DMV records, I am aware that the permanent California license plate number for this vehicle is 9HCU299.

Organized Crime, I am aware that G.M.'s moniker is "Kbo," leading me to believe that these communications were between AMIRYAN and G.M.  As such, I believe, based on my training, experience, and knowledge of this investigation, that G.M. was targeted by members of the Artuni Enterprise given his proximity to AMIRYAN as well as his historical position in the Armenian Organized Crime world.

### 3.   The Artuni Enterprise's Connection with the Attempted Murder

> ### a.   A vehicle registered to A. A. KAZARYAN's father is used in the attempted murder

92.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.   Using a law enforcement database, Detective Reyes, determined that the blue BMW X5 M50 was registered to A. A. KAZARYAN's father.  On or about June 20, 2023, Detective Reyes mailed a 15.25[61] contact letter to A. A. KAZARYAN's father. About a week after the 15.25 contact letter was sent, A. A. KAZARYAN, who identified himself as "Art" to Detective Reyes, called and said that he was responding on his father's behalf to the letter because his father's English was not good.  A. A. KAZARYAN inquired why the letter was sent, and when informed by Detective Reyes that it was concerning a shooting, acted surprised.  A. A. KAZARYAN denied knowing anything about a shooting incident and advised Detective Reyes that he would

---

[61] Based on my training and experience, I know that a "15.25 contact letter" is a letter mailed to an individual requesting that they either call or come into the police station.

speak with his father prior to ending the call.  To date, A. A. KAZARYAN has not contacted Detective Reyes.

       b.   *Cell tower data shows ARTUNI and HAZRYAN following G.M. prior to the shooting[62]*

93.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

       a.  Cell tower data supports that HAZRYAN was following G.M. (whose location is known to law enforcement through GPS data from his vehicle) prior to the shooting and went to A. A. KAZARYAN's residence or a business that they likely co-use after the shooting.  Specifically, on or about June 12, 2023, at approximately 2:03 p.m., HAZRYAN's cellphone[63] connected to a cellular tower near the residence of S.K., a well-known Armenian Organized Crime figure, who earlier in the day, was visited by G.M.  At approximately 2:59 p.m. (around 16 minutes before the shooting occurred), G.M. parked his vehicle at a Shell gas station located at 6801 Reseda Boulevard, Reseda, California.  At approximately 2:56 p.m., HAZRYAN's cellphone connected to a cellular tower located at 6827 Reseda Boulevard, Reseda, California.  The distance between G.M.'s vehicle and the cellular tower that HAZRYAN's cellphone connected to was

---

[62] This cell tower data was obtained pursuant to a state search warrant signed by the Honorable Judge Teresa Sullivan, Superior Judge of the State of California, County of Los Angeles.

[63] Based on my conversations with him, I am aware that Detective Stupar utilized law enforcement databases to determine that the phone number 747-306-5985 was registered to HAZRYAN. Unless otherwise noted, any references hereafter to "HAZRYAN's cellphone" refer to the cellphone associated with this number.

approximately 132 feet.  At approximately 3:24 p.m., around nine
minutes after the murder attempt occurred, HAZRYAN's cellphone
connected to a cellular tower located at 10800 North Lemona
Avenue, Mission Hills, California.  This cellular tower is
located approximately 7.5 miles east from where the shooting
occurred.  At approximately 3:45 p.m., around 30 minutes after
the murder attempt occurred, HAZRYAN's cellphone connected to a
cellular tower located at 10189 Tujunga Canyon Boulevard,
Tujunga, California.  This cellular tower is located
approximately 18.5 miles east from where the shooting occurred
and approximately 0.5 miles from A. A. KAZARYAN's residence
(SUBJECT PREMISES 9 – 10053 Tujunga Canyon Boulevard, Tujunga,
California 91042) and 0.34 miles from Kaz Wholesale Furniture,
Inc. (7505 Foothill Boulevard, Tujunga, California 91042), a
suspected fraudulent business operated by HAZRYAN with suspected
assistance from A. A. KAZARYAN.

   b. Cell tower data supports that ARTUNI was also
following G.M. prior to the murder attempt.  Specifically, at
approximately 2:24 p.m., ARTUNI's cellphone[64] connected to a

---

[64] LAPD Detective Stupar learned from Burbank PD Detective
Pira, who was investigating the July 7, 2023 shooting of AMIRYAN
detailed below, that a phone number belonging to ARTUNI (747-
272-5736) was involved in their shooting investigation.  In
turn, Detective Stupar obtained a warrant for call detail
records ("CDR"), among other information, in support of the
shooting investigation.  The state search warrant was signed by
the Honorable C.J. Pratt, Superior Court Judge of the State of
California, County of Los Angeles.  As previously stated,
investigators seized ARTUNI's iPhone 14 Pro on or about December
12, 2023, when executing a federal search warrant at his
residence signed by the Honorable Jacquelin L. Chooljian.  The
seized cellphone had a corresponding phone number of 747-272-
*(footnote cont'd on next page)*

cellular tower near S.K.'s residence (.72 miles away). Then, at approximately 3:49 p.m., ARTUNI's cellphone connected to a cellular tower located at 10193 Tujunga Canyon Boulevard, Tujunga, California, approximately 16.7 miles from the attempted murder location and 0.44 miles from A. A. KAZARYAN's residence. That cell tower is also located approximately 0.32 miles from Kaz Wholesale Furniture, Inc.

        c.    Of note, between approximately 2:08 p.m. and 4:22 p.m., A. A. KAZARYAN's cellphone[65] connected to a cellular tower located at 10193 Tujunga Canyon Boulevard, Tujunga, California, approximately 16.7 miles from attempted murder location and 0.44 miles from his residence at SUBJECT PREMISES 9. That cell tower is also located approximately 0.32 miles from Kaz Wholesale Furniture, Inc.

        *c.    Call data from STEPANYAN's cellphone shows an hours long gap on the date of the*

---

5736. Hereafter, unless otherwise noted, any references to ARTUNI's cellphone, correspond with the cellphone associated with this phone number.

[65] As part of the ongoing investigation into the shooting of G.M., investigators learned through LexisNexis that A. A. KAZARYAN's phone number was 818-205-8757. Detective Stupar obtained a state search warrant to include CDR data for this phone number. The search warrant was signed by the Honorable C.J. Pratt. Furthermore, investigators seized A. A. KAZARYAN's cellphone (iPhone 15 Pro bearing serial number HQ3617Y71M and IMEI number 353864164453567) on or about December 12, 2023, when executing a federal search warrant at his residence signed by the Honorable Jacqueline L. Chooljian. (2:23-mj-6286.) The corresponding phone number for his phone was 818-205-8757.

*attempted murder[66]*

94.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.  G.M. was shot at approximately 3:15 p.m. as he was driving home.  STEPANYAN's cellphone had a gap in usage between the hours of 1:48 p.m. and 5:31 p.m.  Based on my training, experience, and knowledge of this case, I believe that STEPANYAN did not use his cellphone before, during, and after the attempted murder to thwart law enforcement tracing.

*d.  HAZRYAN has drone footage of G.M.'s residence on his cellphone*

95.  Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.  As previously stated, in relation to this investigation, investigators executed search warrants at assorted locations on or about December 12, 2023, pursuant to federal search warrants signed by the Honorable Jacqueline L.

---

[66] On or about December 12, 2023, investigators served a federal search warrant signed by the Honorable Charles F. Eick, a U.S. Magistrate Judge in the Central District of California, on a storage unit belonging to STEPANYAN.  (Case No. 2:23-mj-6368.)  LAPD Detective Kaminski spoke to the manager of the storage facility, who provided him with the rental agreement listing STEPANYAN and his phone number (818-293-9713) as the person renting the storage unit.  Furthermore, a LexisNexis inquiry listed STEPANYAN, among others, as being the subscriber for the phone number.  In furtherance of the investigation, Detective Stupar obtained a state search warrant seeking CDR data, among other information, for STEPANYAN.  The search warrant was signed by the Honorable Thomas Falls.  Hereafter, unless otherwise noted, any references to STEPANYAN's cellphone are in reference to the cellphone associated with this number.

Chooljian.  HAZRYAN's residence was one such search location. (Case No. 2:23-mj-6287.)  During the search of HAZRYAN's home, investigators located, among other things, a digital device (iPhone 15 Pro bearing IMEI numbers 353431650783350 & 353431653286930, "HAZRYAN's iPhone 15 Pro").[67]  On the device, investigators found aerial drone footage dated August 8, 2023, of G.M.'s residence, including video footage recorded from a drone of HAZRYAN operating the drone.[68]  The video footage also depicted a Jeep Wrangler bearing California license plate number 9DCG912 and registered to A. A. KAZARYAN at his previous residence, 10762 Mount Gleason Avenue, Tujunga, California 91042.

### F.  July 7, 2023: AMIRYAN Is Shot While on the Balcony of His Former Residence

#### 1.  Probable Cause Summary

96.  As set forth below, there is probable cause to believe that ARTUNI, HAZRYAN, STEPANYAN, MANUKYAN, SEDANO, and others known and unknown, conspired to murder AMIRYAN and attempted to murder him and his significant other (R.M.).  The evidence supporting this determination includes, but is not limited to: (1) the recurring pattern of violence targeting the Amiryan

---

[67] Based on my training and experience, I am aware that a phone can have dual IMEI numbers or phone lines, which is why HAZRYAN's cellphones has two numbers associated with it.  These numbers are called eSIM numbers (electronic SIM numbers) that are assigned to each phone line on the same device.

[68] Although this footage post-dates the murder attempt, I believe it still attributes HAZRYAN to the failed June 2023 murder, given the recurring targeting of members and associates of the Amiryan Organized Crime Group at or near their homes. Separately, law enforcement located a video on one of ARTUNI's devices showing ARTUNI operating a drone as well.

Organized Crime Group; (2) MANUKYAN's purchase of the vehicle
used to shoot AMIRYAN and cell tower data indicating that
HAZRYAN and ARTUNI were present at the sale; (3) the presence of
a vehicle commonly driven by SEDANO near AMIRYAN's then-
residence right after he was shot and a photograph of AMIRYAN's
balcony later found on his phone; (4) the presence of a
screenshot of a background check for AMIRYAN, which included a
map with the address of AMIRYAN's then-residence on one of
ARTUNI's digital devices; (5) gaps in usage of STEPANYAN and
SEDANO's cellphones around the time AMIRYAN was shot; (6)
HAZRYAN's search history, which included a search for a shooting
in North Hollywood, which is near where AMIRYAN resided at the
time; (7) bullet casings matching a firearm used in this
shooting and recovered from a storage facility registered to
STEPANYAN and frequented by members and associates of the Artuni
Enterprise, including ARTUNI himself; and (8) a recorded call
between HAZRYAN and AMIRYAN in which AMIRYAN accuses HAZRYAN of
being in cahoots with ARTUNI.

     2.   <u>Description of the Attempted Murders</u>

    97. Based on my conversations with Detectives Stupar and
Sam and Sergeant Mirakyan, my review of Burbank PD and LAPD
reports, and my own knowledge of the investigation, I am aware
of the following:

       a.   On or about July 7, 2023, at approximately 10:40
p.m., Burbank PD officers arrived at the East San Jose residence

(AMIRYAN's then-residence)[69] in response to a radio call regarding a "drive by" shooting committed by a shooter in a red pickup truck.  Upon arriving at the residence, Burbank PD Officer Bickel made contact with AMIRYAN, who was suffering from multiple gunshot wounds.[70]

    b.  Burbank PD Officer Hosepian arrived at the residence and spoke with AMIRYAN's significant other (R.M.). Per R.M., at approximately 10:30 p.m., she and AMIRYAN were seated on their balcony, which is adjacent to an alleyway.  R.M. heard a vehicle driving at a high speed in the alley.  R.M. looked at their home surveillance cameras and saw a red/orange pick-up truck stop directly in front of their apartment balcony in the alley.  Almost simultaneously, R.M. heard loud gunshots from the alley and felt bullets strike their balcony ceiling. R.M. fell to the ground and AMIRYAN climbed on top of her to protect her from the gunfire.  Once the shooting stopped, R.M. looked at the surveillance footage and saw the pick-up truck drive westbound in the alley towards Glenoaks Boulevard.

    c.  Detective Pira, who was later assigned to the investigation, canvassed the area surrounding the residence and

---

[69] Based on my conversations with Detective Stupar and my involvement in this investigation, I am aware that after this shooting, AMIRYAN relocated to another home with his family (SUBJECT PREMISES 1).

[70] Based on my review of hospital records, I am aware that AMIRYAN sustained the following injuries: gunshot wounds to the left shoulder, left elbow, and abdomen, an unspecified displaced fracture of the left humerus, a fractured rib, traumatic hemothorax, a contusion of the lung, acute posthemorrhagic anemia, elevated white blood cell count, and essential primary hypertension.

located surveillance cameras.  After consensually obtaining the footage, Detective Pira reviewed it.  On one video, which is dated July 7, 2023, and time stamped at 10:37 p.m., a 2002, red lifted Ford F-150 bearing California license plate number 12736S3 and VIN 1FTRW08L42KE14605 (the "F-150") is depicted sitting in an alleyway near the balcony.  An individual standing in the bed of the truck appears to fire several rounds towards the balcony where AMIRYAN and R.M. were seated, and then the F-150 speeds away.

d.    The City of Burbank maintains several traffic cameras throughout the city, which are posted in various intersections.  These cameras record and retain footage, which can be accessed and reviewed later.  On or about July 12, 2023, Burbank PD Detective Rodriguez reviewed traffic camera footage to trace the F-150's route after it left the East San Jose residence.  A traffic camera shows that at approximately 10:41 p.m. (four minutes after the shooting), the F-150 arrived at an intersection at Burbank Boulevard with a sedan with a broken rear passenger side taillight and missing hub cap trailing.  The footage depicts the suspected shooter getting out of the bed of the F-150 and entering the sedan on the passenger's side.

3.    The Artuni Enterprise's Connection with the Attempted Murder

a.    *MANUKYAN's purchase of the F-150 used in the attempted murder*

98.  Based on my conversations with Detectives Stupar and Sam and Sergeant Mirakyan, my review of LAPD and Burbank PD

reports, and my own knowledge of the investigation, I am aware of the following:

a.   On or about July 7, 2023, a person using the alias "Briedis Malone" contacted the original owner of the F-150, seeking to purchase it.  And at approximately 4:00 p.m., around six hours before AMIRYAN was shot, "Briedis Malone" met with the original owner, conducted a test drive, and then purchased the vehicle.  When purchasing the vehicle, "Briedis Malone" provided the original owner with a passport image.

b.   During the investigation, Detective Ekimyan recognized the person photographed on the passport from prior contacts and an arrest one week prior as MANUKYAN.[71]  Because the name on the passport was an alias, Detective Ekimyan determined that the passport was likely fake.  (MANUKYAN is a convicted felon, and his criminal history includes fraud and identity theft.)

99.   Based on the use of a fake name on a purported U.S. passport bearing MANUKYAN's image, among other things, I believe that MANUKYAN used a fake passport when purchasing the vehicle, so that the attempt on AMIRYAN's life would not be traced back to him.  Also, based on my training and experience, I know that

---

[71] Based on my knowledge of this investigation and conversations with Sergeant Mirakyan, I know that on or about August 4, 2023, Officers Ekimyan and Martinez arrested MANUKYAN for possession of a controlled substance, in violation of California Health and Safety Code Section 11350(a).  In brief, officers conducted a traffic stop of MANUKYAN's vehicle. Officers learned that MANUKYAN was on probation for being a felon in possession of ammunition.  MANUKYAN gave officers consent to search his vehicle.  A consent/probation check of the vehicle revealed suspected heroin.

people involved in organized crime who plan and commit murders
will often use false information to avoid detection by law
enforcement or rivals.  I also know that organized crime members
who order "hits" (*i.e.*, murders) will often use several
individuals to fulfill the murder plan, and they will assign
each individual specific roles to coordinating and executing the
murder.  This includes roles such as purchasing equipment and
tools for the murder (*e.g.*, vehicles and firearms), surveillance
personnel for the murder target's location, and accessories to
destroy evidence, among other things.  Based on this training
and experience, I believe that at least one of MANUKYAN's roles
was to purchase the vehicle used in the shooting.

> a.   In addition, cell tower data placed ARTUNI (using
a number ending in -6430) and HAZRYAN (using a number ending in
-5736) at or near the location of the vehicle purchase, a tire
shop in Vernon, California.

> *b.   A vehicle likely driven by SEDANO
> accompanies the F-150 after the attempted
> murders*

100. Based on my conversations with Detectives Stupar and
Sam and Sergeant Mirakyan, my review of LAPD and Burbank PD
reports, and my own knowledge of the investigation, I am aware
of the following:

> a.   As previously stated, after the murder attempts,
the F-150 drove to an intersection at Burbank Boulevard with a
sedan with a broken rear passenger side taillight and missing
hub cap trailing.  During the course of this investigation, law
enforcement determined that the individual who commonly drives

this vehicle, or a vehicle that looks much like it, is SEDANO. For example, on or about December 12, 2023, law enforcement executed a search warrant at Unit B16 of Enterprise Self Storage, which is located at 10711 Vinedale Street, Sun Valley, California.  The warrant was signed by the Honorable Charles F. Eick.  (Case No. 2:23-mj-6368.)

      b.   Unit B16 is registered to STEPANYAN.  On or about December 12, 2023, after law enforcement executed warrants at several locations associated with the Artuni Enterprise, SEDANO came to the storage facility and was spotted by law enforcement. At the time, SEDANO was driving a gray Toyota Camry bearing California license plate number 5ZWX352 that was missing a hub cap.

      c.   SEDANO left the facility, upon seeing law enforcement, and later returned, at which time, law enforcement detained him and seized his cellphone (a black Samsung Note cellphone bearing an unknown serial number and IMEI number 356101115240125).  Later, investigators searched SEDANO's cellphone pursuant to a federal search warrant signed by the Honorable Maria A. Audero, a U.S. Magistrate Judge in the Central District of California.[72]  (Case No. 2:23-mj-06439.)  On the phone, investigators located a video that depicted SEDANO's vehicle with a missing a hub cap.  In that same video, there was a 2023, white Toyota Camry bearing California license plate

_____

[72] From this, investigators were able to discern SEDANO's cellphone number.  Detective Stupar obtained a state search signed by the Honorable Thomas Falls for CDR.  Hereafter, any references to SEDANO's cellphone correspond with this cellphone and the associated number.

number 9FOU408.  As detailed below, STEPANYAN appears to drive this car to the storage facility to pick up items prior to the November 9, 2023 attempted murder of H.H.  In addition, on that phone, law enforcement located a Google Maps view of the alleyway behind AMIRYAN's former residence on July 7, 2023.

> c.  *ARTUNI has a screenshot of AMIRYAN's background check, which included AMIRYAN's address, on his cellphone*

101. Based on my conversations with Detective Stupar, my review of LAPD reports, and my own involvement in the investigation, I am aware that investigators located a screenshot of a background check for AMIRYAN, which included a map with the address of AMIRYAN's then-residence, on ARTUNI's iPhone 14 Pro.

> d.  *STEPANYAN and SEDANO seemingly turn off their phones at the time of the attempted murder*

102. Based on my conversations with Detective Stupar, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.  Detective Stupar reviewed CDR for STEPANYAN and SEDANO's cellphones and determined that STEPANYAN and SEDANO's phones were not in use when AMIRYAN was shot.[73]  AMIRYAN was shot at approximately 10:40 p.m., on or about July 7, 2023.  Based on his review of the records, Detective Stupar determined that STEPANYAN's cellphone (818-293-9713) had a gap in usage between 10:17 p.m. and 10:53 p.m., while SEDANO's (818-691-8750), had a

---

[73] The review of this information was authorized by a state search warrant signed by the Honorable Thomas Falls.

gap in usage between 8:07 p.m. and 11:36 p.m.  Based on my training, experience, and involvement in this investigation, I believe that this gap in usage demonstrates their involvement in AMIRYAN's attempted murder as the phones were likely not used in order to avoid law enforcement from being able to trace their locations.

> e.    *HAZRYAN's Internet search history included a search for a shooting in North Hollywood*

103. Based on my conversations with Detective Stupar, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.    A search was conducted at HAZRYAN's residence on or about December 12, 2023, in relation to this investigation. During the search warrant execution, law enforcement found a device (HAZRYAN's iPhone 15 Pro).[74]  When searching the device, Detective Stupar located the following in the web search history: "shooting in north Hollywood".  The search did not have an associated time stamp.  However, based on my involvement in this investigation, I believe that HAZRYAN was searching to see if AMIRYAN had been shot, given that at the time, AMIRYAN resided in Burbank, which is near North Hollywood.  This conclusion is supported by, among other things, HAZRYAN's call

---

[74] Based on my training and experience, I am aware that a phone can have dual IMEI numbers or phone lines, which is why HAZRYAN's cellphones has two numbers associated with it.  These numbers are called eSIM numbers (electronic SIM numbers) that are assigned to each phone line on the same device.

detail records,[75] which place him at or near the location where the F-150 used in AMIRYAN's shooting was purchased.[76]  His call detail records also place him in contact with individuals who, based on cell tower data, were near or around in the days leading up to and at the time of AMIRYAN's shooting.

> f.   *Firearms casings from AMIRYAN's former residence match a firearm seized from STEPANYAN's storage unit*

104.  Based on my conversations with Detective Stupar and Sergeant Mirakyan, my review of LAPD and Burbank PD reports, and my own involvement in the investigation, I am aware that during the search of storage unit on or about December 12, 2023, investigators located an arsenal of weaponry.  Ballistics for one of the firearms located (a Glock, model 21, .45 Auto caliber, pistol bearing serial number KDK598) matched suspect casings retrieved from the alley of AMIRYAN's former residence (the East San Jose residence).  As further described below, this storage facility appears to have been used as an armory for members and associates of the Artuni Enterprise.

> g.   *AMIRYAN accuses HAZRYAN of being in cahoots*

---

[75] Call detail records for HAZRYAN's phone number and the numbers he was in contact with were obtained via state search warrants signed by the Honorable Michael Villalobos, Michael D. Carter, Jared D. Moses, and Adam Y. Chang, Judges of the Superior Court of California, County of Los Angeles. Investigators used law enforcement databases to determine that the numbers were registered to and used by HAZRYAN.

[76] Based on my review of Burbank PD reports and conversations with Burbank PD Sergeant Mirakyan, I am aware that the original owner of the F-150 and an associate of his reported that at least two men were present at the sale.

*with ARTUNI*

105. Based on my conversations with Detective Stupar, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a. On ARTUNI's iPhone 14 Pro, investigators located recorded conversations between AMIRYAN and HAZRYAN that HAZRYAN sent to ARTUNI on or about September 15, 2023.[77]  These conversations were in the Armenian language and translated by Detective Mkrtchyan, Sergeant Mirakyan, and CBP Officers Hakobyan and Tsarukyan.  In one of the recordings, HAZRYAN appears to be baiting AMIRYAN (who he refers to as "Rubo") into discussing MMA-2.[78]  HAZRYAN reiterates MMA-2's name several times causing AMIRYAN to ask him why he was using names and if everything around him was normal.  In another recording, AMIRYAN calls HAZRYAN a "mailman."[79]  AMIRYAN then accuses HAZRYAN of being affiliated with ARTUNI (who he refers to as "Aro" and "Araboyi") and bringing information back to ARTUNI.  AMIRYAN then accuses HAZRYAN of having other people, including ARTUNI,

---

[77] As previously stated, based on my training and experience, involvement in this investigation, and conversations with other law enforcement officers who specialize in Armenian Organized Crime, I believe these recordings were made so that they could be sent to organized crime leaders in Russia and Armenia.

[78] Of note, as previously stated, in video recordings found on GZRARYAN's iPhone 5S, A.K. also named MMA-2 as one of the persons responsible for targeting AMIRYAN and STEPANIAN along with ARTUNI.

[79] Based on my training, experience, and conversations with other law enforcement officers who special in Armenian Organized Crime, I am aware that "mailman" in the Armenian community refers to someone who spreads rumors and misinformation and delivers messages from one person to another.

listening to the call, which HAZRYAN denies.[80]  AMIRYAN then makes several derogatory marks about and towards ARTUNI.

106. Based on my training, experience, and involvement in this investigation, I believe that these recorded conversations are significant.  *First*, they confirm that HAZRYAN is affiliated with ARTUNI considering that HAZRYAN sent them to ARTUNI. *Second,* they confirm that there was (and as detailed below, still is) an ongoing dispute between AMIRYAN and ARTUNI related to their roles and positions within the Armenian Organized Crime world.

### G. August 18, 2023: Individuals Shoot at V. HARUTYUNYAN's Former Residence[81]

#### 1. Probable Cause Summary

107. As set forth below, there is probable cause to believe that ARTUNI, HAZRYAN, STEPANYAN, and others known and unknown, attempted to murder V. HARUTYUNYAN and attempted to murder him by shooting at a dwelling he resided in.  The evidence supporting this determination includes, but is not limited to: (1) the recurring pattern of violence targeting the Amiryan Organized Crime Group; (2) cell tower data placing HAZRYAN and STEPANYAN at or near V. HARUTYUNYAN's residence at the time of

---

[80] Based on my knowledge of this investigation and review of LAPD reports, I am aware that at the end of the recording, after AMIRYAN hangs up, HAZRYAN begins talking to someone else who is either with him or on another phone that he has with him. Therefore, someone else did appear to be listening to the call, as AMIRYAN suspected.

[81] As previously stated, based on my involvement in this investigation, I am aware that while this was his residence at the time of the shooting, V. HARUTYUNYAN has since relocated to the State of Florida.

the shooting; (3) gaps in usage in STEPANYAN, A. A. KAZARYAN, and SEDANO's cellphones at the time of the shooting; and (4) the presence of aerial drone footage depicting V. HARUTYUNYAN's residence on ARTUNI's cellphone.

### 2.    Description of the Shooting

108. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.    On or about August 18, 2023, at approximately 4:50 p.m., LAPD Officers Shin and Garcia responded to a radio call regarding a shooting at a residence on Bryant Street in North Hills, California.

b.    When the two officers arrived, Officer Garcia spoke with V. HARUTYUNYAN who stated that he was asleep in his bedroom located on the second floor when he heard a loud bang coming from the downstairs. V. HARUTYUNYAN did not think much of the noise due to him being half asleep. V. HARUTYUNYAN woke up to a cellphone call from his neighbor, who told him that he just saw a guy running around with a gun near his front yard. During the interview, V. HARUTYUNYAN also stated that he has no enemies, and he has no idea why he was targeted. V. HARUTYUNYAN was not injured.

c.    That same day, officers consensually obtained video surveillance footage from V. HARUTYUNYAN's home that captured the shooting. The surveillance footage from V. HARUTYUNYAN'S home depicts what appears to be a male wearing dark clothing and a helmet driving to V. HARUTYUNYAN's home on a

dark-colored motorcycle.  The motorcyclist parks near the residence and a gray pickup truck parks next to the motorcycle. The motorcyclist retrieves what appears to be a step ladder and rifle from the backseat of the gray pickup truck.  He then stands on the step ladder and fires approximately two rounds striking the downstairs window of V. HARUTYUNYAN's residence. The motorcyclist then gets on the motorcycle and speeds away. The gray pickup truck also drives away.  Of note, the surveillance camera only captured the motorcyclist fire two rounds because it is motion detection activated.  However, Officer Shin recovered approximately nine 7.62x39mm caliber spent shell casings from V. HARUTYUNYAN's driveway.

### 3. The Artuni Enterprise's Connection to the Shooting

#### a. Cell tower data places HAZRYAN and STEPANYAN at or near V. HARUTYUNYAN's residence at the time of the shooting

109. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.  Cell tower data supports that HAZRYAN was at or near V. HARUTYUNYAN's residence prior to the shooting and fled after the shooting (which occurred at approximately 4:20 p.m.). Specifically, at approximately 3:45 p.m., HAZRYAN's cellphone connected to a cellular tower located at 8720 Woodley Avenue, North Hills, California, which is approximately 0.1 miles away from V. HARUTYUNYAN's residence.  At approximately 4:21 p.m., HAZRYAN's cellphone connected to a cellular tower located at

16130 Nordhoff Street, North Hills, California, which is
approximately 0.9 miles from V. HARUTYUNYAN's residence.  At
approximately 4:23 p.m., approximately eight minutes after the
shooting, HAZRYAN's cellphone connected to a cellular tower
located at 9058 ½ North Hayvenhurst Avenue, North Hills,
California, which is approximately one mile from V.
HARUTYUNYAN's residence.  At approximately 5:01 p.m.,
approximately 46 minutes after the shooting, HAZRYAN's cellphone
connected to a cellular tower located at 14545 Victory
Boulevard, Van Nuys.  The distance between the cellular tower
and V. HARUTYUNYAN's residence is approximately one mile.

      b.  Cell tower data also supports that STEPANYAN was
at or near V. HARUTYUNYAN's residence.  Specifically, at
approximately 3:22:26 p.m., STEPANYAN's cellphone used cellular
data and connected to a cell tower located approximately 0.77
miles from V. HARUTYUNYAN's residence.  At 3:22:41 p.m.,
STEPANYAN's phone was within approximately 0.37 miles of V.
HARUTYUNYAN's residence.  At which point there was a gap in
usage further described below.

        *b.  STEPANYAN, A. A. KAZARYAN, SEDANO, and
        ARTUNI's phones all have gaps in usage that
        correspond with the date and time of the
        shooting*

110. Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

      a.  STEPANYAN, A. A. KAZARYAN, SEDANO, and ARTUNI all
had gaps in usage on their cellphones, which included the timing

of the shooting.  Specifically, V. HARUTYUNYAN was shot at while
inside his residence at approximately 4:15 p.m.  STEPANYAN's
cellphone had a gap in usage between approximately 3:22:41 p.m.
and 4:32 p.m.  SEDANO's cellphone had a gap in usage from or
about August 17, 2023, at approximately 2:27 p.m. to on or about
August 18, 2023, at approximately 5:12 p.m.  A. A. KAZARYAN's
cellphone had a gap in usage between approximately 4:09 p.m. and
5:17 p.m.  ARTUNI had a gap in usage between approximately 2:42
p.m. and 5:52 p.m.

> c.   *ARTUNI has drone footage of V. HARUTYUNYAN's
> residence on his cellphone*

111. Based on my conversations with LAPD Detective Stupar,
my review of LAPD reports, and my own involvement in the
investigation, I am aware that on ARTUNI's iPhone 14 Pro,
investigators located aerial drone footage dated July 30, 2023
(19 days before the shooting) of V. HARUTYUNYAN's residence.

**H.   August 25, 2023: V. HARUTYUNYAN Is Shot While in the
Backyard of His Residence**

1.   <u>Probable Cause Summary</u>

112. As set forth below, there is probable cause to believe
that ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, and others known and
unknown, attempted to murder V. HARUTYUNYAN, AMIRYAN, GZRARYAN,
and others by shooting at a backyard that they were all
congregated in.  The evidence supporting this determination
includes, but is not limited to: (1) the recurring pattern of
violence targeting the Amiryan Organized Crime Group; (2) cell
tower data placing ARTUNI, HAZRYAN, and STEPANYAN at or near V.
HARUTYUNYAN's residence at the time of the attempted murders;

(3) gaps in usage in ARTUNI and SEDANO's cellphones at the time of the shooting; (4) video depicting ARTUNI, AGOPIAN, HAZRYAN and STEPANIAN obtaining an item from the storage facility where the Artuni Enterprise held its firearms immediately before the shooting; and (5) as previously mentioned, the presence of aerial drone footage depicting V. HARUTYUNYAN's residence on ARTUNI's cellphone.

##### 2.    Description of the Attempted Murders

113. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a.    On or about August 25, 2023, at approximately 10:05 p.m., LAPD Officers Ruiz and Perez responded to a radio call regarding gunshots fired near Valjean Avenue and Parthenia Street in North Hills, California.  For the second time in a week, a shooting had occurred at V. HARUTYUNYAN's former North Hills residence on Bryant Street.  When the two officers arrived, they spoke with GZRARYAN, AMIRYAN, and others who stated that they were all in the backyard and dropped to the ground when the shooting occurred.  According to them, they did not see any suspects or vehicles.  V. HARUTYUNYAN, who had been shot six times, was transported to the hospital, and officers interviewed him there.  This interview was not recorded.  While at the hospital, V. HARUTYUNYAN stated that he had no enemies, and he had no idea why he was targeted.

b.    On or about the same date, officers consensually obtained video surveillance footage from V. HARUTYUNYAN's home

that captured the shooting.  The surveillance footage from V. HARUTYUNYAN's home depicts what appears to be a gray-colored pickup truck with unknown license plates (resembling the same pickup truck used during the August 18, 2023 shooting) stopped in the rear alley of the residence.  Two individuals are seated in the bed of the pickup truck holding what appears to be assault rifles.  One individual stands and shoots multiple rounds into the backyard, where AMIRYAN, V. HARUTYUNYAN, GZRARYAN, and others are gathered.  What appears to be a soft, black case is at the shooters' feet.  At least two individuals who were in the backyard start shooting back at the pickup truck.  The pickup truck then drives away while the two individuals in the back lay down in the bed of the truck.

        c.    Officer Perez recovered approximately thirty-four 5.56mm caliber spent shell casings, one 5.7mm spent shell casing, and one unknown caliber round in the rear alley of the residence.  Officer Perez also recovered one Federal.40 caliber spent shell casing and one Blazer .40 caliber spent shell casing in the backyard.

        3.   <u>The Artuni Enterprise's Connection to the Attempted Murder</u>

        *a.    Cell tower data places ARTUNI, HAZRYAN, and STEPANYAN at or near V. HARUTYUNYAN's residence at the time of the shooting*

114. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

a. Cell tower data supports that HAZRYAN was at or near V. HARUTYUNYAN's former residence at the time of the shooting and then fled to the area of his and ARTUNI's residences right after. Specifically, at approximately 10:03 p.m., around the time the shooting occurred, HAZRYAN's cellphone connected to a cellular tower located at 8720 Woodley Avenue, North Hills, California. The distance between the cellular tower and V. HARUTYUNYAN's former residence is approximately 0.22 miles. At approximately 10:05 p.m., around two minutes after the shooting and when law enforcement was called, HAZRYAN's cellphone connected to a cellular tower located at 9058 ½ N. Hayvenhurst Avenue, North Hills, California. The distance between the cellular tower and V. HARUTYUNYAN's former residence is approximately .58 miles. At approximately 10:08 p.m., around five minutes after the shooting, HAZRYAN's cellphone connected to a cellular tower located at 10515 Balboa Boulevard, Granada Hills, California. The distance between the cellular tower and V. HARUTYUNYAN's former residence is approximately 3.3 miles. At approximately 10:17 p.m., around 14 minutes after the shooting, HAZRYAN's cellphone connected to a cellular tower located at 11727 Tampa Avenue, Porter Ranch, California. The distance between the cellular tower and V. HARUTYUNYAN's former residence is approximately 8.4 miles. The distance between HAZRYAN's former residence in Porter Ranch, California and the cellular tower is approximately 0.95 miles. The distance between the cellular tower and ARTUNI's residence

(SUBJECT PREMISES 6 – 19747 Winged Foot Way, Northridge,
California), is approximately 0.22 miles.

      b.   Cell tower data also supports that ARTUNI was at
or near V. HARUTYUNYAN's former residence approximately 25
minutes before the attempted murders and fled sometime after.
Specifically, at approximately 9:41 p.m., ARTUNI's cellphone
connected to a cellular tower located at 16208 Parthenia Street,
North Hills, California.  The distance between the cellular
tower and V. HARUTYUNYAN's former residence is approximately
0.14 miles.  As detailed below, there was a gap in usage in
ARTUNI's cellphone during the attempted murders, indicating that
the cellphone was possibly turned off.  Then, at approximately
10:16 p.m., ARTUNI's cellphone connected to a cellular tower
located at 11155 Tampa Avenue, Northridge, California.  The
distance between the cellular tower and ARTUNI's residence is
approximately 1.2 miles.  The distance between the cellular
tower and HAZRYAN's residence is approximately 1.1 miles.

      c.   Cell tower data also supports that STEPANYAN was
at or near V. HARUTYUNYAN's former residence right before the
attempted murders and fled sometime after.  From approximately
9:45 p.m. to 9:46 p.m., STEPANYAN's cellphone connected to a
cell tower located approximately 0.77 miles from the attempted
murder location.  From approximately 9:45 p.m. to 9:49 p.m.,
STEPANYAN's cellphone connected to a cell tower located
approximately 0.63 miles from the shooting location.  From
approximately 10:02 p.m. to 10:12 p.m., STEPANYAN's cellphone

used cellular data and connected to a cell tower located approximately 1.23 miles from the shooting location.

       *b.    ARTUNI and SEDANO's cellphones have a gap in usage that corresponds with the date and time of the attempted murders*

115. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

       a.    SEDANO's cellphone had a gap in usage from on or about August 25, 2023, at approximately 7:16 p.m. to on or about August 26, 2023, at approximately 4:08 p.m., and was likely turned off during this time.[82]  In addition Between 9:41 p.m. and 10:16 p.m., ARTUNI's cellphone had a gap in usage, and was likely turned off.

       *c.    Surveillance footage from a storage facility where STEPANYAN maintained the Artuni Enterprise's weapons depicts ARTUNI, AGOPIAN, HAZRYAN, and STEPANYAN*

116. Based on my conversations with Detectives Stupar and Sam, my review of surveillance footage from a storage facility utilized by the Artuni Enterprise,[83] and my own knowledge of the investigation, I am aware of the following:

       a.    On or about August 25, 2023, at approximately 6:47 p.m., two vehicles arrived at Enterprise Self Storage: a

---

[82] I am aware that the cellphone was likely turned off because when reviewing SEDANO's CDR for multiple periods, it was inconsistent for him to have such a large gap in usage.  Because of that, investigators opine that his phone was turned off during the attempt murders. .

[83] Based on my involvement in this investigation, I am aware that footage from the storage facility was obtained pursuant to an administrative request for information.

dark-colored Infinity SUV bearing California license plate number 9GAL467, registered to A. A. KAZARYAN's father, driven by HAZRYAN and with ARTUNI and AGOPIAN in the backseat (the "SUV") and a white Mercedes Benz sedan bearing California license plate number 9GOF815 and driven by and leased to STEPANYAN (the "Mercedes Benz"). STEPANYAN exited his vehicle and entered HAZRYAN's SUV. The individuals inside the SUV spent a considerable amount of time inside the vehicle. After some time, ARTUNI exited the SUV and spoke on the phone and STEPANYAN and AGOPIAN entered STEPANYAN's vehicle and drove away. ARTUNI eventually re-entered HAZRYAN's SUV.

b.    At approximately 8:18 p.m., STEPANYAN and AGOPIAN returned to the storage facility in the white Mercedes. When they returned, both STEPANYAN and AGOPIAN congregated around the Mercedes Benz along with ARTUNI and HAZRYAN. After some time, STEPANYAN removed what appeared to be an empty soft black guitar case from his vehicle and all four members of the Artuni Enterprise entered the interior of the storage facility. The soft black case appeared flexible and was bending, indicating that it was empty at that time.

c.    At approximately 8:47 p.m., the four men exited the storage facility through the elevator with AGOPIAN carrying what appeared to be the same black case from before. However, at this time, the case looked weighted and rigid, indicating that the something was now inside. (Of note, based on surveillance footage of the attempted murder, which shows what appears to be a soft black case at the feet of the shooters, I

117

believe that the rifles that were used in the shooting a few hours later were placed inside.)

       d.  They walked back to their vehicles and AGOPIAN placed the soft black case inside of STEPANYAN's vehicle. AGOPIAN and HAZRYAN entered HAZRYAN's vehicle. ARTUNI and STEPANYAN entered STEPANYAN's vehicle. Both vehicles drove away.

       e.  On other dates, including on or about September 2, September 6, September 13, and October 25, 2023, STEPANYAN and SEDANO are captured on surveillance footage entering and exiting with a plastic chest, luggage, and other carriers. On or about September 13, 2023, the two were joined by AREKELYAN. AREKELYAN was also seen entering and exiting the facility with STEPANYAN handling assorted carriers on or about November 2, 2023. Of note, based on surveillance footage, anyone entering the storage facility was (apart from on or about December 12, 2023, when SEDANO attempted to enter by himself using STEPANYAN's unique code) always escorted by STEPANYAN.

    **I.**    **November 9, 2023: H.H. Is Shot While Sitting in His Car at a Starbucks**

       1.  <u>Probable Cause Summary</u>

    As set forth below, there is probable cause to believe that ARTUNI, HAZRYAN, STEPANYAN, and others known and unknown, attempted to murder H.H. while he sat in his car at a Starbucks. The evidence supporting this determination includes, but is not limited to: (1) cell tower data placing HAZRYAN and STEPANYAN at or near the attempted murder location; (2) gaps in usage in

ARTUNI and SEDANO's cellphones at the time of the shooting; (3) storage facility surveillance footage depicting STEPANYAN carrying out something in a black canvas-type bag before the shooting; (4) footage near the shooting capturing a car similar to STEPANYAN's; and (5) HAZRYAN's web search history for a shooting at a Starbucks.

    2.   <u>Description of the Attempted Murder</u>

117. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

    a.   On or about November 9, 2023, at approximately 4:40 p.m. LAPD Officers Green and Moreno responded to a commercial area on Foothill Boulevard in Los Angeles, California regarding a shooting with one victim (H.H.) "down."[84]

    b.   When the two officers arrived, H.H. was sitting on the ground, lying against the driver's side door of a parked, gray Toyota Prius. At the time, other officers, who were already at the scene, were rendering medical aid. H.H. was unable to provide any information about the shooting, as he appeared to be drifting in and out of consciousness. H.H. suffered four gunshot wounds, resulting in laceration of the lung, respiratory failure, multiple rib fractures, traumatic hemothorax acute posthemorrhagic anemia, and shock. Officer Moreno recovered approximately six 7.62mm rifle casings around H.H.'s vehicle. H.H.'s vehicle (a black Lexus that was parked

---

[84] Based on my training and experience, I know that a victim being "down" means s/he has been shot or injured and requires medical attention.

several cars down) had gunshot holes in the windshield, hood, driver's seat, and front left tire.  H.H. was taken to a hospital to be treated.

      c.   LAPD Officers Proni and Massie interviewed a witness in the area surrounding the Starbucks.  According to the witness, she saw a 40-year-old, white female wearing a medical mask driving a tan SUV (possibly a Yukon) in the area.  She then saw the woman fire four to five rounds at H.H. before fleeing in her car.

      3.   The Artuni Enterprise's Connection to the Attempted Murder

          *a.   Cell tower data places HAZRYAN and STEPANYAN at or near the attempted murder location*

118. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

      a.   Cell tower data indicates that HAZRYAN was at or near Starbucks prior to the shooting and fled towards A. A. KAZARYAN's residence thereafter.  Specifically, at approximately 3:54 p.m., around 44 minutes before the shooting, HAZRYAN's cellphone connected to a cellular tower located at 8138 W. Foothill Boulevard, Sunland, California.  The distance between the cellular tower and 8241 Foothill Boulevard (the location of the Starbucks where the shooting occurred) is approximately 0.2 miles.  At approximately 4:44 p.m., around six minutes after the shooting, HAZRYAN's cellphone connected to a cellular tower located at 10189 Tujunga Canyon Blvd., Tujunga, California.  The distance between the cellular tower and the location of the

attempted murder is approximately 1.6 miles.  The distance between the cellular tower and A. A. KAZARYAN's residence is approximately 0.2 miles.  At approximately 4:46 p.m., around eight minutes after the attempted murder, HAZRYAN's cellphone connected to a cellular tower located at 6708 Foothill Boulevard, Tujunga, California.  The distance between the cellular tower and the location of the attempted murder is approximately 2.3 miles.  The distance between the cellular tower and A. A. KAZARYAN's residence is approximately 0.3 miles. At approximately 5:16 p.m., around 38 minutes after the attempted murder, HAZRYAN's cellphone connected to a cellular tower located at 435 West Arden Ave., Glendale, California.  The distance between the cellular tower and the location of the shooting is approximately 15.7 miles.

       b.   Cell tower data indicates that STEPANYAN was at or near the Starbucks at the time of the attempted murder. Specifically, at approximately 4:23 p.m., STEPANYAN's cellphone used data and connected to a cell tower located approximately 0.72 miles from the attempted murder location.  At approximately 4:33 p.m., STEPANYAN's cellphone connected to a cell tower located approximately 0.72 miles from the attempted murder location.  At 4:46 p.m., STEPANYAN's phone used data and connected to a cell tower located approximately 0.72 miles from the shooting location, this time, in the opposite direction of the shooting location.

              b.   *ARTUNI and SEDANO's cellphones have a gap in usage that corresponds with the date and*

121

*time of the attempted murder*

119. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

    a.    ARTUNI and SEDANO had gaps in usage on their cellphones, which included the timing of the attempted murder. Specifically, between approximately 4:00 p.m. and 5:08 p.m., there was a gap in usage in ARTUNI's cellphone, indicating that his phone was likely turned off.  SEDANO's cellphone had a gap in usage from approximately 4:11 p.m. to 4:52 p.m.

    *c.    HAZRYAN's cellphone includes an Internet
         search for a shooting at a Starbucks*

120. Based on my conversations with Detectives Stupar and Sam, my review of LAPD reports, and my own knowledge of the investigation, I am aware of the following:

    a.    When searching HAZRYAN's iPhone 15 Pro, Detective Stupar located the following in the web search history: "shooting in tujunga today", "Man shot in Tujunga", "shooting in tujunga star bucks", "SUNLAND-TUJUNGA AREA EMERGENCY POLICE-FIRE SCANNER NEWS", "Tujunga police activity today", and "Sunland tujunga police activity today".  These web searches were conducted on November 10, 2023, a day after H.H. was shot at the Starbucks parking lot.  Detective Stupar discovered another web search item on HAZRYAN's cellphone: "shooting in tujunga today". This last web search was conducted on November 11, 2023, two days after H.H. was shot.  Based on my involvement in this investigation, I believe that HAZRYAN was searching to see if

H.H. was successfully shot, given that H.H. was shot at a
Starbucks.

> d.    *STEPANYAN is captured on surveillance
> footage retrieving something from the
> storage facility*

121. Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, and my own knowledge of the
investigation, I am aware of the following:

a.    At approximately 3:49 p.m., STEPANYAN was
captured on surveillance footage arriving at the storage
facility in a white Camry.[85]  STEPANYAN entered the facility with
a cardboard box and left at approximately 4:11 p.m. with a soft
black carrier that appeared to be a canvas-type bag.

> e.    *A vehicle similar to the one STEPANYAN was
> driving is captured on surveillance footage
> at the Starbucks*

122. Based on my conversations with Detectives Stupar and
Sam, my review of LAPD reports, my review of surveillance
footage obtained from a business near the Starbucks, and my own
knowledge of the investigation, I am aware of the following:

a.    At approximately 4:29 p.m., H.H. drove into the
Starbucks parking lot.  At approximately 4:34 p.m., a white
Camry (similar to the one STEPANYAN drove less than a half hour
earlier at the storage facility) entered the parking lot after
H.H. followed by a tan/brown Nissan Armada.  The white Camry
parked across from H.H.'s vehicle while the Nissan Armada backed
into an empty parking space close by.  At approximately 4:37

---

[85] As mentioned above, this appears to be the same vehicle
depicted in a video on SEDANO's cellphone.

p.m., the white Camry abruptly sped through the parking lot, and the Nissan Armada, reversed out of its parking spot, stopping right in front of H.H.'s vehicle.  After several seconds, the Nissan Armada sped through the parking lot following the Camry. H.H. stumbled out of his vehicle as though injured and approached several bystanders.  H.H.'s vehicle appeared to have several bullet holes in it.

123. Based on witness interviews, forensic evidence, and my training and experience, I am aware that AMIRYAN is considered one of the most prominent Armenian Organized Crime figures in Los Angeles County.  As such, ARTUNI, who has been seeking to advance his position in the Armenian criminal community, with the backing of the Mexican Mafia, has targeted AMIRYAN and those close to him in order to attempt to assume AMIRYAN's position within the Armenian Organized Crime world.

> f. *Casings from the Starbucks are linked to a firearm seized from the storage facility used by the Artuni Enterprise as an armory*

124. Based on my conversations with Detective Stupar, my review of LAPD reports, and my own involvement in this investigation I am aware that when executing the warrant at Unit B16 of Enterprise Self Storage, investigators located a Century Arms, model C39v2, 7.62x39 caliber rifle bearing serial number C39P2A01084.  Casings from the Starbucks matched that firearm.

**J.  December 12, 2023: Law Enforcement Seizes the Artuni Enterprise's Firearms, Ammunition, and Body Armor from a Storage Facility**

125. Based on my conversations with LAPD Detective Stupar and Alcohol, Tobacco, Firearms and Explosives ("ATF") Special

Agent Ghaltakhchyan, my review of LAPD and ATF reports, and my own knowledge of the investigation, I am aware of the following:

a.    During the search of Unit B16 of Enterprise Self Storage on or about December 12, 2023, law enforcement located the following firearms, among others:

| Make | Model | Caliber | Type | Serial No. |
|------|-------|---------|------|-----------|
| Stag Arms | STAG-15 | 5.56mm | Rifle | 110979 |
| Century Arms | C39v2 | 7.62x39 | Rifle | C39P2A01084 |
| Izhmash | Saiga | .223 Remington | Rifle | H04161419 |
| Ruger | American | 6.5 Creedmoor | Rifle | 690876968 |
| Glock | 23 | .40 | Pistol | LLM670 |
| Charter Arms | Bulldog | .44 SPL | Revolver | 22C03482 |
| Glock | 20 | 10mm Auto | Pistol | BNAV439 |
| Taurus | G3 | 9x19 | Pistol | AAL034433 |
| Glock | 29 Gen4 | 10mm Auto | Pistol | BRRT964 |
| Glock | 43X | 9x19 | Pistol | BLUA713 |
| CZ | P-10S | 9x19 | Pistol | UC11926 |
| Taurus | 605 | .357 Magnum | Revolver | TI62464 |
| Ruger | LCP | .380 Auto | Pistol | 371851421 |
| Glock | 21 | .45 Auto | Pistol | KDK598 |
| Glock | 17L | 9x19 | Pistol | NA436 US |
| S/S Inc. | Street Sweeper | 12 gauge | Shotgun/Destructive Device | SH1292[86] |
| None | None | Unknown | AR-Style Short-Barreled Rifle | None |

b.    In addition, law enforcement located several rounds of assorted ammunition, including but not limited to:

| No. of Rounds | Make | Caliber |
|---------------|------|---------|
| 10 | FN Herstal/Fiocchi | 5.7x28mm |
| 21 | FN Herstal/Fiocchi | 5.7x28mm |

---

[86] This firearm was loaded with three rounds of .25 Auto caliber ammunition, which is manufactured by Industrias Tecnos, S.A. de C.V. in Mexico.

| 150 | FN Herstal/Fiocchi | 5.7x28mm |
|---|---|---|
| 77 | Barnaul Cartridge Works | 9mm Luger |
| 59 | Sig Sauer | .380 Auto |
| 19 | Hornady | 7.62x39mm |
| 39 | Hornady | .357 Magnum |
| 11 | Hornady | 9mm Luger |
| 7 | Hornady | .45 Auto |
| 25 | Hornady | .38 Special |
| 1 | Federal Cartridge Company-CCI/Speer | .45 Auto +P |
| 50 | Fiocchi | .380 Auto |
| 6 | 205th Arsenal | .223 Remington |
| 8 | Ammo Incorporated/ Jagemann | 9mm Luger |
| 8 | Sellier & Bellot | 9x19mm |
| 26 | Remington | .22 short |

c.    Law enforcement also located the following, among other items: (1) a Glock switch,[87] (2) two Glock switch assemblies, (3) assorted firearm parts bearing no serial numbers, (4) four suppressors, (5) a rifle scope, (6) five body armor plates, and (7) three body armor carriers.

d.    ARAKELYAN's DNA[88] was found on two of the firearms seized from the storage unit: (1) a Glock, model 29 Gen4, 10mm Auto caliber, pistol bearing serial number BRRT964; and (2) a

---

[87] A Glock switch is a device that attached to a handgun, which allows the handgun to fire automatically.  Glock switches are themselves considered machineguns and are, therefore, prohibited pursuant to 18 U.S.C. § 922(o).

[88] In relation to this investigation, I obtained a warrant signed by the Honorable Daniel J. Albregts, a U.S. Magistrate Judge in the District of Nevada (Case No. 2:24-mj-0410) to seize samples of DNA from ARAKELYAN, who was detained at High Desert State Prison in Nevada.  On or about on May 7, 2024, I served the search warrant on ARAKELYAN and seized a sample of his DNA, following which LAPD Forensic Science Division compared his DNA to DNA samples collected from the firearms seized on or about December 12, 2023, from the storage unit and determined there was a match.

126

Taurus, model G3, 9x19 caliber, pistol bearing serial number
AAL034433.

e.    As it relates to ARAKELYAN, after the search
warrant execution and after I obtained his DNA pursuant to a
federal warrant on May 7, 2024, he made several seemingly
incriminating statements to his then-romantic partner on jail
calls.[89]  Specifically, on a May 8, 2024 call,[90] ARAKELYAN tells
her: "I am fucked."  ARAKELYAN begins to cry throughout the
conversation and tells her that the cops came to speak with him
and gave him a "warrant."  ARAKELYAN tells her that the "feds"
took his DNA.  ARAKELYAN asks her to tell his sister what's
going on, seemingly referring to the criminal investigation into
him.  ARAKELYAN tells her, "Listen to my words I am never
getting released from jail."  ARAKELYAN tells her that he is
"screwed" and that because of the federal government he will not
be getting released.

126. Based on my training, experience, and involvement in
this investigation, I believe that this storage unit was
maintained by STEPANYAN and SEDANO (the two individuals who had
the unique access code and who, as felons, were prohibited from
possessing firearms and ammunition) as the Artuni Enterprise's
armory.  I believe that this was the Artuni Enterprise's armory

---

[89] I obtained the jail calls from Nevada Department of
Corrections, Office of the Inspector General, Criminal
Investigator Karla Moreira.

[90] This call was in Armenian.  Accordingly, I requested the
assistance of Detective Emikyan and Sergeant Mirakyan with the
review and analysis of this call and others obtained from the
prison.

specifically given that assorted members and associates of the Artuni Enterprise, including ARTUNI himself, AGOPIAN, HAZRYAN, STEPANYAN, and SEDANO, frequented the facility, and further, one or more of them were present at the facility prior to the shootings on August 25, 2023, and November 9, 2023.  I also believe, based on firearms matching casings from the July 7, 2023 attempted murders targeting AMIRYAN and his significant other, and the November 9, 2023 attempted murder targeting H.H. that the Artuni Enterprise was responsible for these crimes.

**K.   December 12, 2023: Law Enforcement Seized Firearms from the Residences of ARTUNI, HAZRYAN, A. A. KAZARYAN, and MANUKYAN**

127. Based on my conversations with Detective Stupar, Sergeant Mirakyan, and Special Agent Ghaltakhchyan, my review of LAPD, Burbank PD, and ATF reports, and my own knowledge of the investigation, I am aware of the following:

   1.   <u>Firearms, Ammunition, Body Armor, and a Large Sum of Cash Found at ARTUNI's Residence</u>

   a.   Investigators seized the following items of relevance, among others, from ARTUNI's residence: nine firearms, including one ghost gun; a large quantity of ammunition; magazines; body armor; and $16,917.  Per an ATF "blue ribbon" report, at the time, ARTUNI had not registered to own any firearms.

   2.   <u>Loaded Firearm Found at HAZRYAN's Residence</u>

   b.   Investigators seized the following items of relevance, among others, from HAZRYAN's residence: a handgun with a loaded magazine inside a children's toy box in a bedroom

and body armor.  When later interviewed following a <u>Miranda</u> advisement, HAZRYAN admitted to placing the handgun in the toy box.  A records check of the recovered handgun revealed that it was stolen on January 3, 2023, out of Orlando, Florida.  Per an ATF "blue ribbon" report, at the time, HAZRYAN had not registered to own any firearms.

> 3. <u>Firearms, Ammunition, and Firearm Accessory Found at A. A. KAZARYAN's Residence</u>

c.  Investigators seized the following items of relevance from A. A. KAZARYAN's residence: five firearms, 25 magazines, a large quantity of ammunition, and one rifle upper receiver.  Per an ATF "blue ribbon" report, at the time, A. A. KAZARYAN has not registered to own any firearms.

> 4. <u>Firearms and Ammunition Found at Felon and Addict MANUKYAN's Residence</u>

d.  When investigators executed a warrant, signed by the Honorable Jacqueline L. Chooljian, at MANUKYAN's residence on or about December 12, 2023 (Case No. 2:23-MJ-6288), they were informed by his father that while he did reside at the residence, the week prior, he had left for a drug rehabilitation facility in Orange County.  MANUKYAN's mother further advised that MANUKYAN and his girlfriend had recently welcomed a child; however, the child was taken from them by the Department of Children and Family Services (DCFS) due to both being drug addicts.  Prior to the child being taken, both of MANUKYAN's parents explained that they had cleaned the garage, where MANUKYAN kept his belongings, to make a nursery for the baby,

and MANUKYAN's mother had placed everything they cleaned out in the hallway closet.

    e.    Burbank PD Detective Rodriguez searched the hallway closet and found a prescription with MANUKYAN's name and the following firearms: (1) a Ruger, model 10/22, .22 caliber rifle, bearing serial number 129-54711; (2) a United States, M1 Carbine, .30 caliber, semi-automatic rifle, bearing serial number AA33192; and (3) a Sears Roebuck, model M-300, .20 caliber shotgun, bearing Q118168.  After seeing that the firearms had been located, MANUKYAN's father claimed that they belonged to him,[91] in contradiction to his significant other's earlier statement about placing their son's belongings in the hallway closet.

    f.    Per an ATF "blue ribbon" report, at the time, MANUKYAN had not registered to own any firearms.  Of note, given his felon and addict status, he would not have been able to purchase the firearms and/or register them anyways.

    g.    On or about October 17, 2024, a male purporting to be MANUKYAN's father called Detective Pira and inquired about the status of the seized firearms.  Detective Pira has had prior contact with MANUKYAN in the past and immediately recognized the voice to be MANUKYAN's.  In addition, the caller's phone number (which ends in -3520) is registered to MANUKYAN.  Detective Ekimyan and Sergeant Mirakyan were present and recognized

---

[91] Based on my training and experience, I know that it is common for family members to take responsibility for illegal firearms in residences to avoid their loved ones getting in trouble.

MANUKYAN's voice.  (Of note, Sergeant Mirakyan was present during the warrant execution at MANUKYAN's home and spoke with MANUKYAN's father.  Having spoken with him, he further concluded that the caller was MANUKYAN and not his father.)  Detective Pira asked for the caller to provide MANUKYAN's father date of birth, which he was unable to do.  Detective Pira terminated the call and stated that he would follow up later.  Based on my training, experience, and involvement in this investigation, I believe that MANUKYAN pretended to be his father so that he could obtain the seized firearms.  The fact that MANUKYAN called pretending to be his father further supports my conclusion that the firearms found in the hallway closet belonged to MANUKYAN.

128. In addition, based on my training, experience, and discussions with other law enforcement officers, I am aware that individuals engaged in criminal activity will not register firearms so that the crimes cannot be traced back to them.  In this case, I believe that these individuals' illegal possession of unregistered firearms, and also, in MANUKYAN's case, his illegal possession of firearms and ammunition despite his addict and felon status, is further indicia of their nexus to the violent criminal activity described in this affidavit and their attempts to avoid law enforcement detection.

**L.   April 2024: ARTUNI Flees from the United States and to Armenia, and then Dubai**

129. Based on my conversations with Detective Stupar, my review of LAPD reports, information received from an HSI Attaché

located in Dubai, and my own involvement in this investigation, I am aware of the following:

a. Sometime in April 2024, ARTUNI is believed to have fled the United States through to Mexico, where he flew to Yerevan, Armenia. Based on the timing of his flight, I believe that ARTUNI was (1) fleeing the United States to avoid arrest and prosecution, and (2) to meet with the thieves in law[92] that he referenced during his recorded conversation with A.K.

b. Then, on or about an unknown date in April 2024, ARTUNI flew from Mexico to Dubai. Upon entering Dubai, ARTUNI's photograph was taken at the border. I have reviewed the photograph, which was obtained from a closed source law enforcement system and international partners, and in it, ARTUNI appears to have sustained several injuries and bruises. Based on my training, experience, and involvement in this investigation and my conversations with other law enforcement officers, I believe that while abroad, ARTUNI may have been "reprimanded" or "regulated," that is, punished by a more senior member of Armenian Organized Crime or the Russian Mafia.

c. ARTUNI returned to Los Angeles on or about November 16, 2024, entering through the Otay Mesa Port of Entry at the U.S.-Mexico border near San Diego, California. Based on my training, experience, and involvement in this investigation, and my conversations with other law enforcement officers, I believe that ARTUNI resided in Dubai  for approximately a year

---

[92] As explained earlier, thieves in law are individuals who have been crowned by the Russian Mafia to lead Armenian Organized Crime groups.

to see if charges would be brought against him.  Then, when no
charges were brought, returned to Los Angeles so that he could
recommence his criminal activity.

### M.  March 14, 2025 and March 28, 2025: AMIRYAN's Significant other (R.M.) and GZRARYAN are Both Shot in Seemingly Related Acts of Violence

1.  <u>March 14, 2025: R.M. Is Shot While Parking Her Car at Her Apartment Building in Studio City</u>

130. Based on my conversations with Detective Stupar, my
review of LAPD reports, and my own involvement in this
investigation, I am aware of the following:

a.  On or about March 14, 2025, at approximately
11:16 p.m., LAPD Officers Armas-Rincon and Gutierrez were
dispatched for a "245 Ambulance Shooting" call at a residence on
Kentucky Drive in Los Angeles.  Upon arriving to the scene, the
officers met with R.M. who stated that she drove her vehicle (a
2024 Cadillac Escalade bearing California license plate number
9NZL315) into the parking structure of her apartment complex and
was shot by two unidentified males.  Shortly after making this
statement, R.M. was transferred to a local hospital for further
medical attention as she suffered a single gunshot wound to her
left knee.

b.  LAPD Officers Kim and Huitz arrived at the
hospital and conducted a follow-up interview with R.M.  R.M.
told the officers that prior to the shooting, she and her two
minor children, who were in the car with her, arrived at their
apartment by driving through the rear alleyway.  R.M. opened the
garage and entered the parking structure.  As she began to park

her car, two unidentified males, both wearing all black clothing
and a black mask, and each carrying rifle-style guns in each
hand, entered through the opened garage gate.  Shortly after,
she heard gunshots coming towards her vehicle and put her head
down to avoid being hit.

      i.    On or about March 17, 2025, LAPD Detectives
Stupar and Urena, conducted a follow-up investigation into the
shooting and consensually obtained security camera footage from
a neighboring business.  The footage showed a silver-colored
Audi A4 with left front bumper damage (the "Audi") parked at the
entrance of the alleyway.  Approximately 15 minutes into the
video, the vehicle that R.M. was driving turned into the alley.
Two males who were dressed in all black and carrying rifles,
exited the Audi and ran after R.M.'s car towards the apartment
complex.  Shortly thereafter, the Audi drove through the same
alleyway following after the two males and also moving towards
the apartment complex.

      ii.    On or about March 18, 2025, Detectives
Stupar and Urena, utilizing department resources, conducted a
radial search for silver-colored Audi's in the vicinity of the
shooting.  After reviewing multiple images, there was one image
dated March 17, 2025, of a silver Audi parked at or near Fair
Avenue in Studio City, California, bearing California temporary
license plate number DA25T27, which was actually registered to a

2024 Lexus.[93]  Upon further review of the vehicle, the detectives saw that the vehicle had no front license plate, and it also had the same front left bumper body damage and black side view mirrors as the vehicle used in the shooting.

2. <u>March 28, 2025: GZRARYAN Is Shot While Sitting in a Car in Front of His Home</u>

131. Based on my conversations with Detective Stupar and my review of LAPD reports, I am aware of the following:

a.  On or about March 28, 2025, at approximately 10:50 p.m., LAPD Officers Bloomgren and Ponce were dispatched to an assault with a deadly weapon call on Helen Avenue in Sun Valley, California.  Upon arriving to the scene, officers saw GZRARYAN sitting inside the driver's seat of a vehicle (a 2024 Black BMW 850I bearing license plate 9LHX877 and VIN WBAGV802RR25432) suffering from multiple gunshot wounds to his torso.  Officers also saw approximately 15 large caliber casings scattered near GZRARYAN's vehicle, along with shattered glass and several bullet holes on the driver's side door of his vehicle.  GZRARYAN was transported to a local hospital for further medical treatment.

b.  LAPD Officer Ramirez, who also responded to the shooting, spoke to the reporting party A.C., who told officers she was GZRARYAN's significant other.  A.C. stated that at approximately 10:45 p.m., she heard several gun shots coming from the street and shortly after, received a call from GZRARYAN

---

[93] Based on my training and experience, given that this temporary plate was associated with a different vehicle, I believe that this was a fraudulent temporary plate used by the shooters to avoid law enforcement detection.

stating that he had been shot outside of their home.  A.C. then
exited their home and went to the front where she saw GZRARYAN
sitting in his vehicle and suffering from multiple gunshot
wounds.  A.C. informed Officer Ramirez that she did not see any
suspects or suspect vehicles and had no further information on
who would want to hurt GZRARYAN.

132. Based on my training and experience, my involvement in
this investigation, and my conversation with other investigators
involved in this case, I believe that the modus operandi used by
the shooters in this incident closely matches that of the 2023
shooting incidents orchestrated by the Artuni Enterprise.  The
Artuni Enterprise historically has used one or two shooters;
high-capacity firearms; vehicles recently purchased, stolen,
and/or leased; and a person to act as the getaway driver.  The
Artuni Enterprise is known to be well coordinated, rehearsed and
thought-out when carrying these types of criminal activities and
typically, attacks its targets at or near their homes. I know
from the course of this investigation that the Artuni Enterprise
has previously targeted members and associates of the Amiryan
Organized Crime Group, including AMIRYAN himself.  Accordingly,
I believe that these shootings, which targeted AMIRYAN's
significant other (R.M.) and GZRARYAN, were also conducted by
the Artuni Enterprise.

**N.    April 11, 2025: AGOPIAN, a Felon, Brandishes a Firearm
at a Plainclothes Officer**

133. Based on my conversations with Detective Stupar, my
review of LAPD reports, and my own involvement in this
investigation, I am aware of the following:

a.    On or about April 11,2025, at approximately 7:43
a.m., LAPD's Surveillance Support Section was conducting a
surveillance around AGOPIAN's residence (SUBJECT PREMISES 7 -
10880 Amidon Place, Tujunga, California), in anticipation of a
later arrest and search warrant execution in this investigation.
At this time, AGOPIAN (a convicted felon) began following LAPD
Detective Brian Murphy in a black GMC Yukon Denali, bearing
Oregon License Plate 479QHU.[94]  Detective Murphy was in plain
clothes and driving an unmarked police vehicle.  AGOPIAN pulled
up next to Detective Murphy, lowered his window several inches,
stuck his hand out of the opening, and pointed and waved a
firearm at Detective Murphy.  After the brandishing incident,
Detective Murphy sent out a call for further support, following
which, numerous LAPD officers and detectives responded to the
area.

b.    Detective Stupar obtained a state search warrant
for, among other things, AGOPIAN's person, residence, vehicles,
and digital devices.  The warrant was signed by the Honorable

---

[94] Based on my conversations with LAPD Detective Stupar, I
am aware that this vehicle was armored.  Based on my training,
experience, and participation in this investigation, I believe
that AGOPIAN's use of an armored vehicle and the readiness with
which he brandished a firearm at a person he was not familiar
with supports the conclusion that AGOPIAN himself (a member of
the Artuni Enterprise) is participating in the war against the
Amiryan organized Crime Group.

Shelly Torrealba, Superior Court Judge of the State of California, County of Los Angeles.  While investigators were waiting on the search warrant review and approval, AGOPIAN was transported to the LAPD Foothill station.  Prior to the commencement of the search, Detective Urena was advised by a patrol officer that AGOPIAN requested that they not damage the safes and stated the keys for the safes were located in the main bedroom left side nightstand, in the third drawer down.  Based on my conversations with Detective Mkrtchyan, I am aware that the left side of the nightstand contained items belonging to a male.  Accordingly, I believe this nightstand was used by AGOPIAN, and not his significant other (A.P.).

c.    During a search of the residence, pursuant to the search warrant, Detective Mkrtchyan searched the nightstand third drawer, which was unlocked and located multiple sets of keys for three safes.  One set of keys was for a clock safe located on a small nightstand, in the main bedroom, left of the bed (which I believe, is AGOPIAN's side of the bed), another set of keys was for an empty gun safe located in the garage, and one single key was for the standing safe located in the office-closet.  Access to all three safes was granted via use of these physical keys.

d.    During a search of the premises conducted in part by Detective Mkrtchyan, a loaded Kimber 1911, model Custom TLE II, .45 caliber, semi-automatic pistol bearing serial number K707215 was located inside the "clock" safe.  And, a second firearm, a loaded KelTec, model KSG, 12-gauge shotgun bearing

serial number XXC224 was located inside the standing safe.  Both firearms were registered to AGOPIAN's significant other (A.P.). Given that these firearms were registered to A.P., I believe that she likely acted as a "straw purchaser," that is, she purchased the firearms on AGOPIAN's behalf and registered them under her name because he is otherwise prohibited from possessing them due to his felon status.  Additionally, LAPD Detective Espinoza located two 9mm live rounds in the garage, inside of a rifle bag, which was unsecured.

   e. On or about April 12, 2025, to on or about April 13, 2025, while AGOPIAN was detained in state custody in relation to the above-described incident, he spoke with his significant other (A.P.) on jail calls.  These calls were conducted in the Armenian language.  My understanding of their substance is, therefore, based upon summaries and translations provided by Detective Mkrtchyan.  A brief summary of the relevant calls are as follows:

   i. AGOPIAN and A.P. are talking about the items seized by the police during the search warrant, and AGOPIAN tells A.P. that the police even took the drone.  AGOPIAN tells A.P. to talk with "Davo" (HAZRYAN) about the drone.  (I believe this is significant considering that members of the Artuni Enterprise had drone footage on their phones depicting the homes of members and associates of the Amiryan Organized Crime Group). AGOPIAN asks A.P. if "Aro" (ARTUNI) is around, and she states she does not know and does not have his number.  AGOPIAN tells A.P. to get "Aro's" number from "Narek" (BEZIK).

ii.  A.P. tells AGOPIAN that his guys "Davo" and "Narek" (HAZRYAN and BEZIK) are having "Hovo" drive her around. A.P. tells AGOPIAN that "Davo" told her that when his boss (seemingly referring to AGOPIAN) gets out of jail and finds out that "Davo" allowed A.P. to travel without having one of the guys with her, that the boss will take his head off and that A.P. does not have a choice and that "Hovo" needs to travel with A.P.  (I believe this is significant in that it demonstrates that AGOPIAN holds a position of authority within the Artuni Enterprise.)

iii. AGOPIAN tells A.P. to call "Artur" (likely in reference to A. A. KAZARYAN) and for him to get three new iPhones.  AGOPIAN also asks A.P. to call "Aro."  (I believe this is significant as it reinforces AGOPIAN's relationship with ARTUNI.)  A.P. states that she does not need to talk with "Aro." AGOPIAN asks A.P. why, and A.P. states that she is upset with "Aro."  AGOPIAN, who appears to become upset with A.P. for stating that she is mad at ARTUNI, tells A.P. if she is upset then she should go punch a wall.  AGOPIAN tells A.P. stop being stupid and not to talk in that manner.  A.P. tells AGOPIAN she will tell him about it when he gets out of jail.  Then, A.P. calls "Narek" (BEZIK) on another phone and places the call on speaker.  (I believe this is significant because it reinforces AGOPIAN's relationship with BEZIK.)  AGOPIAN asks BEZIK where they are, and BEZIK states that they are in Tujunga.  (A. A. KAZARYAN lives in Tujunga.)  AGOPIAN tells BEZIK to get a hold of Artur (seemingly in reference to A. A. KAZARYAN) and have him

get three iPhones and to connect them to specific numbers.
AGOPIAN also tells NAREK to talk with his Russian speaking
friend and to tell him to bring him a watch.  (AGOPIAN giving
orders to BEZIK and A. A. KAZARYAN further supports that he is
senior within the Artuni Enterprise.)

134. Based on my training, experience, and involvement in
this investigation, and my conversations with other law
enforcement officers, I believe that AGOPIAN (a senior member of
the Artuni Enterprise) was on high-alert and in possession of
multiple firearms due to the ongoing war between the Amiryan
Organized Crime Group and the Artuni Enterprise, which most
recently, included the shootings of R.M. (AMIRYAN's significant
other) and GZRARYAN (a member of the Amiryan Organized Crime
Group).  The fact that AGOPIAN was driving a custom armored
vehicle with fully armored glass and door panels, and was
willing to brandish a firearm at a plainclothes officer further
supports this conclusion, as does the fact that (1) A.P.
attributes this situation, seemingly referring to the violence
and quick law enforcement response, to ARTUNI, and (2) AGOPIAN
is discussing A.P. leaving Los Angeles and being transported by
a chauffeur/protector (HAZRYAN) on jail calls.

### O. Other Racketeering Activities Conducted by Members and Associates of the Artuni Enterprise

#### 1. Relating to Wire and Financial Institution Fraud

135. Based on my conversations with Detective Stupar, my
review of LAPD reports, my conversations with HSI Special Agent

Victoria Scott, my review of HSI reports, and my own involvement
in this investigation, I am aware of the following:

a.   Since 2022, members of the Artuni Enterprise,
including ARTUNI, HAZRYAN, AGOPIAN, SEDANO, STEPANYAN, KAZARYAN,
and their family members, have used multiple fictitious
businesses, including FREEDOM AT ENTERPRISE, INC. and DK9, INC.,
among others, to engage in, and benefit from, bank and wire
fraud.  The fraud scheme operated as follows:

   a.   *The Scheme*

i.   First, members and associates of the Artuni
Enterprise would use credit cards in their own names and in the
names of other individuals (who in several instances,
consensually provided their information) to make large
transactions at a fictitious business (FREEDOM AT ENTERPRISE,
INC.) through a payment processor such as PayPal or Intuit.

ii.   Next, once the payments cleared the business
bank account, funds would be withdrawn in cash or dispersed via
peer-2-peer ("P2P") money services, wire transfers, checks, or
payments to other entities.  These monies would go directly to
members and associates of the Artuni Enterprise and their
relatives.

iii. Then, the users of the credit cards (or the
persons named on the credit cards) would dispute the
transactions with their credit card companies.  In some
instances, they would request a generic email from FREEDOM AT
ENTERPRISE, INC. regarding an inability to provide the services
promised as proof for the credit card companies.

iv.  Finally, the payment processor would attempt to withdraw the funds from the business bank account to refund the money but would be unable to do so as the funds would already be gone.

   b. *Execution of the FREEDOM AT ENTERPRISE, INC. Scheme*

136. Based on my review of LAPD reports regarding the review of an iPhone 8 bearing IMEI 358711091514018 ("HAZRYAN's iPhone 8 -4018") and an iPhone 8 bearing IMEI number 353222104933026 ("HAZRYAN's iPhone 8 -3026") seized from HAZRYAN's residence on or about December 12, 2023, I am aware that HAZRYAN possessed photographs, videos, and emails indicating he was a controlling party for FREEDOM AT ENTERPRISE, INC., along with A.T.  These include, among other items, the following: A.T.'s California driver's license and U.S. Passport card; FREEDOM AT ENTERPRISE, INC. invoices; sales receipt emails for FREEDOM AT ENTERPRISE, INC.; transactions from Intuit; the California Secretary of State Statement of Information for FREEDOM AT ENTERPRISE, INC.; a City of Los Angeles tax registration certificate for FREEDOM AT ENTERPRISE, INC.; QuickBooks statements for FREEDOM AT ENTERPRISE, INC.; a contract between FREEDOM AT ENTERPRISE, INC. and another individual (M.L.) for $7,890; and access to FREEDOM AT ENTERPRISE, INC.'s email address: freedom20at@gmail.com.

137. Based on my own review, I am aware that according to the California Secretary of State "Statement of Information" for FREEDOM AT ENTERPRISE, INC. filed on September 25, 2023, A.T. is

the Chief Executive Officer, Secretary, and Chief Financial
Officer.  FREEDOM AT ENTERPRISE, INC. lists an address of 145 S.
Glenoaks Boulevard #1015, Burbank, California.  According to
Google maps, that location is a mailbox rental location.

138. I have reviewed LAPD reports regarding HAZRYAN's
iPhone 8 -4018 and -3026, and a text message conversation
between HAZRYAN and phone number ending in -6710, saved as "M"
and associated with M.T.[95], and I am aware of the following:

a.    HAZRYAN obtained the personal identifying
information and credit cards of M.T., H.T., A.Z., and R.M. from
"M" in November 2023.

b.    HAZRYAN possessed FREEDOM AT ENTERPRISE, INC.
invoices from November 2023 for M.T. in the amount of $5,463,
for H.T. in the amounts of $1,800 and $14,250, and for A.Z. in
the amount of $7,956.

c.    On November 19, 2023, HAZRYAN assisted M.T. with
filing a dispute with Discover for the FREEDOM AT ENTERPRISE,
INC. purchase on H.T.'s account.

d.    On December 7, 2023, HAZRYAN texted M.T.
"Declined plz tell them to say yes".  M.T. responded, "Try
again" and "She approved".  The next day, HAZRYAN received an
email from R.M. that stated, "Good afternoon, I am reaching out

_____

[95] According to Accurint, a data platform developed by
LexisNexis that provides access to a vast database of public and
non-public records and primarily used for locating people,
businesses, and assets, verifying identities, conducting
investigations, and detecting fraud, the phone number ending in
-6710 is associated with M.T. at an address in North Hollywood,
California.  In the text messages, M.T. provides a photo of his
own California driver's license with the North Hollywood
address.

and need immediate assistance please.  I paid to have my furniture packed and moved on 11/18/2023 -, you scheduled my move date for 11/23/2023. No one showed up and called. I have made several attempts to call you all and I am getting a ring no [answer] and your voicemail box is full. I have also come to speak with someone in person and no one is there. Please help, I need an update asap? You have charged me for service and did not provide the service and you are not answering my calls and your doors are closed. What is going on? I need someone to please call me back. Thank you, [R.M.]"  On December 9, 2023, M.T. texted HAZRYAN "Following up for [R.M.]. I sent an email yesterday from her email to freedom moving company. Can you respond so I can supply Citibank with the requested documents and I can attach the email correspondence".

   e. HAZRYAN received email confirmations for 89 transactions totaling over $1.2 million deposited in FREEDOM AT ENTERPRISE, INC.'s Chase bank account ending in -6361.

   f. HAZRYAN drafted an email in the Notes application on his phone and then sent the email using the FREEDOM AT ENTERPRISE, INC. email account to 18 customers as follows: "Hi we want let you know that we cannot provide service as promised on invoice sorry for inconvenience please for you refund call you banking institution to dispute charge thanks".  Those customers included, but were not limited to, SEDANO and V. STEPANYAN.  HAZRYAN received 25 email responses to the generic email, many of which appeared to be copied directly from another response.

139. Based on my review of FREEDOM AT ENTERPRISE, INC. bank
account records, I know FREEDOM AT ENTERPRISE, INC. dispersed
the funds gained from the access device fraud to members of the
Artuni Enterprise, including the following:

a.    SEDANO received two checks from FREEDOM AT
ENTERPRISE, INC., for $5,150 and $6,050.  SEDANO deposited the
check for $6,050 into his BMO Checking account ending in -7485
on November 22, 2023.  He deposited the check for $5,150 into
his Chase bank account ending in -0029.

b.    AGOPIAN received a total of $76,000 from FREEDOM
AT ENTERPRISE, INC. via one check for $8,000 on October 4, 2023,
one cashier's check for $8,000 on October 12, 2023, and four
wire transfers for $10,000 on November 6, 2023, $20,000 on
November 7, 2023, $20,000 on November 14, 2023, and $10,000 on
November 22, 2023. The checks and wire transfers were deposited
into his Citibank account ending in -4814.

c.    BEZIK received a total of $154,828 from Freedom
at Enterprise, Inc. via cashier's checks for $20,860 on October
19, 2023, for $5,880 and $8,100 on October 20, 2023, for $37,635
on October 24, 2023, for $51,783 on November 2, 2023, for
$21,975 on November 8, 2023, and for $8,595 on November 16,
2023.  BEZIK's mother (A.A.-1) also received cashier's checks
for $13,525 on October 25, 2023 and $42,600 on October 28, 2023.
BEZIK cashed all of the checks at multiple check cashing
businesses.

d.    BEZIK's girlfriend (N.Y.) received a total of
$34,178 from FREEDOM AT ENTERPRISE, INC. via cashier's checks

146

for $21,570 on October 31, 2023, and $10,608 on November 3, 2023, and a check for $2,000 on November 13, 2023.

   e. ARTUNI's father (V.A.) received a cashier's check for $8,000 on October 11, 2023, from FREEDOM AT ENTERPRISE, INC.

   f. Between October 23, 2023, and November 27, 2023, HAZRYAN transferred a total of $20,670 to a Zelle account in the name of "Davo", which is HAZRYAN's nickname.  Between October 2, 2023, and October 19, 2023, HAZRYAN transferred a total of $10,400 to a Zelle account in the name of "DK9, Inc", another of his fictitious businesses.[96]

   g. According to California Franchise Tax Board records, FREEDOM AT ENTERPRISE, INC. reported $0 gross receipts and $0 net income on their 2020 and 2021 California State Tax returns and reported $83,840 gross receipts and $977 net income on their 2022 California State Tax returns.  At the time of this complaint, FREEDOM AT ENTERPRISE, INC., had not filed 2023 tax returns.

   h. Based on information provided by Intuit investigators, the FREEDOM AT ENTEPRRISE, INC. scheme led to

---

[96] According to Early Warning Systems, the parent company for Zelle, records, the DK9, Inc Zelle account is associated with HAZRYAN's DK9, Inc Bank of America account -9310 and email address dk9dogs@yahoo.com, which was located on HAZRYAN's devices as described below. The "Davo" Zelle account is under the name "Davit Hazryan" and deposits to an unknown Discover Bank account. I have reviewed the transactions and confirmed that the FAEI transactions to "Davo" went to this Zelle account in HAZRYAN's name.

fraudulent charges of at least $400,000 on assorted credit cards.[97]

   c. *Execution of the DK9, INC. Scheme*

 140. Based on my review of LAPD reports regarding the review of digital devices seized from HAZRYAN's residence on or about December 12, 2023, mainly HAZRYAN's iPhone 13 bearing IMEI 355402932981631 and 355402932797375 ("HAZRYAN's iPhone 13"), I know HAZRYAN possessed photographs, videos, and emails indicating he was a controlling party for DK9, INC., along with G.G., who is his mother, including: invoices from DK9, INC.; photographs of credit card merchant sales receipts for DK9, INC. transactions; the California Secretary of State Articles of Incorporation for DK9, INC.; a City of Los Angeles tax registration certificate for DK9, INC., and access to DK9, INC.'s email account: dk9dogs@yahoo.com.

 141. Based on my review of LAPD reports regarding HAZRYAN's iPhone 13, I am aware of the following:

   a. HAZRYAN possessed credit card merchant sales receipts for DK9, INC. and invoices from DK9, INC. for purchases by individuals with the initials A.K., M.A., V.Z, and I.P.

   b. HAZRYAN created a draft in the Notes application that stated, "My name is [G.H.]. On 01/18/2023 I went to DK9 in which is located 16834 Mckeever Ave Granada hills Ca 91344 to buy poodle puppy I made order with this company paid them $5700 and they gave me invoice which says I will get my puppy on

---

   [97] This figure is based on the loss amount that Intuit incurred because they were unable to recover disputed charges from the FREEDOM AT ENTERPRISE, INC. account.

03/03/2023 but I never got my puppy I tried to contact them nobody was answer I went same place no one is there so I open my claim with my bank to resolve this problem and get my money back".

    c.   HAZRYAN received emails from Fiserv, the merchant services company he used for DK9, INC., regarding collections notices for a balance due of $61,666.20.

142. Based on my knowledge and experience with these types of investigations, and my own knowledge of this investigation, I believe HAZRYAN used DK9, INC. in a similar way to FREEDOM AT ENTERPRISE, INC., charging credit cards, withdrawing the funds, and then having card holders dispute the charges.

    *d.   DK9, INC. Paid Lease Payment on Vehicle Used In November 9, 2023 Shooting of H.H.*

143. Based on my review of LAPD reports regarding the November 9, 2023 shooting of H.H., LAPD reports regarding HAZRYAN's devices, and DK9, INC. bank account records, I am aware that HAZRYAN used personal identifying information for Z.I. and DK9, INC. to lease the white Toyota Camry used in the November 9, 2023 shooting,  as discussed above.

144. According to LAPD review of HAZRYAN's iPhone 15, HAZRYAN saved a photo of a California driver's license number Y8885174 in the name of Z.I.  According to the California DMV, license Y8885174 belongs to a different individual.  According to my review of departmental databases, Z.I. is a real person who resides in Utah, and her photograph does not match the female on the California driver's license.

145. According to Toyota Financial records, the white Toyota Camry bearing California license plate 9FOU408 was purchased on March 3, 2023, in the name of Z.I.  The lease application in Z.I.'s name also listed HAZRYAN's Glenwood Rd. address.  On August 10, 2023, DK9, INC.'s Bank of America account ending in -9310 was used to make a one-time payment of $1,230.30 to Toyota Financial for the Toyota Camry's lease.

2.    Relating to the Theft of Interstate Shipment

146. Based on my training, experience, conversations with other law enforcement officers, my review of HSI reports, California DMV records, law enforcement databases, and an Amazon Law Enforcement Referral Report, and my own involvement in this investigation, I am aware of the following:

a.    At present, Amazon is plagued by recurring thefts of its shipments, which is commonly referred to as "cargo theft."  Cargo theft, as it relates to Amazon, typically operates in the following fashion: (1) criminals, masquerading as legitimate trucking carriers, contract with Amazon to transport shipments by truck from vendors to Amazon facilities; (2) after picking up the product from the vendor, the so-called trucking carriers divert part of the load to a location where product is offloaded; (3) the self-styled carriers then deliver the remainder of the shipment to the destination Amazon facility.  BEZIK, A. A. KAZARYAN, and other members of the Artuni Enterprise, conspired and agreed with each other to commit cargo theft as a source of income affecting interstate and foreign commerce.

b.    Since 2021, BEZIK has administered the operations for four transport carriers: AK Transportation, INC ("AK Transportation"); NBA HOLDINGS, LLC ("NBA HOLDINGS"); Belman Transport, Inc ("Belman Transport"); and Markos Transportation ("Markos Transportation").  All based in California, the transport carriers are purportedly engaged in the business of obtaining contracted freight routes from the Amazon Relay Board,[98] to transport purchased goods by Amazon to be picked up at the manufacturers' designated distribution centers and delivered to Amazon designated fulfillment or warehouse centers. In reality, BEZIK and associates, known and unknown, would divert from the designated route for the purpose of removing the Amazon purchased goods and reselling them for a profit or gifting them to associates.

c.    In an Amazon Law Enforcement Referral Report dated August 30, 2024, and titled "Organized Cargo Theft and Resale of Stolen Goods," BEZIK is associated with 33 different "transport carriers" through physical addresses, Internet Protocol ("IP") addresses, and Device ID data.  The 33 "transport carriers" are reported to have a combined total of approximately $83,579,010.99 in missing goods.

d.    In the Amazon report, Amazon identifies the following information as being associated with BEZIK:

_____

[98] The Amazon Relay Load Board driver accounts are designed for individuals responsible for transporting contracted freight and the administrative accounts are designed for individuals overseeing the business aspects of a contracted carriers transportation operations.

        i.   A shipping address for "Areg Bezik" of 436 W Colorado St. Ste 209, Glendale, California 91204-3071.

        ii.  A shipping address for "Areg Bezik" of 537 N Adams St Apt 105, Glendale, California 91206-3488.

        iii. A shipping address for "Areg Bezik" of 7505 Foothill Boulevard, Los Angeles, California 91042.

        iv.  A phone number ending in -8117.

        v.   An email address abezik1989@gmail.com.

        e.   I have confirmed that the above addresses, phone number, and email address are all associated to BEZIK.  436 W. Colorado Street Suite 209, Glendale, California 91204-3071, is the registered principal address for New Era Physical Therapy, Inc., which lists BEZIK as the Chief Executive Officer and Agent on California Secretary of State records as of on or about April 28, 2025.  BEZIK lists 537 North Adams Street Apartment 105 Glendale, California 91206-3488 on two vehicle registrations in his name: a 2022 Chevy, bearing California License Plate 9KOH689, VIN KL79MMS23NB091498; and a 2016 Make: Shore BTM: Carrier, bearing California License Plate 4PA7102, VIN 1MDAPAR18GA584026.  Per Accurint, the address 7505 Foothill Boulevard, Los Angeles, California 91042 is the location for Lifeline Medical Associates, which lists BEZIK as the Chief Executive Officer.  According to my review of a device seized from A. A. KAZARYAN on or about December 12, 2023 (an iPhone 15 Pro bearing Serial Number HQ3617Y71M and IMEI 353864164453567, "A.A. KAZARYAN's iPhone 15 Pro"), the phone number 818-433-8117 belongs to BEZIK, which A.A. KAZARYAN saved as "Narek".  In a

group text which includes BEZIK and S.Y. (A. A. KAZARYAN's significant other), among others, BEZIK directs S.Y. to email him, and she confirms that she emailed him at email address abezik1989@gmail.com.

      f.  Based on my review of the Amazon report and my discussions with counsel for Amazon, I am aware that BEZIK has a personal Amazon account (Amazon Customer ID #: 117451075805) that is used to purchase items from Amazon's online store, which is separate from his account that is utilized to access the Amazon Relay Board.  According to the Amazon Report and my discussion with counsel for Amazon, Amazon has identified that IP address: 107.209.62.197 and device IDs: 50EC19E5DE8B4D3C968FD579E2A4E348 and AC07AD001AD04B4591B8083F42465C2B[99] have specifically accessed BEZIK's customer account.  As listed below, these same unique identifiers (the IP Address and device IDs) have been identified through an internal Amazon investigation to have accessed Amazon Relay Load Board Driver or Administrative accounts and other Amazon Customer Accounts:

      i.  IP Address: 107.209.62.197 has accessed 406 Amazon Relay Load Board Driver or Administrative accounts and four other Amazon Customer Accounts.

      ii.  Device ID: 50EC19E5DE8B4D3C968FD579E2A4E348

---

[99] Based on my training and experience and my discussion with other law enforcement officers, I am aware that this device ID number is a unique, anonymized identifier assigned to each mobile device, such as smartphones, tablets, or wearables.  This identifier is used by apps and services to recognize and interact with your device without accessing personal information

has accessed 110 Amazon Relay Load Board Driver or

Administrative accounts and four other Amazon Customer Accounts.

iii. Device ID: 50EC19E5DE8B4D3C968FD579E2A4E348

has accessed 50 Amazon Relay Load Board Driver or Administrative

accounts and four other Amazon Customer Accounts.

147. Based on the Amazon report, the internal data provided

by Amazon, and my discussions with counsel for Amazon, I am

aware that the IP Address and Device IDs which have been

identified to have accessed BEZIK's Customer Account have also

been identified as having accessed the following four carrier

accounts:

| Transport Carrier Accounts | | | | | |
|---|---|---|---|---|---|
| Carrier Name | Registration Date | USDOT [100] | Company Phone | Administrator | Email |
| AK TRANSPO RTATION INC | 6/14/2022 14:52 | 3765945 | 7472504 433 | A.A.-2 | aktranspo rt1121@gm ail.com |
| NBA HOLDING S LLC | 7/20/2021 11:36 | 3634739 | 8189001 046 | Areg BEZIK | abezik198 9@gmail.c om |
| Belman Transpo rt Inc | 11/30/2021 19:19 | 2839342 | 9163989 087 | A.A.-3 | belmantra nsport21@ gmail.com |
| Markos Transpo | 1/10/2022 22:45 | 3768755 | 8184338 117 | N.M. | markostra nsinc@gma |

---

[100] A United States Department of Transportation ("USDOT") Number is unique identify issued by Federal Motor Carrier Safety Administration for Companies that operate commercial vehicles transporting passengers or hauling cargo in interstate commerce must be registered with the FMCSA and must have a USDOT Number. Also, commercial intrastate hazardous materials carriers who haul types and quantities requiring a safety permit must register for a USDOT Number.

| rtation Inc. | | | | | il.com |
|---|---|---|---|---|---|

148. I have conducted a search through the California Secretary of State registered businesses and corporations for the above-listed accounts, and I am aware of the following:

a.   AK Transportation, Inc. was first registered with the California Secretary of State on or about January 11, 2022, under the name A.A.-2 at 215 W Kenneth Rd, Glendale, California, 91202, as a trucking company with an Entity Number ("EIN") of C4832299, and is still currently active.

b.   NBA HOLDINGS, LLC was first registered with the California Secretary of State on or about November 17, 2015, under BEZIK's name and under the name Sierra Transportation Services, LLC.  On or about December 4, 2018, A.A.-3[101] filed an Amendment to Articles of a LLC for Sierra Transportation Services, LLC and changed the name to NBA HOLDINGS, LLC, Entity File # 201532210086, Type of Business: Interior and Exterior Design.

c.   Belman Transport, Inc was first registered with the California Secretary of State on or about September 22, 2014, under the name of an individual bearing the initials I.K. at 1024 Iron Point Rd, Folsom, California 95630.  On or about

---

[101] Based on my knowledge of this investigation, my conversations with other law enforcement officers involved in this case and my review of the alien file belonging to BEZIK, I am aware that A.A.-3 is his mother and has often been listed as the primary account holder for many bank accounts and as the Owner/Chief Executive Officer for many businesses or corporations controlled and maintained by BEZIK.

July 14, 2021, A.A.-3 filed a State of Information, listing
herself as the Chief Executive Officer at 1024 Iron Point Rd,
Folsom, California 95630.

      d.   Markos Transportation, Inc was first registered
with the California Secretary of State on or about November 9,
2021, as a corporation, under the name of an individual bearing
the initials N.V.H.M. at 718 E Palmer Ave Apt # 8
Glendale, California, 91205.

    149. Based on my knowledge of this investigation, and my
conversations with California Highway Patrol ("CHP")
Investigator Sean Spaulding, I am aware that utilizing closed-
source law enforcement databases, only one of the three USDOT
numbers have been registered in CHP's system (USDOT 3768755 for
Markos Transportation Inc) and the rest returned negative
results.

    150. In the Amazon report, Amazon associated 33 transport
carriers with BEZIK, including the two following transport
carriers which appeared in evidence from this investigation:

      a.   NBA HOLDINGS, LLC., with an estimated loss of
$8,459,044.16.  California Secretary of State records dated
November 17, 2015, list BEZIK as the filer for the Articles of
Organization of Limited Liability Company ("LLC") for NBA
HOLDINGS, LLC.

      b.   AK Transportation, Inc., with an estimated loss
of $1,340,213.42.  On A. A. KAZARYAN's iPhone 15 Pro, I located
a photograph with the file name "67888975243_815A8FD5-1502-4EE6-
AF86-CE1264F6298B.heic", which depicted BEZIK sitting in front

of a computer.  Visible on the computer screen was the following
text: "Routing Request Instruction from Amazon 18368468211" for
aktransport1121@gmail.com, dated July 7, 2022.  Two printouts
were visible on the desk which read the following:

      i.   "Load Board – Trip 1133D2GLM, booked for AK
Transportation Inc., [A.A.-2] at aktransport1121@gmail.com,
dated 07/08/2022 – Chino, CA to Aurora, CO"; and

      ii.   "Load Board – Trip 11535XH29, booked for AK
Transportation Inc., [A.A.-2] at
aktransport1121@gmail.com, dated 07/08/2022 – Chino, CA to
Schertz, TX".

151. Based on my review of digital devices owned by ARTUNI,
HAZRYAN, and A. A. KAZARYAN, I also identified the following
images and videos in conversations involving BEZIK from cellular
phone number (818) 433-8117.  In a conversation between BEZIK
and A. A. KAZARYAN, I discovered videos and photos of them
driving forklifts, moving pallets, or near forklifts/pallets of
cargo sealed goods.  In conversations between HAZRYAN and BEZIK,
I discovered a video sent of a warehouse full of suspected
stolen Amazon goods.  In conversations between BEZIK and ARTUNI,
I discovered videos of a warehouse filled with suspected stolen
Amazon goods and images of different products, with some still
on pallets.  On A. A. KAZARYAN's iPhone 15 Pro, I discovered an
image with file name "5D91C030-34EF-4F56-B524-
4B4BF540B993_1_102_o.jpeg" portraying BEZIK standing on a
forklift near a pallet of sealed/packaged crockpots.

152. On A. A. KAZARYAN's iPhone 15 Pro, I also discovered the following:

a.    A video with file name "ce66820e0fd00d56066028e0de09a514.decrypted" portraying an unknown individual and A. A. KAZARYAN operating a forklift to move pallets of sealed/packaged goods.

b.    A video with file name "IMG_7688.MP4" portraying BEZIK operating a forklift to move pallets of sealed/packaged goods.

c.    A video with file name "IMG_7948.MOV" portraying a male operating a forklift with BEZIK and a minor child standing on the forks of the vehicle, surrounded by pallets of sealed/packaged crockpots.

d.    A video with file name "IMG_6757.HEIC" portraying a A. A. KAZARYAN operating a forklift that is in the process of lighting a pallet containing stacked Keurig Boxes, surrounded by other pallets of sealed/packaged merchandise.

e.    A video with file name "recorded-522842312112.MP4" portraying an individual and A. A. KAZARYAN operating a forklift[102] to move pallets of sealed/packaged goods.

153. On HAZRYAN's iPhone 13, I discovered the following:

---

[102] Based on my review of the images and videos discovered in the seized devices, I am aware that A. A. KAZARYAN, BEZIK and the unidentified male each operated the forklift depicted in "5D91C030-34EF-4F56-B524-4B4BF540B993_1_102_o.jpeg", "IMG_7948.MOV", "IMG_6757.HEIC" and "IMG_7688.MP4" at different points.  I believe this because the forklift depicted in those images had "#15-515" painted in white on the front railings and the numbers "818890" on the back left side of the forklift.

a.    A photo with the file name "IMG_0957.HEIC" portraying several boxes stacked on top of each other, some boxes were still sealed, and others appeared to be opened. Around the stacked boxes there were more stacked boxes and a pallet, indicating that the boxes were likely being shipped from the manufacture to a distribution center.  On top of the boxes in the center, there were four OGX Beauty Products lined up on display, from Vogue International, LLC: Renewing+ argan oil of Morocco shampoo, smoothing+ coconut coffee scrub & wash, Ever straightening+ Brazilian keratin therapy conditioner, and Moroccan curling perfection Defining cream.

b.    A video titled "mov_6420", which appears to be a recording of the inside of a warehouse with a variety of items, ranging from Coway Air filters, Weber grills, tyger tonneau covers, MAC ALLY electronics, X9preformance electronics, and Securityman door bars.

154. On ARTUNI's iPhone X, I discovered the following:

a.    An 11-second video titled "7f44913e-c9b8-4e7e-9d6e-c5b0bae4d460.mp4" that portrays two unidentified males adjacent to a storage unit surrounded by a number of different merchandise that, in my training and experience are packaged in a way that indicates they were directly shipped from the manufacturer and have not been processed for sale.  The two males appear to be sorting and unboxing the items.

b.    An image titled "64997047639_D8D6E75D-A786-45C3-86D2-50162DB3C9D3.HEIC" which depicts a pallet stacked with several boxes packaged in a way that indicates they were

directly shipped from the manufacturer and have not been
processed for sale.  The boxes are marked "Item No.: SR-2061,
Description: End Table, Color: White/Gold".  The second image is
titled "64997046968_F39036A4-6F61-4436-A075-B3D4C2D5A4B0.HEIC"
and depicts a pallet stacked with over 20 boxes packaged in a
way that indicates they were directly shipped from the
manufacturer and have not been processed for sale.  The boxes
are marked "Item No.: MS-9032/2066, Description: Floor Stand".

155. Based on my review of the Amazon report and my
discussions with counsel for Amazon, I am aware that through an
internal investigation conducted by Amazon, Amazon linked BEZIK
and NBA HOLDINGS, LLC to three interstate freight shipments
where Amazon claimed a loss.

156. In my review of the imaged titled
"67888975243_815A8FD5-1502-4EE6-AF86-CE1264F6298B.heic", which
was sent by BEZIK from his phone number, I identified a
contracted Amazon Freight Relay Trip and have included a
synopsis of the trip below:

a.   Trip 1133D2GLM booked for AK Transportation Inc.
According to data received by Amazon, Trip 1133D2GLM, was a
contracted route for AK Transportation Inc, with O.S. listed as
the driver.

b.   The route was scheduled for pickup of Amazon
purchased merchandise from the manufacturer/distribution
warehouse at 22205 E 19th Ave, Aurora, Colorado 80019 with the
delivery location of Amazon purchased merchandise to the Amazon

160

fulfillment warehouse located at 16300 Fern Ave, Chino, California 91708.

      c.   This contracted Amazon Freight Trip was scheduled for on or about July 8, 2022, at approximately 9:00 a.m., but O.S.'s actual arrival was on or about July 8, 2022, at approximately 8:42 a.m.  O.S. then departed the distributor location on or about July 8, 2022, at approximately 1:24 p.m. with an Amazon trailer (Trailer ID AJKQR-cb294f0e-28dc-4ff2-b6a8-5ec77b2b60b9) and was scheduled to arrive at the Amazon fulfillment warehouse on or about July 9, 2022, at approximately 6:10 p.m., but the actual arrival date was on or about July 14, 2022, at approximately 7:17 a.m.

      d.   Amazon has identified the following merchandise as missing after being transported by O.S. under AK Transportation Inc:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 6TAJXITI | Shark VM252 VACMOP Pro Cordless Hard Floor Vacuum Mop | 318 | 318 | 81.49 | $25913.82 |
| | Shark NV360 Navigator Lift | 150 | 150 | 162.05 | $24307.5 |
| | Shark AZ1002 Apex Powered Lift | 51 | 51 | 366.14 | $18673.14 |
| | Ninja FD401 Foodi 12-in-1 Deluxe XL 8 qt. Pressure | 37 | 37 | 180.79 | $6689.23 |

| | | | | |
|---|---|---|---|---|
| | Cooker & Air Fryer | | | | |
| | Shark ZU503AMZ Navigator Lift- | 24 | 24 | 189.19 | $4540.56 |
| | Shark NV356E 31 Navigator Lift for Pet Hair, White/Silver | 17 | 17 | 163.5 | $2779.5 |
| | Ninja SP351 Foodi Smart 13-in-1 Dual Heat Air Fry | 1 | 1 | 276.89 | $276.89 |
| | Shark Rotator Vaccum Upright Vacuum | 1 | 1 | 261.79 | $261.79 |
| Total Loss | | | | | $83,442.43 |

157. In my review of the imaged titled "67888975243_815A8FD5-1502-4EE6-AF86-CE1264F6298B.heic", which was sent by BEZIK from his phone number, I identified a contracted Amazon Freight Relay Trip and have included a synopsis of the trip below:

a.    Trip 11535XH29 booked for AK Transportation Inc. According to data received by Amazon, Trip 1133D2GLM was a contracted route for AK Transportation Inc, with J.M. listed as the driver.

b.    The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 6000 Schertz Pkwy, Schertz, Texas, 78154 with the

delivery location of the Amazon fulfilment warehouse located at
16300 Fern Ave, Chino, California 91708.

      c.   This contracted Amazon Freight Trip was scheduled
for on or about July 8, 2022, at approximately 09:00 a.m., but
J.M.'s actual arrival was on or about July 8, 2022, at
approximately 8:51 a.m.  J.M. then departed the distributor
location at on or about July 8, 2022, at approximately 1:44 p.m.
with an Amazon trailer (Trailer ID AJKQR-12539bb6-92fe-4aa8-
bfe5-984dd5bd96be) and was scheduled to arrive at the Amazon
fulfilment warehouse location on or about July 10, 2022, at
approximately 11:21 a.m., but the actual arrival date was on or
about July 14, 2022, at approximately 8:05 a.m.

      d.   Amazon has identified the following merchandise
as missing after being transported by J.M. under AK
Transportation Inc but never delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 4WNKU2UY | Shark NV356E 31 Navigator Lift-Away Professional Upright Vacuum | 60 | 60 | 163.5 | $9810 |
| | Ninja FD401 Foodi 12-in-1 Deluxe XL 8 qt. Pressure Cooker & Air Fryer | 42 | 42 | 180.79 | $7593.18 |
| | Ninja SS401 Foodi Power Blender Ultimate System | 8 | 8 | 201.61 | $1612.88 |

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| | Ninja QB1004 Blender/Food Processor | 34 | 34 | 41.25 | $1402.5 |
| | Shark Lift-Away Pro Steam Pocket Mop | 4 | 4 | 137.13 | $548.52 |
| | Shark Lift-Away Pro Steam Pocket Mop | 2 | 2 | 206.39 | $412.78 |
| Total loss | | | | | $21,379.86 |

158. In my review of the imaged titled "67888975243_815A8FD5-1502-4EE6-AF86-CE1264F6298B.heic", which was sent by BEZIK from his phone number, I identified a contracted Amazon Freight Relay Trip and have included a synopsis of the trip below:

a.   Trip 1153ZZHM7 booked for AK Transportation Inc. According to data received by Amazon, Trip 1153ZZHM7, was a contracted route for AK Transportation Inc, with E.S. listed as the driver.

b.   The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 2145 Burton Branch Rd, Cookeville, Tennessee 38506, with the delivery location of Amazon purchased merchandised to the Amazon fulfillment warehouse located at 2496 W Walnut Ave, Rialto, California 92376.

c.   This contracted Amazon Freight Trip was scheduled for on or about July 7, 2022, at approximately 4:23 p.m., but

164

E.S.' actual arrival was on or about July 7, 2022, at
approximately 2:50 p.m.  E.S. then departed the distributor
location on or about July 8, 2022, at approximately 1:44 p.m.
with an Amazon trailer (Trailer ID AJKQR-8a6dc9e6-822f-4d3e-
9075-ca1630cb2d10) and was scheduled to arrive at the Amazon
fulfilment warehouse location on or about July 7, 2022, at
approximately 6:00 p.m., but the actual arrival date was on or
about July 8, 2022, at approximately 8:46 p.m.

Amazon has identified the following merchandise as missing after
being transported by E.S. under AK Transportation Inc but never
delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 88T2GI1J | Hoover CleanSlate Plus Carpet & Upholstery Spot Cleaner, Stain Remover, Portable, FH14050, White | 575 | 575 | 117.43 | $67522.25 |
| | Hoover CleanSlate Plus Carpet & Upholstery Spot Cleaner, Stain Remover, Portable, With Spin Scrub Tool, | 52 | 52 | 150.89 | $7846.28 |

165

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| | FH14052, White | | | | |
| | Dirt Devil Razor Pet Bagless Multi Floor Corded Upright Vacuum | 17 | 17 | 86.76 | $1474.92 |
| | Hoover ONEPWR Evolve Pet Cordless Small Upright Vacuum | 6 | 6 | 199.99 | $1199.94 |
| Total loss | | | | | $78,043.39 |

159. In my review of a spreadsheet provided by Amazon's counsel, I identified a contracted Amazon Freight Relay Trip and have included a synopsis of the trip below:

a.   Trip 1147ZHZT2 booked for NBA HOLDINGS, LLC. According to data received by Amazon, Trip 1147ZHZT2, was a contracted route for NBA HOLDINGS, LLC with BEZIK, under the email abezik1989@gmail.com, listed as the driver.

b.   The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 20005 E Business Pkwy, Walnut, CA 91789, with the delivery location of Amazon purchased merchandised to the Amazon fulfillment warehouse located at 3300 Hogum Bay Rd NE, Lacey, WA 98519-3111.

c.   This contracted Amazon Freight Trip was scheduled for on or about November 1, 2021, at approximately 9:00 a.m., but BEZIK's actual arrival was on or about November 1, 2021, at 8:12 a.m.  BEZIK then departed the distributor location on or about November 2, 2021, at approximately 4:47 p.m. with an Amazon trailer (ADMRB-6a638ab5-4837-40c5-9571-66aa351f8d97,ADMRB-99a255ba-d747-415c-9206-e1b7904a0fc9, ADMRB-4341dbb1-2cc6-46c2-bb8d-fde52a3da2c1) and was scheduled to arrive at the Amazon fulfilment warehouse location on or about November 3, 2021, at approximately 1:00 a.m., but the actual arrival date was on or about November 3, 2021, at approximately 7:37 a.m.

d.   Amazon has identified the following merchandise as missing after being transported by BEZIK under NBA HOLDINGS, LLC but never delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 1ZXJZAXE Invoice: 649304454 | GE Countertop Microwave Oven \| Includes Optional Hanging Kit \| 0.7 Cubic Feet Capacity, 700 Watts \| Kitchen Essentials for the Countertop \| Black | 9 | 9 | 110 | $990 |
| Total loss | | | | | $990 |

160. In my review of a spreadsheet provided by Amazon's counsel, I identified a contracted Amazon Freight Relay Trip and have included a synopsis of the trip below:

a.    Trip 111N6JTS3 booked for NBA HOLDINGS, LLC. According to data received by Amazon, Trip 111N6JTS3 booked for NBA HOLDINGS, LLC.  According to data received by Amazon, Trip 111N6JTS3, was a contracted route for NBA HOLDINGS, LLC with R.B. listed as the driver.

b.    The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 20005 E Business Pkwy, Walnut, CA 91789, with the delivery location of Amazon purchased merchandised to the Amazon fulfillment warehouse located at 4375 N Perris Blvd, Perris, CA.

c.    This contracted Amazon Freight Trip was scheduled for on or about November 5, 2021, at approximately 9:00 a.m., but R.B.'s actual arrival was on or about November 5, 2021, at approximately 7:37 a.m.  R.B. then departed the distributor location on or about November 5, 2021, at approximately 11:15 a.m. with an Amazon trailer (ADMRB-b1b9c1f6-2583-4551-a975-1761ea53029c) and was scheduled to arrive at the Amazon fulfilment warehouse location on or about November 5, 2021, at approximately 11:46 a.m., but the actual arrival date was on or about November 6, 2021, at approximately 2:53 p.m.

d.    Amazon has identified the following merchandise as missing after being transported by R.B. under NBA HOLDINGS, LLC but never delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 4W7SMZWK Invoice: 634266936 | GE Profile Opal \| Countertop Nugget Ice Maker | 576 | 576 | 459 | $264,384.00 |
| | GE Profile Opal \| Countertop Nugget Ice Maker | 576 | 576 | 459 | $264,384.00 |
| | GE Profile Opal \| Countertop Nugget Ice Maker | 311 | 311 | 459 | $142,749 |
| | GE Profile Opal \| Countertop Nugget Ice Maker | 122 | 122 | 459 | $55,998 |
| Total loss | | | | | $727,515 |

161. In my review of a spreadsheet provided by Amazon's counsel, I identified a contracted Amazon Freight Relay Trip and have included a synopsis of the trip below:

a.  Trip 1121KL53Q booked for NBA HOLDINGS, LLC. According to data received by Amazon, Trip 1121KL53Q booked for NBA HOLDINGS, LLC.  According to data received by Amazon, Trip 1121KL53Q, was a contracted route for NBA HOLDINGS, LLC with G.S. listed as the driver.

b.  The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 2700 East Imperial Hwy, Lynwood, CA 90262, with the delivery location of Amazon purchased merchandised to the Amazon

fulfillment warehouse located at 22300 E 26th AVE, Aurora, CO
80019.

c.    This contracted Amazon Freight Trip was scheduled
for on or about November 8, 2021, at approximately 9:56 a.m.,
but G.S.' actual arrival was on or about November 8, 2021, at
approximately 8:48 a.m.  G.S. then departed the distributor
location on or about November 9, 2021, at approximately 12:58
p.m. with an Amazon trailer (ADMRB-da950294-1abb-4fa6-8f80-
d9dd56649175) and was scheduled to arrive at the Amazon
fulfilment warehouse location on or about November 9, 2021, at
approximately 8:00 p.m., but the actual arrival date was on or
about November 15, 2021, at approximately 4:18 p.m.

d.    Amazon has identified the following merchandise
as missing after being transported by G.S. under NBA HOLDINGS,
LLC but never delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 37OHXF2N Invoice: 699617836 | TCL 40-inch Class 3-Series HD LED Smart Android TV - 40S334, 2021 Model | 534 | 534 | 196.34 | $104,845.56 |
| Total loss | | | | | $104,845.56 |

162. In my review of an Amazon excel sheet, I identified a
contracted Amazon Freight Relay Trip and have included a
synopsis of the trip below:

a.    Trip 112X3T9XF booked for NBA HOLDINGS, LLC.
According to data received by Amazon, Trip 112X3T9XF booked for NBA HOLDINGS, LLC. According to data received by Amazon, Trip 112X3T9XF, was a contracted route for NBA HOLDINGS, LLC with Z.H. listed as the driver.

b.    The route was scheduled for pickup of Amazon purchased merchandise from the manufacturer/distribution warehouse at 18401 E Arenth Ave, Bldg B, City of Industry, CA 91748, with the delivery location of Amazon purchased merchandised to the Amazon fulfillment warehouse located at 3300 Hogum Bay Rd NE, Lacey, WA 98516.

c.    This contracted Amazon Freight Trip was scheduled for on or about October 5, 2021, at approximately 9:00 a.m., but Z.H.'s actual arrival was on or about October 5, 2021, at approximately 7:25 a.m.  Z.H. then departed the distributor location on or about October 5, 2021, at approximately 11:30 p.m. with an Amazon trailer (ADMRB-e73c2027-6369-4879-80dc-7f92423e4525) and was scheduled to arrive at the Amazon fulfilment warehouse location on or about October 5, 2021, at approximately 8:00 p.m., but the actual arrival date was on or about October 8, 2021, at approximately 10:18 a.m.

d.    Amazon has identified the following merchandise as missing after being transported by Z.H. under NBA HOLDINGS, LLC but never delivered to the fulfilment center:

| Purchase Order | Item title | Quantity Confirmed | Quantity Shortage | Unit Cost | Total Shortage |
|---|---|---|---|---|---|
| 8YJPIVYH Invoice: | Elite Gourmet | 980 | 980 | 28.67 | $ 28,096.60 |

171

| 640580590 | ECT-3100 Long Slot 4 Slice Toaster, | | | | |
|-----------|-----------|---|---|---|---|
| Total loss | | | | | $28,096.60 |

163. Based on my review of the financial analysis reports generated by the HSI Financial Analysis Support and Triage Team ("FAST"), I am aware that NBA HOLDINGS, LLC lists A.A.-3 as "member" and signer on Bank of America accounts ending in -1669 and -0244. Based on my review of digital devices seized from ARTUNI, HAZRYAN, and A. A. KAZARYAN, I am aware that BEZIK often instructs members and associates to transfer funds in and out of NBA HOLDINGS, LLC accounts. Based on my review of the FAST Team financial analysis reports, I am aware of the following NBA HOLDINGS, LLC transactions:

a. NBA HOLDINGS, LLC distributed payments to members of the Artuni Enterprise:

i. BEZIK received a total of $369,300. $359,500 was wired to AREG BEZIK INC[103] and $15,100 in posted checks to BEZIK, on the following dates:

---

[103] I have conducted a search through the California Secretary of State registered businesses and corporations, and I am aware of the following: On May 5, 2022, A.A.-3 filed Articles of Incorporation, CA General Stock, for AREG BEZIK INC, at the address of 537 N Adams St. Apt 105, Glendale, CA 91206. On May 12, 2022, A.A.-3 filed a Statement of Information, listing A.A.-3 as the Chief Executive Officer and Director at the same address. On January 11, 2024, A.G. filed a Statement of Information, listing himself as the Chief Executive Officer and Director. I am aware that between November 29, 2022, to January 30, 2023, A.G. received a total of $71,000 in check payments from NBA HOLDINGS, LLC.

(I)    On or about March 1, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $5,300 with BEZIK as the named beneficiary (check # 1143);

(II) On or about April 13, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $9,800 with BEZIK as the named beneficiary (check # 1161);

(III)    On or about September 27, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $10,000 with AREG BEZIK INC as the named beneficiary (check # 1450);

(IV) On or about October 27, 2022, NBA HOLDINGS, LLC (account -1669) posted a wire transfer of $54,000 with AREG BEZIK INC as the named beneficiary (TRN:2022102700501603 SERVICE REF:017668 BNF:AREG BEZIK INC ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT D ET:410601126);

(V)    On or about November 2, 2022, NBA HOLDINGS, LLC (account -1669) posted a wire transfer of $86,000 with AREG BEZIK INC as the named beneficiary (TRN:2022110200292202 SERVICE REF:006826 BNF:AREG BEZIK INC ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT DET:411408030);

(VI) On or about November 30, 2022, NBA HOLDINGS, LLC (account -1669) posted a wire transfer of $46,000 with AREG BEZIK INC as the named beneficiary (RN:2022113000617338 SERVICE REF:030114 BNF:AREG BEZIK INC

ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT
DET:415211420);

        (VII)    On or about January 31, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $30,000
with AREG BEZIK INC as the named beneficiary
(TRN:2023013100567363 SERVICE REF:028145 BNF:AREG BEZIK INC
ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT D
ET:423686568);

        (VIII)    On or about February 13, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $53,000
with AREG BEZIK INC as the named beneficiary (WIRE TYPE:WIRE OUT
DATE:230213 TIME:1558 ET TRN:2023021300478503 SERVICE REF:013783
BNF:AREG BEZIK INC ID:1895572251 BNF BK:COMERICA B ANK
ID:121137522 PMT DET:425575242);

        (IX) On or about March 9, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $15,000
with AREG BEZIK INC as the named beneficiary
(TRN:2023030900387902 SERVICE REF:012360 BNF:AREG BEZIK INC
ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT
DET:429127492);

        (X)  On or about April 7, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $18,500
with AREG BEZIK INC as the named beneficiary
(TRN:2023040700076883 SERVICE REF:001860 BNF:AREG BEZIK INC
ID:1895572251 BNF BK:COMERICA B ANK ID:121137522 PMT
DET:433129212); and

        (XI) On or about May 3, 2023, NBA HOLDINGS,

LLC (account -1669) posted a wire transfer of $47,000 with AREG
BEZIK INC as the named beneficiary (TRN:2023050300121718 SERVICE
REF:009138 BNF:AREG BEZIK INC ID:1895572251 BNF BK:COMERICA B
ANK ID:121137522 PMT D ET:436708060).

        ii.  A. A. KAZARYAN received $24,156 in a shared
bank account with his father as well as an additional $8,800 to
a Zelle account in the name of "ARVIN" on the following dates:

        (I)  On or about April 27, 2022, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $20,000
with A. A. KAZARYAN's father as the named beneficiary
(TRN:2022042700412621 SERVICE
REF:012315 BNF:ALBERT KAZARIAN ID:153498401337 BNF BK:U S. BANK
N A. LOS ANG ID:122235821 PMT DET:385246242).  This wire was
confirmed to have been wired to a joint account that A. A.
KAZARYAN shares with his father, specifically, a US Bank account
ending in -1337;

        (II) On or about September 9, 2022, NBA
HOLDINGS, LLC (account -1669) posted a check withdrawal of
$5,000 with A. A. KAZARYAN's father as the named beneficiary
(check # 1396); this check was deposited to an account
associated with A. A. KAZARYAN's father, specifically, a US Bank
account ending in -1484;[104]

        (III)    On or about September 13, 2022,
NBA HOLDINGS, LLC (account -1669) posted a Zelle transfer of

---

[104] Based on the Artuni Enterprise's pattern of using family
members' names and accounts, and specifically A. A. KAZARYAN
using his father's name to rent vehicles used by the Artuni
Enterprise, I believe these monetary deposits and/or transfers
were intended for A. A. KAZARYAN, not his father.

$1,000 to an account listed as "ARVIN"[105] (Zelle Confirmation # c4naubsqf);

(IV) On or about September 20, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $3,500 with A. A. KAZARYAN's father as the named beneficiary (check # 1435); this check was deposited to A. A. KAZARYAN's father's US Bank account ending in -1484;

(V) On or about September 21, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $6,362 with A. A. KAZARYAN's father as the named beneficiary (check # 1441); this check was deposited to A. A. KAZARYAN's father's US Bank account ending in -1484;

(VI) On or about October 21, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $3,500 with A. A. KAZARYAN's father as the named beneficiary (check # 1477); this check was deposited to A. A. KAZARYAN's father's US Bank account ending in -1484;

(VII) On or about November 7, 2022, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $8,000 with A. A. KAZARYAN's father as the named beneficiary (check # 1528); this check was deposited to A. KAZARIAN's US Bank account ending in -1484;

(VIII) On or about December 1, 2022, NBA HOLDINGS, LLC (account -1669), posted a check withdrawal of

---

[105] Based on my review of records provided by Early Earning Services, LLC and my conversations with other law enforcement officers, I am aware that "ARVIN" deposits went to a Zelle Account in the name of A. A. KAZARYAN and is associated with his phone number.

$4,000 with A. A. KAZARYAN's father as the named beneficiary (check # 1553); this check was deposited to A. A. KAZARYAN's father's US Bank account ending in -1484;

(IX) On or about January 3, 2022, NBA HOLDINGS, LLC (account -1669) posted a Zelle transfer of $5,000 to an account listed as "ARVIN" (Zelle Confirmation # fgmuszjb2);

(X)  On or about January 10, 2023, NBA HOLDINGS, LLC (account -1669) posted a check withdrawal of $3,500 with A. A. KAZARYAN's father as the named beneficiary (check # 1622); this check was deposited to A. A. KAZARYAN's father's US Bank account ending in -1484; and

(XI) On or about February 1, 2023, NBA HOLDINGS, LLC (account -1669), posted a Zelle transfer of $2,800 to an account listed as "ARVIN" (Zelle Confirmation # cek7sq309).

iii. ARTUNI received a total of $21,500 to a Zelle account in the name "ARO Zell"[106], on the following dates:

(I)  On or about February 4, 2023, NBA HOLDINGS, LLC (account -1669) posted a Zelle transfer of $5,000 to an account listed as "ARO Zell" (Zelle Confirmation # ozjkz73tj);

---

[106] Based on my review of records provided by Early Earning Services, LLC and my conversations with other law enforcement officers, I am aware that "ARO Zell" deposits went to a Zelle Account in the name of A.G., associated to phone number 818-912-9906, who was identified as being the significant other of ARTUNI.

(II) On or about March 24, 2022, NBA
HOLDINGS, LLC (account -1669) posted a Zelle transfer of $2,500
to an account listed as "ARO Zell" (Zelle Confirmation #
y7o4reucv);

(III)    On or about October 25, 2022, NBA
HOLDINGS, LLC (account -1669) posted a Zelle transfer of $4,000
to an account listed as "ARO Zell" (Zelle Confirmation #
q8dr2wmt5);

(IV) On or about February 6, 2023, NBA
HOLDINGS, LLC (account -1669) posted a Zelle transfer of $5,000
to an account listed as "ARO Zell" (Zelle Confirmation #
ich6yf3mo); and

(V)  On or about February 23, 2023, NBA
HOLDINGS, LLC (account -1669) posted a Zelle transfer of $5,000
to an account listed as "ARO Zell" (Zelle Confirmation #
qj85aaguo).

iv.  AGOPIAN received a total of $120,000 from
wire transfers, on the following dates:

(I)  On or about February 1, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $40,000
to AGOPIAN's Citibank account ending in -4814, with AGOPIAN as
the named beneficiary (TRN:2023020100350920 SERVICE
REF:009485 BNF:ALEX AGOPIAN ID:42001584814 BNF BK:CITIBANK, N A.
ID:322271724 PMT DET:423915366); and

(II) On or about February 21, 2023, NBA
HOLDINGS, LLC (account -1669) posted a wire transfer of $80,000
to AGOPIAN's Citibank account ending in -4814, with AGOPIAN as

the named beneficiary (WIRE TYPE:WIRE OUT DATE:230221 TIME:1252
ET TRN:2023022100619375 SERVICE REF:014794 BNF:ALEX AGOPIAN
ID:42001584814 BNF BK:CITIBANK, N A. ID:322271724 PMT
DET:426571026).

  b. NBA HOLDINGS, LLC also had significant money
movement with multiple hospice companies associated with A. A.
KAZARYAN and his family members, including:

   i. On or about February 9, 2022, to November
23, 2022, Blossom Hospice, whose listed CEO is S.Y. (A. A.
KAZARYAN's significant other) deposited $290,650.00 to NBA
HOLDINGS, LLC and on April 28, 2023, Blossom Hospice received
$51,700.00 from NBA HOLDINGS, LLC; and

   ii. On or about May 1, 2022, to November 23,
2022, Benefit Hospice, whose listed CEO is S.Y., deposited
$358,300.00 to NBA HOLDINGS, LLC and received $53,250.00.

  164. Based on my training, experience, and involvement in
this investigation, my knowledge of the Artuni Enterprise and
their involvement in the organized cargo theft of Amazon freight
goods, I believe that BEZIK appears to be the main
administrator/coordinator/accountant of the Amazon related cargo
theft, A. A. KAZARYAN appears to be involved with unloading and
movement of goods, HAZRYAN appears to be involved with storing
goods at the warehouse and selling the goods, and ARTUNI, as the
leader of the enterprise, and AGOPIAN, as a person of prominence
in the enterprise, both receive funds from the proceeds of this
activity.

**P.    Health Care Fraud**

165. Based on my training and experience, my conversations with other law enforcement officers, including L.A. Care, Special Investigations Unit, Investigators Rodriguez and Devine and U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") Special Agent Alfaro, my review of HSI and LAPD reports, and my own involvement in this investigation, I am aware of the following:

a.    HAZRYAN, his significant other (H.K.), BEZIK's girlfriend (N.Y.), and A. A. KAZARYAN's significant other (S.Y.), among others, have conspired to commit and have committed hospice care fraud.  Specifically, they appear to have enrolled unqualified patients in hospice and/or billed for patient services that were not provided.  During this investigation, law enforcement has identified multiple hospice care facilities operated by members of the Artuni Enterprise and/or their significant others to include: (1) Allegiance Hospice Care, Inc., (2) Angeles Family Hospice Care, Inc., and (3) Allegiance Hospice Care, that have seemingly been used to defraud both state and federal health care programs.

b.    The investigation into these hospice care facilities has, in part, revealed that:

i.    For claims that fall under Medi-Cal[107] Health Care benefits, Allegiance Hospice Care, Inc. is listed under

---

[107] According to the California Department of Health Care Services official website, Medi-Cal is California's Medicaid program.  This is a public health insurance program that
*(footnote cont'd on next page)*

N.Y. at 13609 Victory Blvd Ste 247A, Van Nuys, CA 91404. Allegiance Hospice Care billed the State of California a total of $2,320,730.61 and was paid out a total of $2,120,552.08.

ii.  For claims that fall under Medi-Cal Health Care benefits, Angeles Family Hospice Care, Inc. is listed under the name of an individual bearing the initials A.S. at 2505 Foothill Blvd. Ste E., La Crescenta, California 91214.  Angeles Family Hospice Care billed the State of California, a total of $1,248,653.01 and was paid out a total of $20.00.

iii. For claims that fall under MediCare[108] Health Care benefits, Allegiance Hospice Care, Inc., is listed under N.Y. and S.Y., and Angeles Family Hospice Care, Inc. is listed under HAZRYAN.  Allegiance Hospice Care billed the United States, a total of $208,091.22 and was paid out a total of $178,846.49.  Angeles Family Hospice Care billed the United States a total of $5,186,639.15 and was paid out a total of $5,318,631.22.

c.  On or about April 21, 2025, L.A. Care investigators conducted interviews of several purported patients

---

provides needed health care services for low-income individuals including families with children, seniors, persons with disabilities, foster care, pregnant women, and low-income people with specific diseases such as tuberculosis, breast cancer, or HIV/AIDS.  Medi-Cal is financed equally by the state and federal government.

[108] According to the Official Medicare.gov website, Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services.  Medicare is a "health care benefit program, is use by qualifying for medical benefits like benefits but not limited to, inpatient hospital care, skilled nursing facility (SNF) care, home health care, and hospice care persons program.

for Allegiance and Angeles Family Hospice Care providers to inquire about their knowledge of being enrolled in hospice and the need for hospice care health benefits.  At the time the interviews were conducted, four patients for Allegiance Hospice Care were not receiving any type of Hospice services, nor were they terminally ill.  Two patients were receiving hospice services but were not terminally ill.  Two patients were not terminally ill but were promised compensation for their enrollment with Allegiance Hospice Care.  Also, at the time the interviews were conducted, two patients for Angeles Family Hospice Care were not receiving any type of hospice services nor were they terminally ill.  Eight patients were receiving hospice services but were not terminally ill.  One patient was receiving hospice services and was terminally ill.

       d.   Based on my review of evidence seized and documented during the execution of a federal search warrant at HAZRYAN's home on or about December 12, 2023, HSI Special Agents discovered six business checks from Angeles Family Hospice Care, Inc. with payment to Northridge Psychiatry[109] from a JP Morgan Chase Bank Account[110].  There were also three unused business checks from Angeles Family Hospice Care, Inc.

---

[109] Northridge Psychiatry, according to the State of California, Office of the Secretary of State, Statement of Information, lists H.K. (HAZRYAN's significant other) at 10012 Reseda Blvd, Unit A, Northridge, CA 91234 as the Chief Executive Officer.

[110] Based on my discussion with HHS-OIG Special Agent Alfaro, I know that Medicare does not authorize Psychiatric care as part of hospice services, indicating the payments between Angeles Family Hospice Care and Northridge Psychiatry appear to

*(footnote cont'd on next page)*

**Q.    2018 to 2023: "Tribute" Payments to ARTUNI**

166. Based on my conversations with Detective Stupar, my
review of LAPD reports, and my own involvement in this
investigation, I am aware of the following:[111]

    a.    On ARTUNI's iPhone 14 Pro, there were multiple
instances where an individual paid him (either directly or
through his father, V. ARTUNI) large sums of money without
explanation.  For example:

        i.    On or about July 4, 2018, AGOPIAN[112] messages
ARTUNI and tells him that he has $6,250 and that he will bring
it to ARTUNI the following day.

        ii.    On or about October 17, 2018, ARTUNI sends a
picture to AGOPIAN of wire instructions from All Valley Escrow.
AGOPIAN sends a picture of a domestic money transfer that lists
"Alex Agopian 10880 Amidon Place, Tujunga CA 91042" as the money
sender to V. ARTUNI's account and to All Valley Escrow in the
amount of $166,386.52.

        iii. On or about March 3, 2019, AGOPIAN texts
ARTUNI (who in other conversations he refers to as "Santos")
that he will get his money the following day and asks what he
should do with it, seemingly referring to the money.  ARTUNI
responds and asks, how much?  AGOPIAN replies "130000" (meaning

_____

be fraudulent payments made from HAZRYAN to his significant
other.

    [111] Some of these messages are in the Armenian language.  My
summaries are, therefore, based upon translations provided by
Detective Mkrtchyan.

    [112] Based on the content of the message string, law
enforcement determined that the other user was AGOPIAN.

$130,000). ARTUNI then instructs AGOPIAN to give the money to ARTUNI's family (meaning, based on other conversation threads in ARTUNI's cellphone, to his father V. ARTUNI).

iv. On or about October 4, 2020, AGOPIAN sends a photograph of a wire transfer from his significant other (A.P.) to V. ARTUNI.

v. In a Viber message, on or about May 30, 2020, an unidentified person texts ARTUNI that when they come and see him, and they also have someone else that wants to come and will give 50% (seemingly of monetary proceeds) to ARTUNI.

vi. On or about November 27, 2023, ARTUNI sends HAZRYAN (who is listed in his phone under the nickname "Davo") a photograph of a Wells Fargo Wire Transfer Services form showing a transfer from A. A. KAZARYAN's mother to DK9 Inc.,[113] in the amount of $90,000.

b. On one of A. A. KAZARYAN's devices (an iPhone 15 Pro bearing serial number HQ3617Y71M) seized on or about December 12, 2023, he messages with BEZIK[114] about money owed to ARTUNI. For example:

i. On or about October 21, 2022, A. A. KAZARYAN texts BEZIK that ARTUNI called. A. A. KAZARYAN then asks for an update and tells BEZIK, "we owe this guy [ARTUNI] a lot so if you can please give him a call."

_____

[113] DK9, Inc. is listed under the ownership of HAZRYAN's mother (G.G.).

[114] Based on my involvement in this investigation, I am aware that using law enforcement databases, investigators confirmed that the associated number 818-433-8117 was associated with BEZIK.

ii.  On or about January 7, 2023, A. A. KAZARYAN
texts BEZIK and asks for the number to Zelle money to.  BEZIK
provides a number associated with the mother of ARTUNI's
children and states, "Let me know when you send 'zell' to Aro."

c.  HAZRYAN's iPhone 15 Pro also contains references
to tribute payments to ARTUNI.  For example, on or about July
19, 2023, A.T. sends HAZRYAN a screenshot of a text
conversation.  In the screenshot, two of the messages read: "I
tell them Davo [HAZRYAN] called" and "that Ara [ARTUNI] wants
his money".  Based on this message thread, I believe that
HAZRYAN may serve as an enforcer of sorts for ARTUNI and collect
debts owed to him, including payments from members of the Artuni
Enterprise related to its racketeering activity.

167. Based on my training, experience, and involvement in
this investigation, and my conversations with other law
enforcement officers who specialize in Armenian Organized crime,
I believe that the payments to ARTUNI demonstrate his leadership
in the enterprise and in the Armenian criminal community.  In
the Armenian criminal cultural tradition, an *avtoritet* or a *gogh*
would receive payment from underlings and from racketeering
activities of members and associates of the enterprise.  These
large sum payments demonstrate ARTUNI's *avtoritet* status and are
evidence of his leadership in the Armenian criminal community
and of the Artuni Enterprise.

R.  **Felony Criminal Histories**

168. Based on my review of criminal databases and
involvement in this investigation I am aware that the following

185

individuals have been convicted of at least one felony and, therefore, are prohibited from shipping, transporting, possessing, and/or receiving firearms and ammunition.  The felony convictions are as follows:

1.   The Amiryan Organized Crime Group

    a.   *AMIRYAN*

    a.   On or about September 10, 2001, Engaging in the Business of Dealing Firearms without a License, in violation of Title 18 United States Code, Section 922(a), in United States District Court, Central District of California, Case Number 00-CR-1286-CBM.

    b.   *V. HARUTYUNYAN*

    a.   On or about February 24, 1994, two counts of Occupant of Moving Vehicle, Exhibit/Draw Firearm, in violation of California Penal Code Section 417.3, in the Superior Court for the State of California, County of Fresno, Case Number S018599; and

    b.   On or about July 13, 2009, Possession of Assault Weapon, in violation of California Penal Code Section 12280(b); Money Laundering, in violation of California Penal Code Section 186.10(a); and Conspiracy: Commit Crime, in violation of California Penal Code Section 182(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number LACBA33835305.

    c.   *GZRARYAN*

    a.   On or about September 9, 2022, Hit and Run Resulting in Injury, in violation of California Vehicle Code

Section 20001(b)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number BURGA10799101; and

b.    On or about September 29, 2022, Assault with Deadly Weapon: Not Firearm, in violation of California Penal Code Section 245(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number GLNGA11147001.

d.    *STEPANIAN*

a.    On or about August 5, 2004, Grand Theft of Access Cards, in violation of California Penal Code Section 484e(d), in the Superior Court for the State of California, County of Los Angeles, Case Number GA05699302; and

b.    On or about December 6, 2007, Conspiracy to Commit Access Device Fraud, in violation of Title 18 United States Code Section 371; and Fraud with Identification Documents, in violation of Title 18 United States Code Section 1028(a)(1), in United States District Court, District Court of Rhode Island, Case Number 07-CR-94-WES-DLM.

e.    *A. HARUTYUNYAN*

a.    On or about March 17, 2020, Public Company Accounting Reform/Investor Protection Act Of 2002, in violation of Title 18 United States Code, Section 1349, in United States District Court, Central District of California, Case Number 19-CR-287-DMG-5.[115]

---

[115] Based on my knowledge of this investigation, I know that on Pacer, A, HARUTYUNYAN's first name on the docket is listed as "Artur."

    *f. EGUILUZ*

   a. On or about August 12, 2005, Assault w/ Deadly Weapon, in violation of California Penal Code Section 245(b), in the Superior Court for the State of California, County of Los Angeles, Case Number XWESA05816101.

    *g. BOJORQUEZ*

   a. On or about May 19, 2021, Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code Section 11378; Possession of a Controlled Substance with Firearm, in violation of California Health and Safety Code Section 11370.1(A); and Felony Battery, in violation of California Penal Code Section 245(a)(4), in the Superior Court for the State of California, County of Los Angeles, Case Number XSWYA10460801; and

   b. On or about June 6, 2023, Assault with a Deadly Weapon w/ Force, in violation of California Penal Code Section 245(A)(4), in the Superior Court for the State of California, County of Los Angeles, Case Number LACBA50156102.

   2. <u>The Artuni Enterprise</u>

    *a. AGOPIAN*

   a. On or about, October 30, 2014, Grand Larceny: 3rd Degree, in violation of New York Penal Law, Section 155.35 01, in the Supreme Court of the State of New York, County of New York, Case Number 04780-2014; and

   b. On or about, October 30, 2014, Possess Forged Instrument: 2nd Degree, in violation of New York Penal Law,

Section 170.25, in the Supreme Court of the State of New York,
County of New York, Case Number 04780-2014.

b.  *STEPANYAN*

a.  On or about November 15, 2005, Get Credit/Etc:
Use Others ID, in violation of California Penal Code, Section
530.5(A); Use Access Account Infor w/o Consent, in violation of
California Penal Code, Section 484E(D); Force Official Seal, in
violation of California Penal Code, Section 472; Possess
Methaqualone, in violation of California Health and Safety Code,
Section 11350(B); and Possess Concentrated Cannabis, in
violation of California Health and Safety Code, Section
11357(A), in the Superior Court for the State of California, in
Los Angeles County, Case Number GA063152-01;

b.  On or about February 23, 2007, Possess Narcotic
Controlled Substance, in violation of California Health and
Safety Code, Section 11350(A), in the Superior Court for the
State of California, in the County of Los Angeles, Case Number
GLNGA06868101;

c.  On or about February 23, 2007, Possess Narcotic
Controlled Substance, in violation of California Health and
Safety Code, Section 11350(A), in the Superior Court of the
State of California, in the County of Los Angeles, Case Number
GLNGA06825801;

d.  On or about March 12, 2007, Grand Theft:
Money/Labor/Prop, in violation of California Penal Code, Section
487(A) and Petty Theft w/ Prior Jail, in violation of California

Penal Code, Section 666, in the Superior Court of the State of
California, County of Los Angeles, Case Number GA06885501;

      e.  On or about July 3, 2007, Petty Theft w/ Prior
Jail, in violation of California Penal Code, Section 666 and
Possess Narcotic Controlled Substance, in violation of
California Health and Safety Code, Section 11350(A), in the
Superior Court of the State of California, County of Los
Angeles, Case Number GLNGA06958601;

      f.  On or about November 13, 2009, Grand Theft:
Money/Labor/Prop, in violation of California Penal Code, Section
487(A), in the Superior Court of the State of California, County
of Los Angeles, Case Number XNEGA07554902;

      g.  On or about January 13, 2009, Possess Narcotic
Controlled Substance, in violation of California Health and
Safety Code, Section 11350(A), in the Superior Court of the
State of California, County of Los Angeles, Case Number
BURGA07537901;

      h.  On or about November 5, 2012, Transport/Sell
Narcotic Control Substance, in violation of California Health
and Safety Code, Section 11352(A); Poss/Purchase for Sale
Narcotic Control Substance, in violation of California Health
and Safety Code, Section 11351; Poss Controlled Substance while
Armed, in violation of California Health and Safety Code,
Section 11370.1(A); Felon/Addit Poss/Etc Firearm, in violation
of California Penal Code, Section 29800(A)(1); Prohibited
Own/Etc., Ammo/Etc., in violation of California Penal Code
30305(A)(1); Possess Controlled Substance, in violation of

California Health and Safety Code, Section 11377(A), in the
Superior Court of the State of California, County of Los
Angeles, Case Number GLNGA08691101; and

     i.   On or about November 5, 2012, Hit and Run: Death
or Injury, in violation of California Vehicle Code, Section
20001(A); Possess Stolen Vehicle/Vessel/Etc., in violation of
California Penal Code, Section 496d(a); Take Vehicle w/o
Consent/Vehicle Theft, in violation of California Vehicle Code,
Section 10851(a), in the Superior Court of the State of
California, County of Los Angeles, Case Number BURGA08749801.

     *c.*   *MANUKYAN*

     a.   On or about April 10, 2014, Identity Theft, in
violation of California Penal Code Section 530.5(a); and Receipt
of Known Stolen Property, in violation of California Penal Code
Section 496(a), in the Superior Court for the State of
California, County of Los Angeles, Case Number BURGA08955401;

     b.   On or about April 26, 2019, Possession of a
Control Substance for Sale, in violation of California Health
and Safety Code Section 11378, in the Superior Court for the
State of California, County of Los Angeles, Case Number
XNEGA10425202; and

     c.   On or about February 14, 2023, Prohibited Person
in Possession of Ammunition, in violation of California Penal
Code Section 30305(a)(1), in the Superior Court for the State of
California, County of Los Angeles, Case Number BURGA11164101.

d.    *ARAKELYAN*

a.    On or about February 13, 2023, Own/Possession by
Prohibited Person, in violation of Nevada Statue NRS 202.360.1,
in the District Court of the State of Nevada, County of Clark,
Case Number C-20-352231-1;

b.    On or about July 7, 2024, Mail Theft, in
violation of Nevada Statue NRS 205.975.3, in the District Court
of the State of Nevada, County of Clark, Case Number C-24-
381499-1;

c.    On or about October 7, 2008, Distribution of
Methamphetamine, in violation of Title 21 United States Code,
Section 841(a)(1),(b)(1)(A); and Unlawful Use of a Communication
Facility, in violation of Title 21 United States Code Section
843(b), in United States District Court, Eastern District of
Pennsylvania, Case Number 2:06-cr-00226-AB-4; and

d.    On or about October 7, 2008, Conspiracy to
Distribute and Possess with Intent to Distribute
Methamphetamine, in violation of Title 21 United States Code,
Sections 841(a)(1),(b)(1)(A), 846, in United States District
Court, Eastern District of Pennsylvania, Case Number 2:06-cr-
00401-AB-1.

e.    *SEDANO*

a.    On or about May 17, 2007, Vandalism, in violation
of California Penal Code, Section 594(A), in the Superior Court
of the State of California, County of Los Angeles, Case Number
GA06937001;

192

b.   On or about, April 8, 2008, Robbery, in violation
of California Penal Code, Section 211, in the Superior Court of
the State of California, County of Los Angeles, Case Number
LAVLA05797902;

c.   On or about January 31, 2006, Possess Narcotic
Controlled Substance for Sale, in violation of California Health
and Safety Code, Section 11351, in the Superior Court of the
State of California, County of Los Angeles, Case Number
PA054012-01;

d.   On or about April 8, 2011, Vandalism, in
violation of California Penal Code, Section 594(A), w/ (Gang
Enhancement), in the Superior Court of the State of California,
County of Los Angeles, Case Number XNEGA08165801; and

e.   On or about, May 12, 2014, Bring
Alcohol/Drug/Etc. into Prison, in violation of California Penal
Code, Section 4573.5, in the Superior Court of the State of
California, County of San Bernardino, Case Number FSB1204424.

**S.   Alienage**

169. For the Court's convenience, I have prepared the
following charts summarizing the alienage of the non-citizen
targets.  This chart is based on my review of Alien Files (A-
Files) and other documents and records maintained by the DHS.

1.   The Amiryan Organized Crime Group

| Name | Country of Birth | Current U.S. Immigration Status |
|---|---|---|
| AMIRYAN | Armenia | Lawful Permanent Resident |
| V. HARUTYUNYAN | USSR | Lawful Permanent Resident |
| GZRARYAN | Armenia | Illegal Status |

| Name | Country of Birth | Current U.S. Immigration Status |
|------|------------------|--------------------------------|
| STEPANIAN | Armenia | Final Order of Removal Issued |
| A. HARUTYUNYAN | Armenia | Illegal Status |

### 2.    The Artuni Enterprise

| Name | Country of Birth | Current U.S. Immigration Status |
|------|------------------|--------------------------------|
| ARTUNI | Iran[116] | Lawful Permanent Resident |
| MANUKYAN | USSR | Refugee |
| ARAKELYAN | USSR | Final Order of Removal |

170. Based on my review of immigration documents maintained by DHS, I am aware that GZRARYAN, STEPANIAN, A. HARUTYUNYAN, and ARAKELYAN are prohibited from shipping, transporting, possessing, and/or receiving firearms and ammunition given their status in this country as illegal aliens.

**T.    Interstate Nexus of Firearms and Ammunition**

171. Based on my involvement in this investigation, I am aware that ATF Interstate Nexus Experts have examined the firearms and ammunition referenced in this affidavit and, excluding the ghost guns, that is, firearms bearing no manufacturer's mark, confirmed that they were manufactured outside of the State of California. Because the firearms and ammunition were found in California, I believe that they traveled in and affected interstate and foreign commerce.

---

[116] Based on my involvement in this investigation and review of CBP records, I am aware that ARTUNI has routinely flown on an Armenian passport. Accordingly, I believe that ARTUNI was actually born in Armenia.

**U.    Identification of the SUBJECT PREMISES and SUBJECT VEHICLES**

172. Based on my conversations with Detective Stupar, who has liaised with LAPD Major Crimes' Surveillance Support Section ("LAPD SSS"), my review of LAPD surveillance reports, review of cell-site location data obtained via California State search warrants, and my own knowledge of the investigation, I am aware of the following:

1.    AMIRYAN: SUBJECT PREMISES 1 and SUBJECT VEHICLE 1

a.    I am aware that SUBJECT PREMISES 1 is AMIRYAN's current residence and SUBJECT VEHICLE 1 is the vehicle that he is currently using based on the following surveillance and cell-site information as well as his statements to law enforcement:

i.    On or about May 7, 2025, at approximately 10:45 a.m., LAPD SSS saw AMIRYAN's black Lexus bearing California license plate 9LTT595 (SUBJECT VEHICLE 1) pull into the parking garage of 3944 Kentucky Drive, Los Angeles, California 90068.  At the same time, cell-site location data for AMIRYAN's phone number ending in -0909 also showed AMIRYAN at the Kentucky Drive location.

ii.    On or about May 12, 2025, LAPD investigators were analyzing cellphoneAMIRYAN and his significant other's (R.M.) cell-site location data and determined that both phones were near 6446 Deep Dell Place, Los Angeles, California 90068 (SUBJECT PREMISES 1).  Consequently, members of the LAPD Special Investigations Section ("LAPD SIS") set up surveillance around SUBJECT PREMISES 1.  At or around 11:00 a.m., members of LAPD

195

SIS saw a United Postal Service delivery driver deliver a
package to SUBJECT PREMISES 1.  SIS investigators saw
R.M.accept and sign for the package.

       iii. On or about May 12, 2025, LAPD Detectives
Stupar and Kaminski met with AMIRYAN and R.M. regarding a
separate pending LAPD investigation.  AMIRYAN and R.M. arrived
at the meeting in SUBJECT VEHICLE 1.  During the meeting,
AMIRYAN stated that they no longer lived at their previous
address on Kentucky Drive but were staying at a friend's place
for the next month or two.  After the meeting, an LAPD
helicopter assisting LAPD SIS with surveillance observed AMIRYAN
and R.M. return to SUBJECT PREMISES 1 in SUBJECT VEHICLE 1 and
pull into the garage.

      2.   <u>GZRARYAN: SUBJECT PREMISES 2 and SUBJECT VEHICLE
2</u>

    b.  I am aware that SUBJECT PREMISES 2 is GZRARYAN's
current residence and SUBJECT VEHICLE 2 is the vehicle that he
is currently using based on the following surveillance and cell-
site information:

       i.  On or about May 8, 2025, LAPD SSS located
GZRARYAN at Auto Speed LA, a car dealership located at 3343
Foothill Boulevard, La Crescenta, California 91214, which is
GZRARYAN's place of employment.  LAPD SSS saw GZRARYAN driving a
gray 2014 Honda Accord bearing California license plate 7WLR494
(SUBJECT VEHICLE 2) and followed GZRARYAN to 5345 Sepulveda
Boulevard, Sherman Oaks, California 91411, a large apartment
complex.  After LAPD SSS discontinued surveillance, the cell-

site location data for GZRARYAN's cellphone indicated that GZRARYAN's cellphone remained around 5345 Sepulveda Boulevard until approximately 10:45 p.m.  At approximately 11:25 p.m., the cell-site location data for GZRARYAN's cellphone indicated that GZRARYAN's cellphone cell-sitewas at or near 1103 North Maple Street, Burbank, California 91505 (SUBJECT PREMISES 2), an address associated with GZRARYAN's father.

ii.  On or about May 9, 2025, LAPD SSS saw SUBJECT VEHICLE 2 parked in front of SUBJECT PREMISES 2.  At approximately 4:30 p.m., LAPD SSS saw GZRARYAN exit the front of SUBJECT PREMISES 2, enter the driver's seat of SUBJECT VEHICLE 2, and depart the residence.  At approximately 6:55 p.m., the cell-site location data for GZRARYAN's cellphone indicated that GZRARYAN's cellphone cell-sitehad returned to SUBJECT PREMISES 2 and then remained overnight.

iii. On or about May 11, 2025, LAPD SSS saw SUBJECT VEHICLE 2 parked in front of SUBJECT PREMISES 2.  The cell-site location data for GZRARYAN's cellphone also indicated that GZRARYAN's cellphone cell-sitewas at the SUBJECT PREMISES 2.

3.   STEPANIAN: SUBJECT PREMISES 3 and SUBJECT VEHICLES 3, 4 and 5

c.   I am aware that SUBJECT PREMISES 3 is STEPANIAN's current residence and SUBJECT VEHICLES 3, 4, and 5 are vehicles owned and/or used by STEPANIAN based on the following surveillance and cell-site information and well as information provided by United States Postal Inspection Services ("USPIS"):

197

i.   On or about October 1, 2024, a 2024 GMC Hummer EV bearing California license plate number 9NPY868 and registered to STEPANIAN (SUBJECT VEHICLE 3) was parked in the driveway of 4035 Ellenita Avenue, Tarzana, California 91356 (SUBJECT PREMISES 3).  On or about May 8, 2025, LAPD SSS located a blue 2025 BMW iX bearing California license plate number 9NXG011, also registered to STEPANIAN, parked in the driveway of SUBJECT PREMISES 3 (SUBJECT VEHICLE 4).

ii.   According to the California DMV, STEPANIAN is also the registered owner of a black 2025 BMW sedan bearing California license plate number 9SQY613 (SUBJECT VEHICLE 5).

iii. On or about May 9, 2025, investigators with the USPIS, conducted a check on SUBJECT PREMISES 3.  USPIS investigators discovered M.S. (STEPANIAN's daughter) had received parcels at the address as of March 18, 2025, and "Mik STEPANIAN" and  STEPANIAN's significant other (K.P.) had also received parcels at the address as of February 2025.

iv.   On or about May 10, 2025, at approximately 2:45 p.m., LAPD SSS saw K.P. leave SUBJECT PREMISES 3 driving SUBJECT VEHICLE 4.  K.P. returned to SUBJECT PREMISES 3 at approximately 3:10 p.m.  At approximately 4:40 p.m., K.P. exited the residence with two juvenile children and re-entered SUBJECT VEHICLE 4and left the location.

4.   EGUILUZ: SUBJECT PREMISES 4 and SUBJECT VEHICLE 6

d.   I am aware that SUBJECT PREMISES 4 is EGUILIUZ' current residence and SUBJECT VEHICLE 6 is the vehicle that he

198

is currently using based on the following surveillance and cell-site information:

i.    In or around February 2025, EGUILUZ registered a silver 2020 BMW 530i bearing California license plate number 8PLM033 (SUBJECT VEHICLE 6) to 14709 Budlong Avenue, Gardena, California 90247.  According to Accurint, EGUILUZ is associated with 14709 Budlong Avenue, Apartment 305, Gardena, California 90247 (SUBJECT PREMISES 4).

ii.    On or about May 2, 2025, LAPD SSS saw SUBJECT VEHICLE 6 parked at SUBJECT PREMISES 4 in parking spot "O" (the letter).  At approximately 1:45 p.m., LAPD SSS saw SUBJECT VEHICLE 6 leave SUBJECT PREMISES 4.  LAPD SSS saw EGUILUZ driving SUBJECT VEHICLE 6.

iii. Cell-site location data for EGUILUZ's cellphones to date, is consistent with him residing at SUBJECT PREMISES 4, considering location data placing him there at night.

5.    ARTUNI: SUBJECT PREMISES 5

e.    I am aware that SUBJECT PREMISES 5 is ARTUNI's current residence based on the following surveillance information:

i.    On or about May 12, 2023, LAPD SSS saw a black 2021 Chevrolet Suburban bearing California temporary license plate DF14G31 and registered to HAZRYAN (SUBJECT VEHICLE 10) near 19747 Winged Foot Way, Porter Ranch, California 91326 (SUBJECT PREMISES 5).  LAPD SSS followed SUBJECT VEHICLE 10 to a parking area in front of Ali Baba Persian restaurant near

199

Chatsworth Street and Encino Avenue in Granada Hills, California.  At approximately 1:30 p.m., LAPD SSS saw ARTUNI, HAZRYAN, BEZIK, and AGOPIAN exit the restaurant and speak outside.  HAZRYAN entered the driver's seat of SUBJECT VEHICLE 10, AGOPIAN entered the front passenger seat, BEZIK entered behind the driver, and ARTUNI entered behind the front passenger.  SUBJECT VEHICLE 10 departed the restaurant and returned to SUBJECT PREMISES 5, where a silver 2024 Chevrolet Suburban bearing California license plate 9ROW138 (SUBJECT VEHICLE 12) was parked.  BEZIK exited SUBJECT VEHICLE 10 and entered the driver's seat of SUBJECT VEHICLE 12.  AGOPIAN and ARTUNI also exited SUBJECT VEHICLE 10 and got into SUBJECT VEHICLE 12.  The two vehicles departed in tandem.

   f. At approximately 4:20 p.m., SUBJECT VEHICLE 12 returned to SUBJECT PREMISES 5, ARTUNI and AGOPIAN exited the vehicle, and walked towards the front door of the residence. BEZIK departed the location in SUBJECT VEHICLE 12.

   6. AGOPIAN: SUBJECT PREMISES 6 and SUBJECT VEHICLE 7

   g. I am aware that SUBJECT PREMISES 6 is AGOPIAN's current residence and SUBJECT VEHICLE 7 is the vehicle that he is currently using based on the following surveillance and cell-site information and additionally, based on information obtained during his arrest on April 11, 2025:

   i. On or about April 11, 2025, during LAPD SSS surveillance at AGOPIAN's residence, located at 10880 Amidon Place, Tujunga, California 91042 (SUBJECT PREMISES 6), AGOPIAN brandished a firearm at an LAPD SSS member, resulting in

AGOPIAN's arrest by LAPD.  Upon executing a state search warrant at SUBJECT PREMISES 6, law enforcement located several pieces of mail bearing AGOPIAN's name and SUBJECT PREMISES 6's address.  A black Land Rover bearing California license plate 9NVB635 (SUBJECT VEHICLE 7) and registered to AGOPIAN was parked in the driveway.

ii.  According to Los Angeles Department of Water and Power ("LA DWP"), SUBJECT PREMISES 6 has utilities subscribed to A.P., AGOPIAN's significant other.

iii. On or about May 9, 2025, USPIS conducted an address check and discovered that AGOPIAN received a parcel to SUBJECT PREMISES 6 as late as April 26, 2025.

7.    HAZRYAN: SUBJECT PREMISES 7 and SUBJECT VEHICLES 8, 9, and 10

h.  I am aware that SUBJECT PREMISES 7 is HAZRYAN's current residence and SUBJECT VEHICLES 8, 9, and 10 are vehicles owned and/or used by him based on the following surveillance and cell-site information:

i.  On or about May 7, 2025, LAPD SSS saw cell-site location data for H.K., HAZRYAN's significant other, near 11432 Louise Avenue, Granada Hills, California 91344, and saw a black 2024 Land Rover Velar bearing California license plate 9LFD749 and registered to H.K. parked in front of the residence (SUBJECT VEHICLE 9).  LAPD SSS saw H.K. enter the vehicle and followed her to 20648 Pesaro Way, Porter Ranch, California 91326 (SUBJECT PREMISES 7).

ii.  On or about May 9, 2025, LAPD SSS saw
SUBJECT VEHICLE 9 as well as a 2025 Toyota Tundra bearing
California license plate 04340D4 (SUBJECT VEHICLE 8) parked at
SUBJECT PREMISES 7.  At approximately 8:15 a.m., LAPD SSS saw
SUBJECT VEHICLE 8 depart SUBJECT PREMISES 7 and drop off a
juvenile at a local school.  SUBJECT VEHICLE 8 then drove to a
local coffee shop where LAPD SSS saw HAZRYAN exit the driver
seat of the vehicle.

iii. On or about May 12, 2023, as described
above, HAZRYAN was seen driving SUBJECT VEHICLE 10, which is
registered to him with temporary plates, indicating a new
purchase.

8.  <u>STEPANYAN: SUBJECT PREMISES 8 and SUBJECT VEHICLE
11</u>

i.  I am aware that SUBJECT PREMISES 8 is STEPANYAN's
current residence and SUBJECT VEHICLE 11 is the vehicle that he
is currently using based on the following surveillance and cell-
site information:

i.  On or about May 7, 2025, at approximately
5:50 a.m., LAPD investigators saw a white 2023 Mercedes S580
bearing California license plate 9GOF815 and registered to
STEPANYAN (SUBJECT VEHICLE 11) leaving 8007 Cabernet Court, Sun
Valley, California 91352 (SUBJECT PREMISES 8) via pole
camera.  At the same time, cell-site location data for
STEPANYAN's cellphone indicated STEPANYAN's cellphone also
departed the area of SUBJECT PREMISES 8.  LAPD investigators saw

SUBJECT VEHICLE 11 on Flock cameras[117] in the city of Glendale, California consistent with STEPANYAN's cell-site location data at the following times:

(I)  At 7:48 a.m. at northbound North Pacific Avenue at Burchette Street; and

(II) At 7:49 a.m. at the intersection of North Pacific Avenue and West Glenoaks Boulevard.

ii.  At approximately 10:15 a.m., Burbank PD Sergeant Kaefer saw SUBJECT VEHICLE 11 return to SUBJECT PREMISES 8 via pole camera, which was consistent with STEPANYAN's cell-site location data.

9.   A. A. KAZARYAN: SUBJECT PREMISES 9

j.   I am aware that SUBJECT PREMISES 9 is A. A. KAZARYAN's current residence based on the following surveillance and cell-site information:

i.   While monitoring the video feed from a pole camera, Detective Urena saw A. A. KAZARYAN exit the front door of his residence at 10053 Tujunga Canyon, Tujunga, California 91042 (SUBJECT PREMISES 9) on April 30, 2025, at approximately 11:50 a.m.  A. A. KAZARYAN entered a white BMW sedan parked in driveway and departed the residence.  A. A. KAZARYAN returned to SUBJECT PREMISES 9 in the same vehicle at approximately 1:57 p.m.  A. A. KAZARYAN parked in front of the automatic security gate, waited for the security gate to open, and then exited the

---

[117] Based on my training and experience, I am aware that Flock Safety cameras are license plate recognition (LPR) systems, also known as license plate readers, that capture vehicle data and are part of a larger network of cameras.

vehicle and entered the driveway of the residence towards the garage.

   ii. While monitoring the video feed from a pole camera, Detective Urena saw the white BMW pulling out of the driveway of SUBJECT PREMISES 9 on May 8, 2025, at approximately 8:23 a.m.  The white BMW stopped at the apron of the driveway, A. A. KAZARYAN exited the driver's seat, walked up to the driveway, returned to the car and then departed the residence.

   10. <u>BEZIK: SUBJECT PREMISES 10 and SUBJECT VEHICLE 12</u>

   k. I am aware that SUBJECT PREMISES 10 is BEZIK's current residence and SUBJECT VEHICLE 12 is the vehicle that he is currently using based on the following surveillance and cell-site information:

   i. On or about May 10, 2025, LAPD investigators determined that cell-site location data for BEZIK's cellphone was in the area of 19867 Turtle Springs Way, Porter Ranch, California 91326 (SUBJECT PREMISES 10).  LAPD SSS saw a silver 2024 Chevrolet Suburban bearing California license 9ROW138 (SUBJECT VEHICLE 12) parked in the driveway SUBJECT PREMISES 10. At approximately 9:20 a.m., LAPD SSS followed SUBJECT VEHICLE 12 from SUBJECT PREMISES 10, with the assistance of an LAPD airship.  SUBJECT VEHICLE 12 drove to a barbershop located at 217 North Verdugo Road, Glendale, California 91206.  LAPD SSS positively identified BEZIK as the driver of SUBJECT VEHICLE 12 at the barber shop.

   ii. On or about May 11, 2025, LAPD SSS saw SUBJECT VEHICLE 12 parked in the driveway of SUBJECT PREMISES

10.  At approximately 9:20 a.m., LAPD SSS saw BEZIK drive SUBJECT VEHICLE 12 out of the neighborhood with an unidentified female front passenger.  At approximately 12:00 p.m., LAPD SSS saw SUBJECT VEHICLE 12 return to the neighborhood.  At approximately 12:43 p.m., LAPD SSS saw SUBJECT VEHICLE 12 travel to Chevron located at 11240 Tampa Avenue, Northridge, California 91326 and saw that BEZIK was the driver of SUBJECT VEHICLE 12.

11.  <u>MANUKYAN: SUBJECT PREMISES 11 and SUBJECT VEHICLE 13</u>

l.  I am aware that SUBJECT PREMISES 11 is MANUKYAN's current residence and SUBJECT VEHICLE 13 is the vehicle that he is currently using based on the following surveillance and cell-site information:

i.  On or about May 8, 2025, Sergeant Kaefer saw MANUKYAN driving a red Toyota Camry bearing California license plate 6RBU664 and registered to Knarik Vahanyan at 12770 Cohasset Street, North Hollywood, California (SUBJECT VEHICLE 13) and park at 6653 Cedros Avenue, Van Nuys, California 91605 (SUBJECT PREMISES 11).  Later that afternoon, cell-site location data for MANUKYAN placed him near 638 Price Drive, Burbank, California 91504, his previous residence and the home of his parents.  Burbank PD detectives saw SUBJECT VEHICLE 13 parked at the residence.

ii.  On or about May 9, 2025, Sergeant Kaefer saw SUBJECT VEHICLE 13 parked in front of SUBJECT PREMISES 11.  At approximately 7:30 a.m., Burbank PD Detective T. Murphy saw MANUKYAN appear at the rear of the residence, walk down the

driveway and out through the white metal gate.  MANUKYAN placed a black backpack and gray plastic bag into the backseat of SUBJECT VEHICLE 13, entered the driver's seat, and departed the location.

iii. Since on or about May 1, 2025, cell-site location data has consistently placed MANUKYAN at SUBJECT PREMISES 11 during nighttime hours.

12.  SEDANO: SUBJECT PREMISES 12 and SUBJECT VEHICLE 14

m.  I am aware that SUBJECT PREMISES 12 is SEDANO's current residence and SUBJECT VEHICLE 14 is the vehicle that he is currently using based on the following surveillance and cell-site information:

i.  According to California DMV, SEDANO's residential address is 8641 Glenoaks Boulevard, Apartment 132, Sun Valley, California 91352 (SUBJECT PREMISES 12).  He is also the registered owner of a gray 2007 Toyota Camry bearing California license plate 5ZWX352 registered at SUBJECT PREMISES 12 (SUBJECT VEHICLE 14).

ii.  According to license plate reader data, SUBJECT VEHICLE 14 was seen parked on the street near SUBJECT PREMISES 12 on more than 15 occasions in the month of April 2025.

iii. On pole camera footage from April 28, 2025, Detective Urena saw SEDANO exit the front gate of SUBJECT PREMISES 12, enter SUBJECT VEHICLE 14, and depart the area. Approximately ten minutes later, Detective Urena saw SUBJECT

VEHICLE 14 return to park in front of SUBJECT PREMISES 12,
SEDANO exit the vehicle, and enter SUBJECT PREMISES 12 through
the main gate.

   iv. On pole camera footage from May 2, 2025,
Detective Urena saw SEDANO exit the main entrance of SUBJECT
PREMISES 12, enter the SUBJECT VEHICLE 14, and depart the area.

### XIV. <u>TRAINING AND EXPERIENCE REGARDING THEFT OF INTERSTATE OR FOREIGN SHIPMENTS</u>

173. Based on my training and experience and information
obtained from other law enforcement officers who investigate
crimes involving the theft of interstate of foreign shipments, I
am aware the following:

   a. People involved in theft of interstate or foreign
shipment often utilize other personal identifying information
(such as names, Social Security numbers, and dates of birth),
identification documents belonging to other people that they can
use to fraudulently, and email accounts associated to
transportation carries to bid and obtain carrier contracts from
manufactures and/or retail stores to execute the shipment of
goods.  It is a common practice for those involved in such
crimes to use either false identification or stolen real
identification to bid and obtain carrier contracts to avoid
detection and to complete the transaction.

   b. It is common practice for individuals involved in
theft of interstate or foreign shipment crimes to possess and
use multiple digital devices at once.  Such digital devices are
often used to facilitate, conduct, and track fraudulent

transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) creating fraudulent carrier/transportation shell companies; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent accounts for carrier/transportation shell companies; (3) using fraudulently obtained carrier/transportation shell companies to bid on and win shipping contracts and/or for the purpose of pilfering portions of the goods being transported or theft of the entirety of the goods being transported; and (4) coordinating with co-conspirators.

   c. Based on my training and experience, I am aware that individuals who participate in crimes involving the theft of interstate of foreign shipments often also engage in identity theft.  They often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

   d. Based on my training and experience, I am aware that individuals who participate in the theft of interstate

shipments commonly store the stolen items in their vehicles, residences, or warehouse locations.

## XV. TRAINING AND EXPERIENCE REGARDING HEALTH CARE FRAUD

174. Based on my training, experience, discussions with other agents and Medicare fraud investigators, and review of applicable laws and regulations, I am aware that Medicare is a federally funded health care benefit program for individuals over 65 and disabled persons, which operates as described below:

a.    Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b) and a "federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

b.    Individuals who qualify for Medicare benefits are referred to as Medicare "beneficiaries." Each beneficiary is given a unique health insurance claim number ("HICN").

c.    Physicians, hospices, and other health care providers that provide medical services that are reimbursed by Medicare are referred to as Medicare "providers." To participate in Medicare, providers are required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations, including the Federal anti-kickback statute. If Medicare approves a provider's application, Medicare assigns the provider a Medicare "provider number," which is used for the processing and payment of claims. In addition, providers often submit an Electronic Funds Transfer

("EFT") Authorization form as part of the Medicare enrollment package, which allows Medicare to send payments directly to a provider's financial institution, whether claims are filed electronically or on paper.

d.    A health care provider with a Medicare provider number can submit claims to Medicare to obtain reimbursement for services rendered to beneficiaries.

e.    Most providers submit their claims electronically pursuant to an agreement they execute with Medicare in which the providers agree that they are responsible for all claims submitted to Medicare by themselves, their employees, and their agents; that they will submit claims only on behalf of those Medicare beneficiaries who have given their written authorization to do so; and that they will submit claims that are accurate, complete, and truthful.

175. Based on my training and experience, investigation in this case, and from information provided to me from other agents and officers in this investigation that the Medi-Cal program is a state-administered program, funded by both the state and federal governments, so it is also federally funded health insurance program, as defined by 18 U.S.C. § 24(b), that operates as described below:

a.    Medi-Cal provides coverage for essential medical care and services for California's qualifying indigent, elderly, disabled, and refugees.  These covered individuals are also referred to herein as "beneficiaries" or "patients." Medi-Cal

reimburses health care providers providing medically necessary treatment and services to Medi-Cal beneficiaries.

b.    Medi-Cal is regulated by the California Department of Health Care Services ("DHCS"), which promulgates rules for the administration of the program.  DHCS authorizes provider participation, determines beneficiary qualification, and issues Medi-Cal eligibility cards to beneficiaries for their use to obtain goods and services from Medi-Cal providers.

c.    Medi-Cal providers (such as physicians, pharmacies, durable medical equipment suppliers, etc.) participate in Medi-Cal on a voluntary basis and are not government employees.  Beneficiaries present their Medi-Cal eligibility cards to the providers for goods and services. Providers typically photocopy these cards, which contain information such as the beneficiary identification number, name, and date of birth.  This information enables providers to bill Medi-Cal for services and goods, including prescriptions, rendered by the provider to the beneficiaries.

d.    Health care providers receive direct reimbursement from Medi-Cal by applying to Medi-Cal and receiving a Medi-Cal provider number.  To obtain payment for services, an enrolled provider, using its unique provider number, submits claims to Medi-Cal certifying that the information on the claim form is truthful and accurate and that the services or goods provided were reasonable and necessary to the health of the Medi-Cal beneficiary.  Claims are mailed or transmitted electronically by providers to DHCS's contracted

fiscal intermediary, currently Electronic Data Systems, which processes claims on behalf of Medi-Cal.  Once claims have been through an edits and audits review, then EDS informs DHCS and the State Controller's Office.  The Controller's Office then sends payment to the provider in the form of a California State Warrant (similar to a bank check).

176. Based on my training and experience, I am aware that individuals who participate in health care fraud commonly store documents and items related to their fraudulent scheme in their vehicles and residences, as well as on their persons, including on digital devices.

## XVI.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

177. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices, vehicles, and residences.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful purchase of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

XVII.    __TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES__

178. Based on my training and experience, as well as my familiarity with investigations conducted by other law

213

enforcement officers into racketeering enterprises, including
those engaged in murder (and similar acts of violence), money
laundering, fraud, and other racketeering activity conducted by
criminal enterprises ("Racketeering Activity"), I am aware of
the following:

      a.   Racketeering Activity involves numerous
participants operating in either a "flat" or hierarchical
structure.  When transnational criminal organizations are the
proponents of such Racketeering Activity, the participants, who
are both members and non-members of the racketeering enterprise,
tend to operate across the globe in multiple territories.

      b.   Criminal enterprises may sell narcotics, create
illegitimate businesses, launder the proceeds of their illicit
activities, commit theft, commit acts of violence, and engage in
other criminal conduct, like fraud.

      c.   Criminal enterprise members and associates will
often take and share photographs and videos of their illicit
activities using their digital devices.

      d.   Criminal enterprise members and associates often
maintain books, receipts, notes, ledgers, bank records, and
other records relating to their Racketeering Activity.  Such
records are often maintained where the criminal enterprise
member has ready access to them, such as in their homes, their
places of business, in their vehicles, on their persons, and in
their cellphones and other digital devices.  Additionally, I am
aware that individuals engaged in racketeering enterprises often
keep such evidence for long periods of time, including in

storage on their digital devices that they keep in close proximity, for extended periods of time, including in their homes, their places of business, and on their persons.

       e.    Communications between enterprise participants, as well as from victims of Racketeering Activity, often take place by telephone calls and messages, such as e-mail, text messages, the exchange of photographs and videos, and social media messaging applications, sent to and from cellphones and other digital devices.

       f.    Criminal enterprise members and associates often keep the names, addresses, and telephone numbers of those involved in their Racketeering Activity on their digital devices and in their vehicles and residences. Criminal enterprise members and associates often keep records of meetings with others engaged in illicit criminal activity, including in the form of notes, calendar entries, and location data.

       g.    Criminal enterprise members and associates often possess firearms to protect and advance their Racketeering Activity. Criminal enterprise members and associates often keep information regarding their firearms on their digital devices, including contacts that can provide firearms and photographs of firearms they possess and use.

## XVIII.    <u>TRAINING AND EXPERIENCE ON HOMICIDE, KIDNAPPING, AND OTHER VIOLENT OFFENSES</u>

    179. Based on my training and experience, and the training and experience of other agents with greater involvement in murder investigations, I am aware of the following:

a.    Individuals who commit homicides, kidnapping, and other violent crimes or seek the assistance of others in committing homicides, kidnapping, and other violent crimes or concealing the evidence of homicides often maintain materials about their intended victims in their residences or places of business, in their vehicles, on their persons, and on their digital devices, and often for long periods of time.  This information could include information about or photographs of their intended victims, their home addresses, information about places they frequent, or the motive behind such intended homicide.  It could also include information about the victims' family members, communication with or from the victims' friends or family, or other information that could be used to carry out or conceal the murder.

b.    It is also common for individuals who have committed a homicide, kidnapping, or other violent crime, or attempted to do so, to search social media or the internet using their digital devices to determine what investigators, news sources, or social media users know and/or are disseminating about the facts of the murder.  Individuals who commit homicides will often do so in an attempt to determine what potential evidence may be used against them, to determine whether or not they are suspected of committing the murder, and if and how the suspect can formulate a plausible alibi or explanation for the involvement with the victim.

216

## XIX.  TRAINING AND EXPERIENCE REGARDING BANK FRAUD, WIRE FRUAD, IDENTITY THEFT, AND ACCESS DEVICE FRAUD

180. Based on my training and experience and information obtained from other law enforcement officers who investigate bank fraud and identity theft crimes, I am aware of the following:

a.  People involved in bank fraud, wire fraud, identity theft, and access device fraud crimes often collect checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents belonging to other people that they can use to fraudulently obtain money and items of value.  It is a common practice for those involved in such crimes to use either false identification or stolen real identification to make purchases with stolen access devices at in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such fraudulent transactions on their persons, including their digital devices, as well as in their vehicles, residences, and places of business.

b.  It is common for identity thieves, and individuals engaged in bank fraud, wire fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital

devices, such as computers.  Such equipment and software are
often found in the thieves' possession as they can be small and
easily portable.

       c.   It is common practice for individuals involved in
identity theft, bank fraud, wire fraud, and access device fraud
crimes to possess and use multiple digital devices at once.
Such digital devices are often used to facilitate, conduct, and
track fraudulent transactions and identity theft.  Suspects
often use digital devices to perpetrate their crimes due to the
relative anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) applying online
for fraudulent credit cards; (2) obtaining or storing personal
identification information for the purpose of establishing or
modifying fraudulent bank accounts and/or credit card accounts;
(3) using fraudulently obtained bank accounts and/or credit card
accounts to make purchases, sometimes of further personal
information; (4) keeping records of their crimes; (5)
researching personal information, such as social security
numbers and dates of birth, for potential identity theft
victims; (6) verifying the status of stolen access devices; and
(7) coordinating with co-conspirators.

       d.   Based on my training and experience, I am aware
that individuals who participate in identity theft, bank fraud,
wire fraud, and access device fraud schemes often have co-
conspirators, and often maintain telephone numbers, email
addresses, and other contact information and communications

involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## XX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[118]

181. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[118] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

182. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

183. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AMIRYAN, GZRARYAN, STEPANIAN, EGUILUZ, ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, A. A. KAZARYAN, BEZIK, MANUKYAN, and SEDANO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of AMIRYAN, GZRARYAN, STEPANIAN, EGUILUZ, ARTUNI, AGOPIAN, HAZRYAN, STEPANYAN, A. A. KAZARYAN, BEZIK, MANUKYAN, and SEDANO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

222

184. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## XXI. <u>TIME OF EXECUTION OF WARRANTS</u>

185. I seek permission to execute these warrants at any time in the day or night. Given that the target persons and other persons at the SUBJECT PREMISES are likely armed, night service will provide a tactical advantage to law enforcement when executing the search warrant. Night service will also better ensure the safety of the executing law enforcement personnel, residents, neighbors, passerby, and other members of the community.

## XXII.   <u>CONCLUSION</u>

186. For all of the reasons described above, there is probable cause to believe the following:

a. AMIRYAN, V. HARUTYUNYAN, GZRARYAN, STEPANIAN, A. HARUTYUNYAN, BOJORQUEZ, and EGUILUZ violated 18 U.S.C. § 1201(a)(1): Kidnapping;

b. ARTUNI, HAZRYAN, STEPANYAN, and SEDANO violated 18 U.S.C. § 1959(a)(5): Attempted Murder in Aid of Racketeering Activity (on or about July 7, 2023);

c. AGOPIAN (Kimber 1911, model Custom TLE II, .45 caliber, semi-automatic pistol bearing serial number K707215), MANUKYAN (Ruger, model 10/22, .22 caliber rifle, bearing serial number 129-54711), and ARAKELYAN (Glock, model 29 Gen4, 10mm Auto caliber, pistol bearing serial number BRRT964), violated 18 U.S.C. § 922(g): Felon in Possession of a Firearm;

223

d.    A. A. KAZARYAN and BEZIK violated 18 U.S.C.
§§ 659, 371: Conspiracy to Commit Theft of Interstate Shipments
(NBA HOLDINGS, LLC);

187. Further, there is probably cause to believe that the
times listed in:

a.    Attachment B-1, which constitute evidence,
fruits, and instrumentalities of violations of the AMIRYAN Group
Subject Offenses will be found at, in, or on AMIRYAN, SUBJECT
PREMISES 1, and SUBJECT VEHICLE 1, as described in Attachments
A-1, A-2, and A-3.  Attachment B-2, which constitutes the person
of AMIRYAN, will be found at or in SUBJECT PREMISES 1, as
described in Attachment A-2.  Attachment B-3, which constitutes
a sample of DNA, should be obtained from AMIRYAN, as described
in Attachment A-1, for evidence relating to violations of
AMIRYAN's Subject Offenses.

b.    Attachment B-1, which constitute evidence,
fruits, and instrumentalities of violations of the AMIRYAN Group
Subject Offenses will be found at, in, or on GZRARYAN, SUBJECT
PREMISES 2, and SUBJECT VEHICLE 2, as described in Attachments
A-4, A-5, and A-6.  Attachment B-4, which constitutes the person
of GZRARYAN, will be found at or in SUBJECT PREMISES 2, as
described in Attachment A-5.  Attachment B-3, which constitutes
a sample of DNA, should be obtained from GZRARYAN, as described
in Attachment A-4, for evidence relating to violations of
GZRARYAN's Subject Offenses.

c.    Attachment B-1, which constitute evidence,
fruits, and instrumentalities of violations of the AMIRYAN Group

Subject Offenses will be found at, in, or on STEPANIAN, SUBJECT PREMISES 3, and SUBJECT VEHICLE 3, 4, and 5 as described in Attachments A-7, A-8, A-9, A-10, and A-11.  Attachment B-5, which constitutes the person of STEPANIAN, will be found at or in SUBJECT PREMISES 3, as described in Attachment A-8. Attachment B-3, which constitutes a sample of DNA, should be obtained from STEPANIAN, as described in Attachment A-7, for evidence relating to violations of STEPANIAN's Subject Offenses.

d.    Attachment B-1, which constitute evidence, fruits, and instrumentalities of violations of the AMIRYAN Group Subject Offenses will be found at, in, or on EGUILUZ, SUBJECT PREMISES 4, and SUBJECT VEHICLE 6, as described in Attachments A-12, A-13, and A-14.  Attachment B-6, which constitutes the person of EGUILUZ, will be found at or in SUBJECT PREMISES 4, as described in Attachment A-13.  Attachment B-3, which constitutes a sample of DNA, should be obtained from EGUILUZ, as described in Attachment A-12, for evidence relating to violations of EGUILUZ' Subject Offenses.

e.    Attachment B-7, which constitute evidence, fruits, and instrumentalities of violations of ARTUNI's Subject Offenses will be found at, in, or on ARTUNI and SUBJECT PREMISES 5, as described in Attachments A-15 and A-16.  Attachment B-8, which constitutes the person of ARTUNI, will be found at or in SUBJECT PREMISES 5, as described in Attachment A-16.  Attachment B-3, which constitutes a sample of DNA, should be obtained from ARTUNI, as described in Attachment A-15, for evidence relating to violations of ARTUNI's Subject Offenses.

f.    Attachment B-9, which constitute evidence, fruits, and instrumentalities of violations of AGOPIAN's Subject Offenses will be found at, in, or on AGOPIAN, SUBJECT PREMISES 6, and SUBJECT VEHICLE 7, as described in Attachments A-17, A-18, and A-19.  Attachment B-10, which constitutes the person of AGOPIAN, will be found at or in SUBJECT PREMISES 6, as described in Attachment A-18.  Attachment B-3, which constitutes a sample of DNA, should be obtained from AGOPIAN, as described in Attachment A-17, for evidence relating to violations of AGOPIAN's Subject Offenses.

g.    Attachment B-11, which constitute evidence, fruits, and instrumentalities of violations of HAZRYAN's Subject Offenses will be found at, in, or on HAZRYAN, SUBJECT PREMISES 7, and SUBJECT VEHICLE 8, 9, and 10, as described in Attachments A-20, A-21, A-22, A-23, and A-24.  Attachment B-12, which constitutes the person of HAZRYAN, will be found at or in SUBJECT PREMISES 7, as described in Attachment A-21.  Attachment B-3, which constitutes a sample of DNA, should be obtained from HAZRYAN, as described in Attachment A-20, for evidence relating to violations of HAZRYAN's Subject Offenses.

h.    Attachment B-13, which constitute evidence, fruits, and instrumentalities of violations of STEPANYAN's Subject Offenses will be found at, in, or on STEPANYAN, SUBJECT PREMISES 8, and SUBJECT VEHICLE 11, as described in Attachments A-25, A-26, and A-27.  Attachment B-14, which constitutes the person of STEPANYAN, will be found at or in SUBJECT PREMISES 8, as described in Attachment A-26.  Attachment B-3, which

constitutes a sample of DNA, should be obtained from STEPANYAN,
as described in Attachment A-25, for evidence relating to
violations of STEPANYAN's Subject Offenses.

      i.   Attachment B-15, which constitute evidence,
fruits, and instrumentalities of violations of A. A. KAZARYAN's
Subject Offenses will be found at, in, or on A. A. KAZARYAN and
SUBJECT PREMISES 9, as described in Attachments A-28, A-29.
Attachment B-16, which constitutes the person of A. A. KAZARYAN,
will be found at or in SUBJECT PREMISES 9, as described in
Attachment A-29.  Attachment B-3, which constitutes a sample of
DNA, should be obtained from A. A. KAZARYAN, as described in
Attachment A-28, for evidence relating to violations of A. A.
KAZARYAN's Subject Offenses.

      j.   Attachment B-17, which constitute evidence,
fruits, and instrumentalities of violations of BEZIK's Subject
Offenses will be found at, in, or on BEZIK, SUBJECT PREMISES 10,
and SUBJECT VEHICLE 9, as described in Attachments A-30, A-31,
and A-32.  Attachment B-18, which constitutes the person of
BEZIK, will be found at or in SUBJECT PREMISES 10, as described
in Attachment A-31.  Attachment B-3, which constitutes a sample
of DNA, should be obtained from BEZIK, as described in
Attachment A-30, for evidence relating to violations of BEZIK's
Subject Offenses.

      k.   Attachment B-19, which constitute evidence,
fruits, and instrumentalities of violations of MANUKYAN's
Subject Offenses will be found at, in, or on MANUKYAN, SUBJECT
PREMISES 11, and SUBJECT VEHICLE 13, as described in Attachments

A-33, A-34, and A-35.  Attachment B-20, which constitutes the person of MANUKYAN, will be found at or in SUBJECT PREMISES 11, as described in Attachment A-34.  Attachment B-3, which constitutes a sample of DNA, should be obtained from MANUKYAN, as described in Attachment A-33, for evidence relating to violations of MANUKYAN's Subject Offenses.

l.    Attachment B-21, which constitute evidence, fruits, and instrumentalities of violations of SEDANO's Subject Offenses will be found at, in, or on SEDANO, SUBJECT PREMISES 12, and SUBJECT VEHICLE 14, as described in Attachments A-36, A-37, and A-38.  Attachment B-22, which constitutes the person of SEDANO, will be found at or in SUBJECT PREMISES 12, as described in Attachment A-37.  Attachment B-3, which constitutes a sample of DNA, should be obtained from SEDANO, as described in Attachment A-36, for evidence relating to violations of SEDANO's Subject Offenses.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 15th day of May, 2025.

_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE